UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

UNIVERSITAS EDUCATION, LLC,

       Petitioner,

   -v-

NOVA GROUP, INC.,

       Respondent.

--------------------------------------------------------x

NOVA GROUP, INC.,

       Petitioner,

   -v-

UNIVERSITAS EDUCATION, LLC,

       Respondent.

--------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: JUN 1 9 2014

No. 11 Civ. 1590 (LTS)(HBP)

No. 11 Civ. 8726 (LTS)(HBP)

ORDER

The attached ex parte submission from Mr. Carpenter was received today. The requests are denied, without prejudice to action by Mr. Carpenter's counsel of record.

       SO ORDERED.

Dated: New York, New York
     June 19, 2014

                         _____
                         LAURA TAYLOR SWAIN
                         United States District Judge

DANIEL E. CARPENTER
18 PONDSIDE LANE
WEST SIMSBURY, CT 06092

June 13, 2014

Honorable Laura Taylor Swain
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007



RECEIVED

JUN 1 9 2014

CHAMBERS OF
LAURA TAYLOR SWAIN
U.S.D.J.

**Re:    Please Remove Carpenter Injunction**

Dear Judge Swain:

Next week I am scheduled to report to prison for a non-crime, that I certainly did not commit fourteen years ago because I allegedly did not tell people that I never met how their funds would be invested. The reason? Simply because the prosecutors in Boston have used **your** negative words about me in two opinions to convince Judge O'Toole in Boston to revoke my bail pending appeal because I am a "danger to society" simply because counsel for Universitas has falsely accused me of effectively stealing life insurance proceeds from their specious charity. So that I may properly defend myself, I would respectfully beseech the Court to immediately do three things:

1. Please amend and reissue the Court's orders without the negative language about me, which is both unwarranted and based on false statements and misrepresentations given to the Court by Counsel for Universitas.

2. Please rescind and revoke the letter order to Attorney Pastore dated March 12, 2014, holding up payment of the Merrill Lynch settlement proceeds, because Attorney

Pastore has withdrawn from the case, settled with Universitas, and left me and my company Boston Property Exchange Transfer Company, Inc. (BPETCO) defenseless and unrepresented. Attorney Pastore had no basis for sending his letter to Your Honor in the first place, because the Universitas Injunction is very clear that it prevents me from **spending** more than $20,000 per month, which I have abided by religiously, but nowhere in the Injunction does it prohibit any Carpenter-controlled company from **receiving** money. Universitas has now twice tortiously interfered with companies not even listed in the original petition by simply sending letters to Your Honor. No service of process, no summons and complaint, and certainly no jurisdictional analysis. These are the fundamental cornerstones of due process.

3. I would also beg Your Honor to rescind and revoke the Injunction Order of January 13, 2014 for the reasons I will share with you below. As Your Honor knows well by now, all of the Charter Oak Trust money was spent by October of 2009. The last of the money was transferred to Grist Mill Capital, LLC, pursuant to a Confidential Settlement and Indemnity Agreement dated October 26, 2009 attached here as Exhibit One. Universitas has a copy of this document; as does the AUSA who recently indicted me on "money-laundering" charges because of the Sash Spencer death proceeds. The investigation of the Charter Oak Trust began on May 26, 2011 with a commando raid on our peaceful office in Simsbury, Connecticut. Judge Stefan Underhill of Connecticut remarked that there were three times as many **armed** federal agents at our offices than were used to take out Osama bin Laden.

I would respectfully ask Your Honor to do these three things immediately in the interests of justice pursuant to the Court's own supervisory powers, if for no other reason than so that I might provide for my family and take care of any outstanding business issues before I have to report. Moreover, let's make this a fair fight. If Universitas thinks I have done anything wrong, let them come to Connecticut to sue me. Tony Zelle and the Boston Exchangors will not come to Connecticut because I received a unanimous victory in the Connecticut Supreme Court against them in 2006.

Also, please extend my sincerest apologies to Magistrate Pitman, who I know believes that the people associated with the Charter Oak Trust were dilatory in every way possible throughout discovery. But, it really wasn't anyone's fault, and now that Wayne Bursey and I have both been indicted regarding the Charter Oak Trust and the government has threatened to indict several other people, I feel that you could tell Magistrate Pitman that this is one time where people were wise to take the Fifth. And, I totally understand why you feel that my testimony was "self-serving" and "incredible" after me taking the Fifth, because that is what has happened to me for 14 years in Boston. In fact, the same Exchangor clients that I lost $8 million for in the stock market crash of 2000 have now been repaid over $50 million in my legal victories against PaineWebber and Merrill Lynch. Merrill's attorney John Snyder referred to me as the "Master of Deception," and Universitas had you quoting John Snyder's lies from 12 years ago in Boston. Now, as of last Friday, Snyder and Bingham are facing $120 million in damages and sanctions for their lies, withholding evidence, destruction of evidence, and coaching all the Merrill witnesses to lie about me and the nature of BPETCO. It is clear from the Massachusetts

decision that Merrill's John Snyder is the real "Master of Deception." I have attached a copy of the appeals court's decision as Exhibit Two.

In the same light, please read the Exchangors' lawsuit against Merrill filed in February of 2008 attached as Exhibit Three that I did not receive a copy of until July of 2009, a year after my second trial in Boston ended in 2008. You will see my name is not even mentioned, and that we were totally up front in our dealings with Merrill in saying that we were investing other people's money – not our own. This is important evidence that was withheld from us by not only the government, but the Exchangors, and Merrill Lynch as well. I never appeared at or testified at the trials in Boston, so it was easy for Merrill's attorneys to make me out as the "bad guy" and Universitas literally copied all of the bad things said about me by the Exchangors and Merrill Lynch. Suffice it to say, my indictment from 10 years ago would not pass the *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), tests for even a breach of contract. You yourself would dismiss the complaint for failure to plead fraud with particularity as required by Rule 9(b) – "the who, what, where, when" of fraud. Do you see any fraud in the Exchangors' February 2008 lawsuit? Neither do I.

The simple truth is that I was a victim of prosecutorial misconduct in my first trial in 2005 that was a part of the USA Today study of September 22, 2010 (*see Prosecutors' Conduct Can Tip Justice Scales*, USA Today, September 22, 2010). The prosecutorial misconduct was even more egregious in my second trial in 2008. So much so that I was awarded a new trial for a second time in 2011, which the government appealed and after several trips to the Supreme Court over a two year period, the government was able to overturn my new trial order at the end

of November 2013. This gave the AUSA in Connecticut courage to indict me for another non-crime a month later in December 2013 for events happening between 2006-2008.

My arraignment was on January 17, 2014, just days after Your Honor's Injunction of January 13th. As Your Honor knows well, most arraignments take 5-10 minutes. My arraignment took three hours because Mr. Barnett, counsel for Universitas, was passing up notes to the AUSA as if they were still in High School together. Moreover, Ms. Colbath had sent a letter, attached as Exhibit Four, which literally threatened the government to not allow my own wife to post her family's old homestead, which she owns 100% of, as surety for her husband's bail. When the AUSA demanded more collateral for my bail, my daughter volunteered her newly-purchased home, bought by her new husband as collateral for my bail. Your Honor, there was not a dry eye in the courtroom. When the AUSA rose to demand more, Magistrate Martinez told him to sit down, and promptly said: "I refuse to believe that Mr. Carpenter is a flight risk that would leave his wife of 32 years or his only daughter homeless. Bail is satisfied."

Mr. Barnett then sent up more notes to the AUSA in order to make sure that Your Honor's Injunction was included as one of the court orders I had to obey, as in all court orders by a federal court – and I have dutifully reported all expenditures according to the Injunction order. But, that did not satisfy the counsel for Universitas.

The reason I am forced to correspond with Your Honor in this unorthodox manner is that I have no one helping me in New York. My wife is paying for my legal representation in Boston and in Hartford, but **no one** will even speak to her, much less take money from her to represent me in New York for fear of being sued by Ms. Colbath and Loeb & Loeb.

Because of the Universitas Injunction, I am unable to pay for **any** legal counsel and, more significantly, because of all of the restraining letters sent threatening legal action to recover any money paid to any of the 30 law firms that Ms. Colbath and Mr. Barnett have contacted, I cannot even get a return phone call from firms that I have paid significant sums to in the past. I have included one such letter (attached as Exhibit Five) to Gregory Garre of Latham & Watkins, who was a former Solicitor General of the United States. I tried several other Washington, D.C. firms to represent me in the Supreme Court appeal of the government overturning my new trial order, but it is clear that the Supreme Court community is small and tight-knit, and if Carpenter had used Latham four times in the past, why aren't they helping him now. Even attorneys who are friends of mine at big firms have politely turned me down.

I am not exaggerating that good friends at major law firms do not return my phone calls. Neither my wife nor I are kept up to date with the proceedings in Your Honor's own Court, even though the case is supposedly all about me. Please feel free to ask the attorneys that show up, whenever the hearing about my Injunction is, when was the last time you sat down with or talked to Mr. Carpenter? I believe Your Honor will be surprised to learn that I am not the "Master of Deception" that controls all of the companies of the world. I do not have PACER or ECF and no one returns my phone calls.

Finally, Your Honor, let me say that I am doubly hurt by the negative comments that you have made about me in your findings. First, because I believe with every fiber of my being that I am an honest businessman who has done nothing wrong, much less illegal. Second, I was the only person that testified at that hearing and I testified for four hours without anyone contradicting anything that I said. I even believe that Your Honor smiled at me several times

believing what I said, and nodding at me with judicial approval. I swore to tell the truth, and I

believe that I have told the God's honest truth. Now it appears that I failed in Your Honor's

estimation, and the government has used Your Honor's words against me in several different

proceedings.

Therefore, if Your Honor would be kind enough to hit the "RESET" button and let us

start over. Please rescind the Attorney Pastore letter as well as the January 13, 2014 Injunction

order, I will then be happy to file a series of Rule 60(b)(1) motions to show the information that

may have been incomplete or missing; a Rule 60(b)(3) Motion to show the blatant frauds on the

Court committed by Ms. Colbath and Mr. Barnett, and finally a Rule 60(b)(4) motion based on

the Supreme Court's January 2014 decision in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014),

because this Court does not have jurisdiction over **any** of the Carpenter Companies listed in the

original petition – Carpenter Financial Group, Inc., and Grist Mill Capital, LLC. But, there is no

way that Universitas can claim to have jurisdiction to interfere with the business dealings of

Grist Mill Partners, LLC or BPETCO, which had nothing to do with Sash Spencer, the Charter

Oak Trust, or Nova Group, Inc., or any other company not listed on the original petition.

This type of "vicarious jurisdiction" that Universitas recommends, i.e., Carpenter is a bad

guy everywhere, so we can "pierce the corporate veil" for all of his companies, and we have

jurisdiction over his companies anywhere, is not favored or approved anywhere in the United

States, especially after *Goodyear Dunlop Tires Operations S.A. v. Brown*, 131 S. Ct. 2846, 2851

(2011), and now *Daimler*. For an excellent discussion on this subject, see the Journal of

International Law article by Lonny Hoffman, *Further Thinking About Vicarious Justification:*

*Reflecting on Goodyear v. Brown and Looking Ahead to Daimler Ag v. Bauman*, 34 J. Int'l L.

765 (). Available at: http://scholarship.law.upenn.edu/jil/vol34/iss4/4.

Therefore, just to remind the Court, the evidence adduced thus far is as follows:

1. I was not an officer of Nova Group, Inc. – See Exhibit Six.

2. Grist Mill Capital, LLC, the company that provided over $100 million in funding for the Charter Oak Trust to pay premiums, was dismissed from the Charter Oak Trust arbitration by Ms. Colbath.  See Exhibit Seven.

3. I was dismissed from the arbitration after it was over, so I, and not Universitas, should have the benefit of "*res judicata*" and "collateral estoppel."  See Exhibit Eight.

4. Grist Mill Capital, LLC was the **primary beneficiary** of the Sash Spencer policies. See the beneficiary form attached as Exhibit Nine.  The small print says: "I hereby designate Grist Mill Capital, LLC as primary beneficiary of any sums which remain unpaid pursuant to any other agreements I might have with Nova Group, Inc., and acknowledge that my beneficiaries as designated above will receive all death benefit proceeds in excess of the sums payable to Grist Mill Capital, LLC."

5. Sash Spencer agreed that Grist Mill Capital was a secured, collateralized funder.  See Funding Agreement attached as Exhibit Ten.

6. Spencer agreed to the two amounts taken out in May of 2009.  See Exhibit Eleven.

7. The remaining $19 million was covered by the Confidential Settlement Indemnity Agreement.  See Exhibit One.

8. It is Universitas' own fault that it did not take the $18 million when it was originally offered.  See Exhibit Eleven.

9. Universitas then renounced all of its claims to the death benefit for a payment of $5 million from Mary Spencer, who had no idea the insurance policies were even taken out on her husband. See Exhibit Twelve.

10. Sash Spencer had a detailed agreement with Grist Mill Capital that he not only signed, but initialed in several places, laying out the terms of the agreement between the parties. See Exhibit Thirteen.

Therefore, in conclusion, I would respectfully ask the Court to reconsider its previous opinions, rescind the letter order to Attorney Pastore and to end the Universitas reign of terror over me and my family.

Thank you for your time and thoughtful consideration on this matter.

Respectfully Submitted,

Daniel E. Carpenter

# EXHIBIT ONE

# CONFIDENTIAL SETTLEMENT AND INDEMNIFICATION AGREEMENT

This Confidential Settlement and Indemnification Agreement ("Settlement Agreement"), dated October 26, 2009, is by and between The Charter Oak Trust Welfare Benefit Plan u/d/t dated October 1, 2006, by and through Wayne H. Bursey as Trustee of the Trust (the "Plan" or "Trust"); and Grist Mill Capital, LLC ("GMC"), as the Trust's sole funder. This Agreement also applies to the respective agents, employees, officers, directors, trustees, beneficiaries, administrators, sponsors, attorneys, and affiliated entities of the Trust and GMC (collectively, the "Parties" and each a "Party").

WHEREAS, Sash A. Spencer ("Spencer") began his participation in the Plan on or about December 17, 2006;

WHEREAS, on or about December 22, 2006, The Lincoln National Life Insurance Company ("Lincoln") issued life insurance policies 7320809 and 7305475, with face amounts of $20 million and $10 million respectively, insuring the life of Spencer, with the Trust as the sole owner and beneficiary thereof (the "Policies");

WHEREAS, all of the funding for the purchase of the Policies, as well as all of the funding for the Trust generally, was provided entirely by GMC;

WHEREAS, on or about May 9, 2008, Spencer executed an Election of Participation and Beneficiary Designation Form whereby he designated Universitas Education, LLC, a private charitable foundation created with the intent to provide students with financial aid to attend college ("Universitas"), as his sole irrevocable beneficiary under the Trust;

WHEREAS, neither Spencer, nor Spencer's employer, nor Universitas provided any funding whatsoever for Spencer's participation in the Plan or the purchase of the Policies;

WHEREAS, on or about June 10, 2008, Spencer unexpectedly passed away;

WHEREAS, prior to his death, Spencer had accepted an offer from GMC whereby GMC agreed to purchase the Policies from the Trust and, in return, make a one-time lump-sum cash payment to Universitas for six percent (6%) of the Policies' face value, or $1.8 million (the "GMC Transaction");

WHEREAS, Spencer's premature and unexpected death prevented GMC and Spencer from consummating the GMC Transaction, prevented GMC from taking over the control and sole ownership of the Policies, and prevented GMC from becoming the new sole beneficiary of the Policies;

WHEREAS, on May 5, 2009, in order to obtain the death benefit payable under the Policies, the Trust filed a legal action against Lincoln styled *Wayne Bursey, Trustee of the Charter Oak Trust Welfare Benefit Plan v. The Lincoln National Life Insurance Company*, in the United States District Court for the District of Connecticut, Case No. 3:09-CV-00735-AWT (the "Lincoln Action");

WHEREAS, on May 15, 2009, Lincoln paid to the Trust the death benefit payable under the Policies plus some interest;

WHEREAS, in October 2009, Lincoln paid to the Trust an additional $250,000 in interest in return for the full and complete settlement and dismissal of, and release of all claims asserted in, the Lincoln Action;

WHEREAS, unbeknownst to the Trust at the time, on November 11, 2008, Universitas entered into a settlement agreement with Spencer's employer, Spencer's widow (acting as Spencer's personal representative), and Spencer's insurance agent, whereby Universitas and Spencer's employer agreed to split any death benefit received from the Trust on a 50-50 basis, and provided further that if the death benefit payable from the Trust exceeded $23 million that Spencer's insurance agent would receive a commission of $200,000 (the "Universitas Agreement");

WHEREAS, the Universitas Agreement is illegal, void and unenforceable as a matter of law because it provides for an illegal reversion to Spencer's employer as well as an illegal payment to Spencer's insurance agent, all of which is in contravention of the Plan documents, Connecticut state law, and federal law;

WHEREAS, in a letter dated July 8, 2009, the Trust informed Universitas of the GMC competing claim for the death benefit pursuant to the GMC Transaction, as well as the numerous defects with respect to any claim for benefits which Universitas may file under the Plan with respect to timeliness, threatened litigation, etc.;

WHEREAS, notwithstanding the numerous defects with respect to any claim filed by Universitas, the Trust allowed Universitas to file a provisional claim for benefits under the Plan;

WHEREAS, on July 14, 2009, Universitas filed its provisional claim for benefits under the Plan, and attached thereto a copy of the Universitas Agreement;

WHEREAS, on July 30, 2009, the Trust confirmed receipt of the Universitas provisional claim, raised numerous objections to the legality and validity of the Universitas Agreement, and requested more information from Universitas;

WHEREAS, on September 21, 2009, the law firm of Loeb & Loeb LLP (acting as new counsel for Universitas) informed the Trust that the Universitas Agreement was "not in effect";

WHEREAS, on September 22, 2009, the Trust requested that Loeb & Loeb provide written evidence that the Universitas Agreement was "not in effect," and to do so by October 2, 2009, because the Trust's 90-day claims disposition period expired on October 16, 2009;

CONFIDENTIAL

WHEREAS, on October 2, 2009, having not heard from Loeb & Loeb, the Trust denied the Universitas claim in its entirety for allowing an illegal reversion to Spencer's employer under the Universitas Agreement, for allowing an illegal payment to an insurance agent under the Universitas Agreement, for failure to file a timely claim, for threatening litigation against the Plan, and for the conflicting claims of GMC to the death benefit in light of the GMC Transaction;

WHEREAS, in the claim denial letter dated October 2, 2009, the Trust also made a settlement offer to Universitas of $1.8 million, which was the amount Universitas would have received under the GMC Transaction had it been consummated as intended prior to Spencer's death;

WHEREAS, after the close of business on Friday, October 2, 2009, Loeb & Loeb sent the Trust a letter to which was appended a so-called Termination Agreement which purportedly terminated the Universitas Agreement, although the signatures on the Termination Agreement were all notarized on October 1 and 2, 2009, as opposed to the date on which Loeb & Loeb had previously advised the Trust that the Universitas Agreement was "not in effect" (*i.e.*, September 22, 2009);

WHEREAS, during the early evening of October 2, 2009, a Loeb & Loeb attorney telephoned the Trust's in-house counsel and inquired whether the Termination Agreement had any effect on the claims denial letter, and was told that Universitas could file an appeal pursuant to the procedure described in the claims denial letter;

WHEREAS, Universitas failed to respond to the Trust's settlement offer by the October 16, 2009 deadline, and such settlement offer expired and is now deemed to be null and void;

WHEREAS, GMC has advised the Trust that GMC intends to file suit against the Trust to enforce the consummation of the GMC Transaction, as GMC is the rightful beneficiary of the insurance proceeds payable from the Policies;

WHEREAS, in order to avoid the burden and expense of litigation, to preserve the assets of the Trust for other Trust beneficiaries and participants, and in recognition of the fact that all funds of the Trust, including those funds used to pay for the Policies, were provided entirely by GMC, the Trust has decided to enter into this Settlement Agreement;

WHEREAS, the Parties wish to resolve all disputes between and among them without admission of liability but in the interests of efficiency and economy;

WHEREAS, it is advantageous and important to the Parties to retain the tax-free status of the insurance proceeds payable under the Policies pursuant to Internal Revenue Code Section 101(a) by recognizing GMC as the new beneficiary of such proceeds in place of Universitas; and

WHEREAS, this Settlement Agreement is deemed by the Parties to be in their best interest;

3

CONFIDENTIAL

NOW, THEREFORE, in consideration of the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and shall be conclusively presumed, the Parties hereby agree as follows:

1. **Settlement Payment.** GMC shall pay to the Trust the sum of One Million Eight Hundred Thousand Dollars ($1,800,000.00) (the "Settlement Payment"), by check made payable to the Trust. The Settlement Payment shall be made no later than October 30, 2009.

2. **Indemnification Payment.** In order to assist the Trust in funding its Indemnification Obligations (as defined in Section 6), GMC shall pay to the Trust the additional sum of One Hundred Fifty Thousand Dollars ($150,000.00) (the "Indemnification Payment"), by check made payable to the Trust. The Indemnification Payment shall be made no later than October 30, 2009.

3. **Payment of Net Death Benefit.** In consideration for the Settlement Payment and the Indemnification Payment, the Trust shall immediately transfer to GMC the death benefit payable under the Policies less any and all set-offs and expenses incurred by the Trust with respect to the Policies.

4. **Release of GMC.** In consideration of the Settlement Payment, the Indemnification Payment, and the mutual covenants described in this Settlement Agreement, the Trust hereby releases, remises and forever discharges and holds harmless GMC and its past, present and future officers, directors, shareholders, employees, agents, administrators, trustees, attorneys, predecessors, successors, and assigns, whether individually or in their official capacities, current, former and future affiliated, subsidiary and parent entities from any and all claims, acts, contracts, agreements, covenants, duties, demands, liens, controversies, liabilities, damages, attorneys' fees, debts, loans, obligations, accounts, costs, expenses, dues, actions and causes of action, of any kind and nature, known or unknown, suspected or unsuspected, in law or in equity, arising out of any acts, omissions, events or occurrences, including any such claims relating to the Policies, from the beginning of time to the date of execution of this Settlement Agreement.

5. **Release of the Trust.** In consideration of the receipt of the net death benefit payable under the Policies, and the mutual covenants described in this Settlement Agreement, GMC hereby releases, remises and forever discharges and holds harmless the Trust and its past, present and future officers, directors, shareholders, employees, agents, administrators, trustees, attorneys, predecessors, successors, and assigns, whether individually or in their official capacities, current, former and future affiliated, subsidiary and parent entities from any and all claims, acts, contracts, agreements, covenants, duties, demands, liens, controversies, liabilities, damages, attorneys' fees, debts, loans, obligations, accounts, costs, expenses, dues, actions and causes of action, of any kind and nature, known or unknown, suspected or unsuspected, in law or in equity, arising out of any acts, omissions, events or occurrences, including any such claims regarding the Policies, from the beginning of time to the date of execution of this Settlement Agreement; provided, however, that the Indemnification Obligations described in Section 6 shall not be subject to this release.

4

CONFIDENTIAL

6. *Indemnification Obligations.* The Trust hereby agrees to indemnify GMC from and against the entirety of any Adverse Consequences (as hereinafter defined) GMC may suffer resulting directly or indirectly from, arising out of, relating to, in the nature of, or caused by any claim made by any third party with respect to the Policies and/or the payment of the net death benefit.[1]

7. *Agreement Confidential.* The Parties agree that they will not disclose, directly or by implication, any of the terms or provisions of this Settlement Agreement, except (i) as may be necessary to obtain professional, legal and/or tax advice regarding this Settlement Agreement, (ii) to the Parties' current and future officers and directors, and those individuals necessary to administer this Settlement Agreement, (iii) to the Parties' auditors, risk managers or other third parties with a legitimate need to know, or (iv) as required by law or administrative subpoena. Notwithstanding the foregoing, if either Party is required to disclose this Settlement Agreement pursuant to a subpoena and/or in any judicial proceeding, it must, before production, promptly notify counsel for the other in writing such that there is a reasonable opportunity to intervene and object to the disclosure of the Settlement Agreement. In response to inquiries, the Parties may state that they have resolved their differences, or words to that effect.

8. *Other Covenants.* Each person signing this Settlement Agreement as a representative or otherwise on behalf of another person or entity represents and warrants that it has the requisite authority to sign on behalf of such other person or entity and to cause such other person or entity to effectuate and consummate the obligations embodied herein. Each Party represents and warrants that it has not assigned, sold or transferred to any other person, firm, or entity any claims that are included within the scope of the releases set forth above.

9. *Parties Bound.* This Settlement Agreement shall be binding upon and inure to the benefit of the Parties, any parent or subsidiary corporations of the Parties, and their respective successors and assigns.

10. *Entire Agreement.* This Settlement Agreement sets forth the entire agreement between the Parties hereto, and fully supersedes any prior agreements or understandings between the Parties on the subject matter hereof. The Parties acknowledge that each has not relied on any representations, promises, or agreements of any kind made to him/it in connection with their decision to accept this Settlement Agreement, except for those set forth in this Settlement Agreement.

11. *Headings.* Section headings are not to be considered part of this Settlement Agreement, are included solely for convenience of reference, and are not intended to be full or accurate descriptions of the contents of any paragraph or subparagraph.

---

[1] "Adverse Consequences" means all actions, suits, proceedings, arbitrations, hearings, investigations, charges, complaints, claims, demands, injunctions, judgments, orders, decrees, rulings, damages, dues, penalties, fines, costs, amounts paid in settlement, liabilities, obligations, liens, losses, taxes, expenses, and fees, including court costs, arbitration costs, attorneys' fees and expenses.

5

12. ***Governing Law***. This Settlement Agreement shall be governed in all respects, including validity, interpretation and effect, and construed and enforced under the substantive laws of the State of Connecticut, without regard to its conflict of law or choice of law rules.

13. ***Dispute Resolution***. Any and all disputes between the Parties regarding this Agreement not susceptible to amicable resolution between the Parties themselves shall be submitted to binding arbitration before a single arbitrator in Hartford, Connecticut. Any award rendered by the arbitrator shall not be subject to appeal and may be entered as a final judgment in any court of competent jurisdiction. The losing party in the arbitration shall be responsible for payment of the prevailing party's attorneys' fees and costs, as well as the costs of arbitration.

14. ***Amendment***. This Settlement Agreement may not be amended or modified except by a writing signed by all Parties.

15. ***Counterparts***. This Settlement Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which taken together shall comprise but a single instrument.

IN WITNESS WHEREOF, the Parties have executed this Settlement Agreement as of the day and year first above written.

THE CHARTER OAK TRUST
WELFARE BENEFIT PLAN

By: Wayne H. Bursey, Trustee

GRIST MILL CAPITAL, LLC

By: Daniel E. Carpenter, Chairman of
Managing Member

6

CONFIDENTIAL

## Acknowledgment

We hereby certify that all funds as specified under the terms of the Agreement have been transferred and received.

The Charter Oak Trust
Welfare Benefit Plan

_____
Witness

_Wayne H. Bursey, Trustee_
Wayne H. Bursey, Trustee

State of Connecticut

County of Hartford        ss. Simsbury

On this the 28th day of October , 20 09, before me Amanda Rossi, the undersigned, personally appeared Wayne H. Bursey , known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument and acknowledged that he/she executed the same for the purposes therein contained.

In witness whereof I hereunto set my hand.

_____
Signature of Notary Public

AMANDA ROSSI
Notary Public, State of Connecticut
My Commission Expires April 30, 2012

_____
Witness

Grist Mill Capital, LLC

_____
Daniel E. Carpenter, Chairman of
Managing Member

State of Connecticut

County of Hartford        ss. Simsbury

On this the 28th day of October , 20 09, before me Amanda Rossi, the undersigned, personally appeared Daniel E. Carpenter known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument and acknowledged that he/she executed the same for the purposes therein contained.

In witness whereof I hereunto set my hand.

_____
Signature of Notary Public

AMANDA ROSSI
Notary Public, State of Connecticut
My Commission Expires April 30, 2012

## Acknowledgment

We hereby certify that all funds as specified under the terms of the Agreement have been transferred and received.

The Charter Oak Trust
Welfare Benefit Plan

_Warren H. Bursey, Trustee_

Witness

Wayne H. Bursey, Trustee

State of Connecticut

County of Hartford          ss. Simsbury

On this the 28th day of October, 20 09, before me Amanda Rossi, the undersigned, personally appeared Wayne H. Bursey, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument and acknowledged that he/she executed the same for the purposes therein contained.

In witness whereof I hereunto set my hand.

Signature of Notary Public

AMANDA ROSSI
Notary Public, State of Connecticut
My Commission Expires April 30, 2012

Grist Mill Capital, LLC

_Daniel E. Carpenter_

Witness

Daniel E. Carpenter, Chairman of Managing Member

State of Connecticut

County of Hartford          ss. Simsbury

On this the 28th day of October, 20 09, before me Amanda Rossi, the undersigned, personally appeared Daniel E. Carpenter, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument and acknowledged that he/she executed the same for the purposes therein contained.

In witness whereof I hereunto set my hand.

Signature of Notary Public

AMANDA ROSSI
Notary Public, State of Connecticut
My Commission Expires April 30, 2012

# EXHIBIT TWO

# GAIL A. CAHALY & others[1] vs. BENISTAR PROPERTY EXCHANGE TRUST COMPANY, INC., & others.[2]

1 Jeffrey M. Johnston; Bellemore Associates, LLC; Massachusetts Lumber Company, Inc.; Joseph Iantosca, individually and as trustee of the Faxon Heights Apartments Realty Trust and Fern Realty Trust; and Belridge Corporation.

2 Benistar Ltd.; Benistar Employer Services Trust Corporation; Benistar Admin. Services, Inc.; Carpenter Financial Group, LLC; Molly Carpenter; Daniel E. Carpenter (collectively, the Benistar defendants); Merrill Lynch, Pierce, Fenner & Smith, Inc.; and U.S. Property Exchange; Bingham McCutchen LLP, intervener in the sanctions proceedings.

### No. 12-P-956.

### APPEALS COURT OF MASSACHUSETTS

### 2014 Mass. App. LEXIS 62

### December 2, 2013, Argued
### June 6, 2014, Decided

## NOTICE:

THIS OPINION IS SUBJECT TO FORMAL REVISION BEFORE PUBLICATION IN THE MASSACHUSETTS REPORTER USERS ARE REQUESTED TO NOTIFY THE CLERK OF THE COURT OF ANY FORMAL ERRORS SO THAT CORRECTIONS MAY BE MADE BEFORE THE BOUND VOLUMES GO TO PRESS.

## PRIOR HISTORY: [*1]

**Suffolk.** Civil actions commenced in the Superior Court Department on January 9, 16, 22, and 23, 2001; February 6, 2001; September 20, 2001; and April 30, 2002. Following review by the Supreme Judicial Court, 451 Mass. 343 (2008), motions for sanctions and for a new trial were heard by Stephen E. Neel, J.

## CORE TERMS:

site, work product doctrine, intermediary', work product, discovery, new trial, good faith, disclosure, trading, visited, impression, adequate basis, qualification, con-

sultant, withhold, escrow, fax, legal standards, anticipation of litigation, interrogatory, preparation, intervener, nonlawyer, belonged, in-house, patent, real estate transactions, law firm, relevant facts, issue of sanctions

## HEADNOTES

*Attorney at Law*, Work product. *Penalty. Practice, Civil*, New trial.

**COUNSEL:** Anthony R. Zelle for Gail A. Cahaly & others.

Michael B. Keating for the intervener.

Brooks L. Glahn for Benistar Property Exchange Trust Company, Inc., & others.

**JUDGES:** Present: Kantrowitz, Graham, & Meade, JJ.

**OPINION BY:** MEADE

## OPINION

MEADE, J. The plaintiffs appeal from the denial of their motion for sanctions against Bingham McCutchen LLP (Bingham), intervener, the law firm that defended Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill), in the 2002 jury trial of this action. The plaintiffs claim that in that litigation Bingham wrongfully withheld documents relevant to the issue whether Merrill, in handling the accounts of Benistar Property Exchange Trust Company, Inc. (Benistar), knew that Benistar was trading with money belonging to third parties. We hold that Bingham lacked an adequate legal basis, under the guise of the work product doctrine, for its decisions to withhold information that Merrill employees [*2] had viewed certain Benistar Web pages describing its business as an intermediary for third-party funds and then to present a defense claiming that no Merrill employees had viewed the very same Web pages.[3] As a result, we vacate that portion of the final judgment entering judgment in favor of Bingham on the plaintiffs' motion for sanctions.[4] As explained below, there remain certain issues that require resolution by a fact finder, and thus, we remand for further proceedings consistent with this opinion.[5]

3 Also before us is the Benistar defendants' appeal from the denial of their motion for a new trial.

4 Final judgment entered on February 7, 2011. Paragraph E pertains to the issue of sanctions.

5 The plaintiffs prevailed on their claims against Merrill at the new trial. The plaintiffs and Merrill have since settled all claims between them.

*Background.* For background regarding the 2002 trial and the underlying dispute, we refer to *Cahaly* v. *Benistar Property Exch. Trust Co.*, 451 Mass. 343 (2008) (*Cahaly*),[6] in which the Supreme Judicial Court affirmed the order of the Superior Court judge granting the plaintiffs a new trial. The documents at issue here came to light during the preparation of **[*3]** the second trial in 2009, when Merrill, then represented by different counsel, produced the documents as responsive to document requests served by the plaintiffs in 2001. As a result, after the second trial, the plaintiffs moved for sanctions against Merrill and Bingham, intervener on the issue of sanctions, and the judge conducted an eight-day evidentiary hearing on the motion. He adopted most of the 334 stipulated facts submitted by the parties and made comprehensive additional findings of fact, set out in his January 11, 2011, memorandum and order. We summarize those facts here, adding additional materials from the record where noted.

> 6 The basis of the motion for a new trial in *Cahaly* was certain documents provided by attorney David Patterson. See *Cahaly, supra* at 362-368. The plaintiffs have never contended that Bingham had possession of these documents or wrongly withheld them, and the documents Patterson supplied are not the subject of this appeal.

Merrill retained Bingham in June, 2001, to represent it in connection with the complaints filed by the plaintiffs, who were former clients of Benistar and who claimed losses of $8 million as a result of Benistar's wrongdoing in investing **[*4]** the plaintiffs' funds. John R. Snyder, a Bingham partner and experienced trial attorney, became Merrill's lead trial counsel, and proceeded to gather information in response to discovery requests. In speaking with Merrill employees involved with the Benistar accounts, Snyder was informed that none of them knew that the money in those accounts belonged to third parties, and that on September 20, 2000, Benistar's trading was restricted because of losses rather than because of concerns that the accounts contained third-party funds. Snyder also determined that none of Merrill's employees had visited the § 1031 pages of the Benistar Web site,[7] which explained that Benistar's business was to serve as an intermediary for third-party funds.

> 7 Section 1031 refers to a section of the Internal Revenue Code, 26 U.S.C. § 1031 (2006), that permits tax advantages for certain like-kind property exchanges and requires that the proceeds be placed in an escrow account, a qualified trust, or with a qualified intermediary. See *Cahaly, supra* at 345 n.4.

On July 15, 2002, Snyder received a file from Joseph Pash, a Merrill in-house lawyer, which Pash had obtained from Martin Malia, an options specialist in Merrill's **[*5]** compliance department. The file contained documents indicating that on the morning of September 20,

2000, the day Merrill ordered Benistar's trading restricted, Malia had visited the § 1031 pages of the Benistar Web site. Those pages contained information about § 1031 property exchanges and revealed that Benistar's business was as an intermediary to hold funds for clients engaged in § 1031 property exchanges. The pages contained a question and answer section, including the following:

> "Can I trust Benistar Property Exchange with My Money? . . . [W]e protect your assets: We have accounts with major banking and investment firms -- accounts under our sole control, as required for these exchanges. . . . Our accounts are restricted to paying out funds only for a subsequent closing, or to return funds to the original property owner. We distribute funds only at your written request."

The judge found that the § 1031 pages of the Benistar Web site disclosed that Benistar handled other people's money and caused Malia to suspect that Benistar was trading other people's money through its Merrill accounts. The judge also found that this information concerned Malia because of the losses in Merrill's [*6] Benistar accounts, but that the Web site did not inform Malia that Benistar's options trading was a breach of Benistar's duty to its clients to hold their funds in low-risk escrow accounts. Also in the file was a facsimile transmission (fax) from Malia to Thomas Rasmussen, a Merrill administrative manager, sent at 11:04 A.M. on September 20, 2000, attaching the § 1031 Web site pages.[8]

> 8 The Malia file also included, among other things, a September 27, 2000, electronic mail message from Hassan Tabbath, a Merrill vice-president, requesting that brokers involved with the Benistar account send a letter, "Confidential to Counsel," concerning their "knowledge about the client managing other people's money." The file also contained the brokers' October 2, 2000, "Confidential to Counsel" memorandum, stating that "[a]s far as we know [Carpenter's] major source of business is: estate planning, insurance, pension management and real estate transactions. We have been under the assumption that the money he has been investing has been his own." (Carpenter refers to Daniel E. Carpenter, Benistar's chairman and sole shareholder.)

Upon reviewing the Malia file, Snyder thought that some of the documents [*7] might be protected under the work product doctrine. When he spoke with Malia, Malia indicated that he performed the Web site search before he made the decision to restrict the accounts and that the information on the question and answer page gave him some suspicion of embezzlement. Malia also told Snyder that in September, 2000, he reported to Dennis Pape, an attorney working as a compliance supervisor at Merrill, and after September 22, 2000, he was working with an in-house lawyer of Merrill's office of general counsel.[9]

9 September 22, 2000, is the date on which Daniel Carpenter wrote to Merrill protesting the trading restrictions placed on the Benistar accounts and stating, among other things: "We have chosen Merrill [Lynch] as our depository for our clients so we cannot move the funds elsewhere." Benistar moved its funds to an account at UBS Paine Webber, Inc., in October, 2000.

Snyder discussed with Merrill's in-house lawyers whether the Malia file was protected from disclosure under the work product doctrine. They considered that Malia operated under the umbrella of the office of general counsel, that he acted on occasion when litigation was anticipated, and that he was generally **[\*8]** under the direction of attorneys. Pash determined that the documents were protected work product, and Snyder agreed.[10] We add that Snyder testified at the evidentiary hearing that he did not know whether he conducted legal research in making the work product determination, but he did not think that Bingham's billing records would reflect such research.

> 10 Snyder also considered whether to call Malia as a witness, as his testimony might have been useful to rebut certain arguments made by Benistar against Merrill. It was determined that Merrill would waive its work product protection for the Malia file by so doing, and the decision was made not to call him.

On June 19, 2002, the trial judge granted the plaintiffs' emergency motion to compel evidence of visits by Merrill employees to the Benistar Web site. Merrill responded that no nonprivileged documents had been found. In October, 2002, after receiving the Malia file, Bingham drafted supplements to several of Merrill's interrogatory answers concerning Merrill's knowledge of Benistar's business and visits to the Web site. Those responses would have disclosed the fact that Malia had viewed the § 1031 pages. In the end, Snyder decided not **[\*9]** to serve the supplemental answers, following his determination that the Malia file was protected work product.

We also add from the record that prior to receiving the Malia file, Bingham had filed a motion for summary judgment, which contained the following representation: "At no time prior to the transfer of the accounts did any employee at Merrill Lynch learn that the funds in the Benistar accounts were being held by Benistar as a third party intermediary for real estate transactions or that those funds were Benistar client escrowed funds." In addition, the parties stipulated that Merrill's portion of the first revised joint pretrial memorandum, dated September 25, 2002, included the following: "At no time prior to the transfer of the Benistar accounts from Merrill Lynch to Paine Webber did any employee at Merrill Lynch learn that the funds in the accounts were being held by Benistar as a third party intermediary for real estate transactions or that those funds were Benistar client escrow funds."

At the hearing on the motion for sanctions, the parties stipulated that at the 2002 trial, Snyder, in examining Rasmussen, asked whether Rasmussen knew in 2000 that Benistar acted as a

third-party **[\*10]** intermediary or escrow agent handling other people's money, and Rasmussen testified that he did not. Rasmussen also testified that he never visited the Benistar Web site before the accounts were transferred to UBS Paine Webber, Inc., and that he had never thought to do so. The record further discloses that Snyder told the jury, in closing, that "the Merrill people" did not know that the funds in the accounts belonged to third parties, and that the witnesses all said they did not know what a § 1031 exchange was and that there was no reason for them to go to the § 1031 "button" on the Web site. According to the record, in Merrill's motion for judgment notwithstanding the verdict, Merrill argued that the plaintiffs "have failed even to present sufficient evidence to support a reasonable inference that Merrill knew that the Benistar accounts contained third party funds."

Following the sanctions hearing, the judge concluded that Snyder acted in good faith in failing to disclose the Malia file and in presenting a defense at the 2002 trial that included the claim that Merrill employees had not viewed the § 1031 pages of the Benistar Web site.

*Discussion.* The plaintiffs maintain that Snyder **[\*11]** was prohibited from not disclosing the fact, under the work product doctrine, that certain Merrill employees had seen the § 1031 pages of the Benistar Web site, and then asserting, as part of Merrill's defense, that Merrill employees had not seen the § 1031 pages of the Benistar Web site. We agree.

We review the judge's decision regarding sanctions for abuse of discretion. "[O]ur function is to determine whether the judge abused that discretion, which includes considering whether proper legal standards were applied and whether there was reasonable support for the judge's evaluation of the facts." *Psy-Ed Corp.* v. *Klein*, 62 Mass. App. Ct. 110, 114 (2004), quoting from *Van Christo Advertising, Inc.* v. *M/A-COM/LCS*, 426 Mass. 410, 417 (1998). In so doing, we accept the judge's findings of fact as true unless they are clearly erroneous. "On the other hand, to ensure that the ultimate findings and conclusions are consistent with the law, we scrutinize without deference the legal standard which the judge applied to the facts." *Kendall* v. *Selvaggio*, 413 Mass. 619, 621 (1992). See *Panagakos* v. *Collins*, 80 Mass. App. Ct. 697, 702 (2011) (clearly erroneous standard does not protect findings based **[\*12]** on incorrect legal standard).

1. *The work product doctrine.* The Massachusetts work product doctrine derives from *Hickman* v. *Taylor*, 329 U.S. 495 (1947), and may be invoked to protect from discovery certain types of documents prepared by a party's attorney, or nonlawyer representative, in anticipation of litigation. "The work product doctrine is codified in Mass.R.Civ.P. 26(b)(3), [365 Mass. 772 (1974)]. . . ." *McCarthy* v. *Slade Assocs.*, 463 Mass. 181, 194 (2012). The doctrine is intended "to prevent one party from piggybacking on the adversary's preparation," *Commissioner of Rev.* v. *Comcast Corp.*, 453 Mass. 293, 312 (2009) (*Comcast Corp.*), quoting from *United States* v. *Adlman*, 68 F.3d 1495, 1501 (2d Cir. 1995), and thus protects from disclosure the attorney's "mental impressions, conclusions, opinions, or legal theories" regarding the litigation. Mass.R.Civ.P. 26(b)(3).

The judge correctly cited the legal principle from *Comcast Corp.*, i.e., that the work product doctrine may be invoked to protect documents that a party's nonlawyer representative pre-

pared, or obtained, in anticipation of litigation. Much of the judge's analysis focused on whether Snyder reasonably believed that Malia's **[\*13]** investigation of the Benistar account in September, 2000, was undertaken in his role as Merrill's legal representative and in anticipation of litigation, and the judge credited both Snyder and Bingham's expert in concluding that Snyder's decision to withhold the documents on those grounds had an adequate basis in the law and was made in good faith.

However, in *Comcast Corp.*, the Supreme Judicial Court went further and identified two important qualifications to the work product doctrine that bear directly on the facts of this case and were absent from the judge's analysis. First, the court noted that work product may be subject to disclosure upon a showing of a substantial need for the material and that its equivalent cannot be obtained by other means. *Comcast Corp., supra* at 314. See *Chambers* v. *Gold Metal Bakery, Inc.*, 464 Mass. 383, 391 n.22 (2013). Substantial need is shown where, as here, the work product at issue is central to the parties' substantive claims. See *McCarthy* v. *Slade Assocs., supra* at 195, citing *Madanes* v. *Madanes*, 199 F.R.D. 135, 150 (S.D.N.Y 2001). In fact, the plaintiffs specifically sought, and the trial judge ordered, that Merrill produce evidence of Web site **[\*14]** visits.

The second qualification noted by the court is that the doctrine encompasses two types of work product, fact and opinion. *Comcast Corp., supra*. The court distinguished the degree of protection afforded each type, explaining that the rule affords protection primarily against disclosure of an attorney's opinion, that is, "the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." *Ibid.*, quoting from Mass.R.Civ.P. 26(b)(3). Fact work product, on the other hand, receives far less protection. *Comcast Corp., supra*. It has long been held that "[w]here relevant and non-privileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had." *Hickman* v. *Taylor*, 329 U.S. at 511. See *Fleet Natl. Bank* v. *The Gloucester Corp.*, 150 F.R.D. 10, 14-15 n.6 (D. Mass. 1993) (litigants cannot use work product doctrine to shield relevant facts from discovery). See also *Resolution Trust Corp.* v. *Dabney*, 73 F.3d 262, 266 (10th Cir. 1995) (doctrine principally guards against disclosing attorney's strategies and legal impressions, **[\*15]** and does not protect "facts concerning the creation of work product or facts contained within work product"); *Koch Materials Co.* v. *Shore Slurry Seal, Inc.*, 208 F.R.D. 109, 122 (D.N.J. 2002).

With these qualifications in mind, we conclude that Snyder lacked an adequate basis in law to support his decision to withhold, as protected work product, the significant facts that Malia visited the § 1031 pages on the Benistar Web site on September 20, 2000, and then sent those pages by fax to Rasmussen. "Simply identifying what documents an attorney reviewed, what documents were provided by a consultant, or what documents were provided to the client, in each instance without any requirement to describe content, reveals nothing about the attorney's (or the consultant's or the client's) opinion or impression of any of the documents, or any conclusions the attorney (or consultant or client) drew from them." *McCarthy* v. *Slade Assocs.*, 463 Mass. at 201, citing *Bamberg* v. *KPMG LLP*, 219 F.R.D. 33, 36 (D. Mass. 2003).

See *In re San Juan Dupont Plaza Hotel Fire Litigation*, 859 F.2d 1007, 1014-1018 (1st Cir. 1988). Snyder's failure to supplement the interrogatories seeking that factual information, and [*16] his continued assertion, in pleadings and at trial, that Merrill employees had not visited the § 1031 Web site, were without legal justification.

Even assuming, without deciding, that Snyder was reasonable in his belief that Malia's visit to the § 1031 Web site pages, and Malia's fax to Rasmussen containing those pages, revealed Malia's mental impressions, we discern no adequate basis in the law for Snyder's belief that he could withhold the information and still assert a defense claiming just the opposite.

Plainly, whether Merrill employees had visited the Benistar Web site, and what knowledge they gleaned therefrom, were significant points of contention in the parties' dispute. In *Ward* v. *Peabody*, 380 Mass. 805, 817-818 (1980), the court explained that protection for work product does not extend to evidence of the "words and deeds" of an attorney when the inquiry bears on an issue in dispute, in that case the activities of a contractor and its law firm alleged to have improperly influenced the award of public contracts. "[W]hen the activities of counsel are inquired into because they are at issue in the action before the Court, there is cause for production of documents that deal with [*17] such activities, though they are 'work product.' 4 Moore's, Federal Practice par. 26.62[4] at 26-447 (2d ed. 1979)." *Id.* at 818.[11] More recently, in *McCarthy* v. *Slade Assocs.*, 463 Mass. at 195, the Supreme Judicial Court reiterated that work product was not shielded from discovery if the parties' dispute "puts in play" the knowledge of the plaintiff and her attorney, in that case knowledge of the location of a parcel of land, which was pertinent to the discovery rule asserted by the plaintiffs in response to a statute of limitations defense.

11 See *Kearney & Trecker Corp.* v. *Giddings & Lewis, Inc.*, 296 F. Supp. 979, 982 (E.D. Wis. 1969) (cited in *Ward* v. *Peabody, supra*) (production of work product documents required where claim of unclean hands in patent procurement called into question relationship between plaintiff and its patent consultant, a former patent office employee). See also *Gulf Constr. Co.* v. *St. Joe Paper Co.*, 24 F.R.D. 411, 414-415 (S.D. Tex. 1959) (best evidence of mitigation involved communications between attorneys); *Bourget* v. *Government Employees Ins. Co.*, 48 F.R.D. 29, 33 (D. Conn. 1969) (insurer's attorney's knowledge as to severity of plaintiff's injuries subject [*18] to disclosure in failure to settle case).

The fact that a Merrill employee, lawyer or nonlawyer, knew that Benistar's business was as an intermediary for third-party funds was significant to the plaintiffs in making out their claim for aiding and abetting against Merrill. Moreover, the evidence of Malia's visit to the § 1031 pages of the Benistar Web site on September 20, 2000, and his transmission of those pages by fax to Rasmussen, ran directly counter to the heart of Merrill's defense that it had no such knowledge. Indeed, the plaintiffs' failure to provide such evidence was repeatedly highlighted by Merrill as a fatal flaw in the plaintiffs' case throughout the 2002-2003 proceedings. Its

disclosure would have revealed facts that would have contradicted the observations of the trial judge,[12] this court,[13] and the Supreme Judicial Court,[14] in their respective rulings, that evidence of Merrill's knowledge of the nature of Benistar's business was lacking in the 2002 trial. See Mass. R. Prof. C. 3.3(a)(1), 426 Mass. 1383 (1998) (lawyer shall not knowingly make false statement of material fact or law to tribunal). It likely would have led the plaintiffs to the existence of other relevant  [*19]  facts and would have been useful in cross-examining the Merrill witnesses, Rasmussen in particular, who denied ever seeing the information. See *Hickman* v. *Taylor*, 329 U.S. at 511. See also Mass. R. Prof. C. 3.3(a)(4), 426 Mass. 1383 (1998) (lawyer shall not knowingly offer evidence that lawyer knows to be false).

12 In ruling on Merrill's motion for judgment notwithstanding the verdict in the 2002 trial, the trial judge observed that while certain Merrill employees looked at the Benistar Web site homepage and one employee looked at information about "§ 419" employee benefit plans under the Internal Revenue Code, "[i]t is the case that the Benistar.com website contains information about Benistar Property Exchange Trust Company and its role as a 'qualified intermediary' for purposes of property exchanges under § 1031 of the Internal Revenue Code, but this appears in a separate, discrete part of the website that is not visible on the home page or in connection with any information about § 419 plan administration."

13 "The judge found scant evidence that Merrill Lynch had actual knowledge that Benistar was using funds belonging to third parties . . . ." *Cahaly* v. *Benistar Property Exch. Trust Co.*, 68 Mass. App. Ct. 668, 671 (2007).

14 "Testimony  [*20]  from several Merrill Lynch employees that they viewed the Benistar Web site homepage (which did not contain a description of Benistar Trust's business) and a linked page that had nothing to do with § 1031 like-kind exchanges has no probative value in establishing Merrill Lynch's knowledge of the primary wrongdoing." *Cahaly, supra* at 356. The court also observed: "Several witnesses for Merrill Lynch testified that not only did they not know the actual nature of Benistar Trust's business as a 'qualified intermediary' under § 1031, but they also had no understanding of § 1031 or its requirements until the first of the plaintiffs' lawsuits was filed in January, 2001." *Id*. at 354 n.24.

These important qualifications to the work product doctrine, which relate directly to the undisputed facts of this case, were not addressed in the judge's rulings when he relied on *Comcast Corp*. to conclude that Snyder had an adequate basis in law to support his work product determination. We are also of the view that Snyder's persistence in pursuing a defense that included Merrill's lack of knowledge of the nature of Benistar's business and the § 1031 Web site pages calls into question his good faith. Accordingly,  [*21]  the judge's ultimate finding that Snyder acted reasonably and in good faith in withholding critical documents as

work product must be reassessed in light of the legal principles we have set out here. Nevertheless, reasonableness and good faith are determinations we leave to the fact finder, who is in a better position to assess the credibility of witnesses and to weigh the evidence, in the context of the applicable law. See *Cahaly, supra* at 369. See, e.g., *Psy-Ed Corp.* v. *Klein*, 62 Mass. App. Ct. at 114. For that reason, the matter is remanded for further proceedings consistent with this opinion.

2. *Authority for imposition of sanctions*. The plaintiffs no longer press the ground of fraud on the court as a basis for imposing sanctions. But the plaintiffs maintain that Bingham's conduct was sufficiently egregious to warrant sanctions pursuant to the inherent power of the trial court. See generally *Sommer* v. *Maharaj*, 451 Mass. 615, 621-622 (2008); *Munshani* v. *Signal Lake Venture Fund II, LP*, 60 Mass. App. Ct. 714, 719 n.6 (2004) (court's inherent power to impose sanctions for attorney misconduct was not limited to instances of fraud on the court).

The plaintiffs additionally rely on Mass.R.Civ.P. 11, **[*22]** 365 Mass. 753 (1974), requiring that pleadings be based on an attorney's reasonable inquiry and an absence of bad faith. See *Doe* v. *Nutter, McClennen & Fish*, 41 Mass. App. Ct. 137, 142 (1996). The rule requires "at least some level of reasonable inquiry" into the factual and legal basis supporting the pleading. *Psy-Ed Corp.* v. *Klein*, 62 Mass. App. Ct. at 113. See *Van Christo Advertising, Inc.* v. *M/A-COM/LCS*, 426 Mass. at 416-417 (we do not condone "an attorney's 'wilful ignorance' of facts and law which would have been known had the attorney simply not consciously disregarded them"). In ruling on a motion for rule 11 sanctions, a judge may consider whether the attorney's misconduct was the result of a "genuine, professional judgment," see *Psy-Ed Corp.* v. *Klein, supra* at 117, or was instead to secure a tactical advantage by hampering the opposing party's presentation of its case, in violation of the rules of court and of professional conduct. *Munshani* v. *Signal Lake Venture Fund II, PL, supra* at 720.

Finally, the plaintiffs urge that sanctions be imposed against Bingham for discovery violations, for its failure to supplement the plaintiffs' interrogatories in 2002. See, e.g., *Keene* v. *Brigham & Women's Hosp., Inc.*, 56 Mass. App. Ct. 10, 21 (2002), **[*23]** *S.C.* 439 Mass. 223, 235 (2003); *Short* v. *Marinas USA Ltd. Partnership*, 78 Mass. App. Ct. 848, 853 & n.7 (2011). We defer to the judge on remand to determine whether sanctions are warranted on any of those grounds, as determined by the judge's further findings on Bingham's good faith and the nature and effect of the violations.[15]

15 We reject Bingham's suggestion that it produced enough information to the plaintiffs prior to the 2002 trial to alert them to Malia's role -- that the fault somehow belonged to the plaintiffs. As the court observed in *Cahaly, supra* at 367, "the plaintiffs' repeated efforts at increasingly tailored discovery were impeded at nearly every turn by Merrill Lynch."

3. *Benistar defendants' appeal*. The Benistar defendants appeal from the judge's denial of their motion for a new trial. The judge relied principally on *Cahaly, supra* at 362-368,

wherein the court denied Benistar's motion for a new trial based on the newly discovered evidence addressed in that case. We agree with the judge that the Benistar defendants have not demonstrated that the documents produced by Merrill in 2009 require a different outcome.

*Conclusion.* The order denying the Benistar defendants' motion  **[*24]** for a new trial is affirmed. Paragraph E of the final judgment entered on February 7, 2011, is vacated as to intervener Bingham only, and the matter is remanded to the Superior Court for further proceedings consistent with this opinion.[16]

> 16 Because the judge who decided the plaintiffs' motion for sanctions has retired, the judge deciding the motion on remand may, in his or her discretion, hear additional evidence and receive additional submissions from the parties.

*So ordered.*

# EXHIBIT THREE

# COMMONWEALTH OF MASSACHUSETTS
## BUSINESS LITIGATION SESSION

SUFFOLK, ss.                                    **SUPERIOR COURT DEPARTMENT**

JOSEPH IANTOSCA, Individually and as Trustee )
of the Faxon Heights Apartments Realty Trust and )
Fern Realty Trust, **BELRIDGE CORPORATION,** )
**GAIL A. CAHALY, JEFFREY M. JOHNSTON,** )
**BELLEMORE ASSOCIATES, LLC, and** )
**MASSACHUSETTS LUMBER COMPANY, INC.** )          **08-0775-D**

Plaintiffs,                                )      CIVIL ACTION NO.

v.                                         )

**MERRILL LYNCH PIERCE FENNER &** )
**SMITH, INC.,** )

Defendant.                                 )

## COMPLAINT AND JURY DEMAND

### PARTIES

1.      Joseph Iantosca is a natural person and a resident of the Commonwealth of Massachusetts. Mr. Iantosca brings this action individually and as trustee of plaintiffs Faxon Heights Apartments Realty Trust and Fern Realty Trust.

2.      Belridge Corporation is a Massachusetts Corporation with a principal place of business in Weymouth, Massachusetts. Mr. Iantosca is the President and sole shareholder of Belridge.

3.      Gail A. Cahaly is an individual residing in Westwood, Massachusetts.

4.      *Jeffrey M. Johnston is an individual residing in Boston, Massachusetts.*

4.      Jeffrey M. Johnston is an individual residing in Boston, Massachusetts.

5.      Bellemore Associates, LLC is a limited liability company organized under the laws of New Hampshire.

6.      Massachusetts Lumber Company, Inc. is a Massachusetts corporation with its principal place of business in Cambridge, Massachusetts.

7.     Merrill Lynch Pierce Fenner & Smith, Inc. ("Merrll Lynch") is a Delaware corporation with a usual place of business at 125 High Street in Boston Massachusetts.

## FACTS

8.     By letter dated January 16, 2008, the plaintiffs presented Merrill Lynch with a written demand for relief in accordance with Massachusetts General Laws Chapter 93A, § 9 (3).

9.     Merrill Lynch did not respond with a reasonable offer within 30 days.

10.     Merrill Lynch opened and operated brokerage accounts for Benistar Property Exchange Trust Company, Inc.

11.     As its name suggests, Benistar Property Exchange Trust Company, Inc. held money in trust for its clients. Specifically, Benistar Property Exchange Trust Company, Inc. had Escrow Agreements with its clients, including plaintiffs, under which it agreed to hold its clients funds in escrow.

12.     Gerald Levine, one of the Merrill Lynch brokers who opened and managed the accounts for Benistar Property Exchange Trust Company, Inc. was informed by the President of Benistar and by an attorney for one of Benistar's clients that the funds in Benistar's accounts at Merrill Lynch belonged to Benistar's clients and were escrow funds that had to be returned on demand to Benistar's clients.

13.     The Merrill Lynch brokers who opened and managed the accounts for Benistar Property Exchange Trust Company, Inc. were informed in writing that the funds in Benistar's accounts at Merrill Lynch belonged to Benistar's clients and were escrow funds that had to be returned on demand to Benistars clients.

14.     The documents provided to Merrill Lynch included the Escrow Agreement used by Benistar to establish its contractual and fiduciary duties with its clients.

2

15.     The documents provided to Merrill Lynch included the Exchange Agreement that described in detail Benistar's contractual and fiduciary duties as an intermediary in accordance with Section 1031 of the Internal Revenue Code.

16.     As described in the Escrow and Exchange documents that were provided to Merrill Lynch, and as described to Gerald Levine in the conversations he had with Benistar's president and the attorney for one of Benistar's clients, Benistar served as an intermediary for Section 1031 transactions.

17.     Section 1031 of the Internal Revenue Code entitles taxpayers to defer capital gains taxes on the appreciation of commercial real estate by using the proceeds of a sale of such real estate to purchase like-kind property.

18.     The documents provided to Merrill Lynch explained that Benistar Property Exchange Trust Company held in escrow for its clients the proceeds of real estate sales made by its clients and that Benistar agreed to hold these funds in escrow pending its clients' need for those funds to acquire replacement property.

19.     Despite their knowledge that the money in the Benistar accounts belonged to Benistar's clients and was to be held in escrow, the Merrill Lynch brokers approved the Benistar accounts for highly speculative option trading.

20.     Benistar lost millions through the option trading and, despite demands by plaintiffs, failed to return approximately $8.7 million to plaintiffs.

21.     In 2001, plaintiffs sued Benistar and served a third party subpoena on Merrill Lynch seeking all documents relating to the Benistar accounts.

22.     Merrill Lynch did not produce the Benistar Escrow and Exchange Agreements or the correspondence between its broker and the attorney for one of Benistar's clients.

3

23. Later in 2001, Merrill Lynch was added as a party in this Massachusetts litigation and plaintiffs served discovery requests on Merrill Lynch seeking all information and all documents relating to the Benistar accounts.

24. Merrill Lynch did not produce the Benistar Escrow and Exchange Agreements or the correspondence between its broker and the attorney for one of Benistar's clients, nor did it identify these documents and communications.

25. Merrill Lynch lied about its involvement with the Benistar accounts and destroyed, concealed and/or failed to produce the documents evidencing its participation with Benistar in the misuse of Benistar's clients' funds.

26. Plaintiffs discovered the documents evidencing Merrill Lynch's participation with Benistar in the misuse of its clients' funds after Merrill Lynch's brokers testified under oath that they had no knowledge that the Benistar accounts contained other people's money.

27. Despite the testimony by Merrill Lynch's brokers denying their knowledge of and participation with Benistar in the misuse of Benistar's clients' funds, a jury found Merrill Lynch liable for colluding with Benistar and found that Merrill had violated New York and Connecticut consumer protection statutes.

28. A judgment entered on that verdict prior to the award of damages based on Merrill Lynch's violation of the New York and Connecticut consumer protection statutes. The present judgment has a value of more than $26,000,000.

29. Merrill Lynch has persisted in its denial of liability despite the discovery by plaintiffs of the documents that Merrill Lynch destroyed, concealed and/or failed to produce and despite its own knowledge that the testimony provided at trial by its brokers was perjurious.

4

30.     Merrill has pursued litigation in an attempt to harass plaintiffs, to impose financial costs and emotional distress on the plaintiffs and to extort plaintiffs to settle for less then they are owed.

31.     As a result of the unfair and deceptive conduct described above, plaintiffs have suffered damages in the form of the attorneys' fees, the loss of use of money, tax liabilities, accountants' fees and emotional distress.

32.     Merrill's Lynch's Board of Director's has adopted *Merrill Lynch's Code of Ethics for Financial Professionals* and which states: "All financial professionals must . . .[e]ngage in and promote honest and ethical conduct . . . [and] act in good faith, responsibly, with due care, competence, prudence and diligence, without misrepresenting material facts or allowing one's independent judgment or decisions to be subordinated."

### COUNT I – UNFAIR AND DECEPTIVE ACTS PROHIBITED BY G.L. c. 93A

33.     Plaintiffs restate the allegations set forth in paragraphs 1-32 above and incorporate them by reference as though fully set forth herein.

34.     Merrill Lynch has willfully and knowingly engaged in unfair and deceptive conduct in violation of G.L. c. 93A.

35.     Plaintiffs have been injured by Merrill Lynch's willful and knowing engaged in unfair and deceptive conduct in violation of G.L. c. 93A.

36.     Plaintiffs are entitled to compensatory damages, punitive damages and attorneys fees based on Merrill Lynch's willful and knowing unfair and deceptive conduct.

### COUNT II - FRAUD

37.     Plaintiffs restate the allegations set forth in paragraphs 1-36 above and incorporate them by reference as though fully set forth herein.

38.    Merrill Lynch's willfully and knowingly engaging in unfair and deceptive conduct constitutes fraud.

39.    Plaintiffs have been injured by Merrill Lynch's fraudulent conduct.

40.    Plaintiffs are entitled to recover from Merrill Lynch the damages caused by Merrill Lynch's fraudulent conduct.

## COUNT III – MALICIOUS DEFENSE

41.    Plaintiffs restate the allegations set forth in paragraphs 1-40 above and incorporate them by reference as though fully set forth herein.

42.    In support of Merrill Lynch's defense to plaintiffs' claims based on its collusion with Benistar in the improper use of plaintiffs' escrow funds, Merrill Lynch created false material evidence and gave false testimony advancing such evidence.

43.    Plaintiffs have been injured by Merrill Lynch's malicious defense.

44.    Plaintiffs are entitled to recover from Merrill Lynch the damages caused by Merrill Lynch's malicious defense.

**WHEREFORE**, plaintiffs demand judgment against Merrill Lynch in an amount sufficient to compensate them for the injuries caused by Merrill Lynch, for punitive damages in the amount of three times the amount of the judgment on all claims arising out of the same and underlying transactions or occurrences, for costs and attorneys fees, and for all other relief the court may deem appropriate.

**PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

6

JOSEPH IANTOSCA, Individually and as Trustee
of the Faxon Heights Apartments Realty Trust and
Fern Realty Trust, BELRIDGE CORPORATION,
GAIL A. CAHALY, JEFFREY M. JOHNSTON,
BELLEMORE ASSOCIATES, LLC, and
MASSACHUSETTS LUMBER COMPANY, INC.

By their attorneys,

Anthony R. Zelle, BBO No. 548141
**ZELLE MCDONOUGH LLP**
Four Longfellow Place, 35th Floor
Boston, MA 02114
Tel: (617) 742-6520
Fax: (617) 973-1562

William C. Nystrom, BBO No. 559656
Colleen C. Cook, BBO No. 636359
**NYSTROM BECKMAN & PARIS LLP**
10 St. James Avenue, 16th Floor
Boston, Massachusetts 02116
(617) 778-9100

7

# EXHIBIT FOUR



PAULA K. COLBATH
Partner

345 Park Avenue
New York, NY 10154

**Direct** 212.407.4905
**Main** 212.407.4000
**Fax** 212.937.3189
pcolbath@loeb.com

January 15, 2014

David E. Novick
Assistant U.S. Attorney
District of Connecticut
157 Church Street, 23rd Floor
New Havenm CT 06510

Re:   Daniel Edgar Carpenter and Case No. 3-13-CR-226-RNC

Dear David:

In response to your inquiry, we are of the view that **Mr. Carpenter's or anyone else's posting or transferring of any assets or property collectively valued at more than $20,000, in order to obtain a bond, would violate the Southern District of New York's January 13, 2014 Preliminary Injunction Order against Mr. Carpenter** (copy attached).

This is because any such assets would necessarily be in Mr. Carpenter's direct or indirect control, or in his direct or indirect interest. See Preliminary Injunction Order at 15-16. These assets include, but are not limited to, Mr. Carpenter's house at 18 Pondside Lane in West Simsbury, Connecticut, which we understand to be nominally in the name of his wife Molly, as well as the office building at 100 Grist Mill Road in Simsbury, which we understand to be nominally in the name of Grist Mill Partners, LLC.

Please do not hesitate to contact me if you have any questions. Should the Court have any inquiries for me, I or my associate Michael Barnett will be available by phone on Friday.

Thank you for your attention to this matter.

Sincerely,

Paula K. Colbath
Partner

Enclosure

cc:   Richard R. Brown (via e-mail)
      Anthony J. Siano (via e-mail)
      Dan E. LaBelle (via e-mail)

Los Angeles   New York   Chicago   Nashville   Washington. DC   Beijing   Hong Kong   www.loeb.com

A limited liability partnership including professional corporations

NY1247771.1
214560-10001

# EXHIBIT FIVE



**PAULA K. COLBATH**
Partner

345 Park Avenue         **Direct**   212.407.4905
New York, NY 10154      **Main**    212.407.4000
                        **Fax**     212.937.3189
                        pcolbath@loeb.com


**\*This letter does not seek to collect a debt\***
Via E-mail

January 30, 2014

Latham & Watkins
c/o Gregory G. Garre
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004-1304

Re:  *Universitas Education, LLC v. Nova Group, Inc.*, Case No. 11-1590-LTS-HBP (S.D.N.Y.),
and the **Assets and Property Controlled by Daniel Edgar Carpenter**

Hello:

This law firm represents Universitas Education, LLC ("Universitas").  We write to you because you may have, or may have had, dealings with (1) **Daniel E. Carpenter**, or (2) an entity that he controls or an entity in which he has an interest, or (3) someone representing Mr. Carpenter or one of these entities, and/or (4) someone acting on behalf of Mr. Carpenter or one of these entities. Mr. Carpenter resides at 18 Pondside Lane in West Simsbury, Connecticut and has a business address at 100 Grist Mill Road in Simsbury, Connecticut.

Pursuant to Federal Rule of Civil Procedure 65(d)(2), we are providing you with notice of a Preliminary Injunction Order, issued on January 13, 2014 by the Honorable Laura Taylor Swain, United States District Judge in the United States District Court for the Southern District of New York,  **placing preliminary and immediate restraints on Mr. Carpenter's ability to transfer assets and property that are in his and his entities' control**. **Please note that this Preliminary Injunction Order may bind you if you have, or have had, dealings with Mr. Carpenter or one of the entities described in the Order.**

The Court's Order provides the following:

> Mr. Carpenter, his and his entities' officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with them are hereby enjoined, pending resolution of Petitioner's turnover motion, from directly or indirectly causing, making, permitting or suffering any sale, assignment or transfer of, or any interference with, any asset or property of Mr. Carpenter, and any asset or property of any company, corporation or other entity (including any trusts) in which Mr. Carpenter has a direct or indirect interest or control; provided that Mr. Carpenter may expend or transfer up to an aggregate amount of $20,000.00 per month solely for ordinary expenses of himself and all of the entities are subject to this injunction.

1/13/14 Opinion and Order at pp. 15-16 (copy of Opinion and Order <u>attached</u>).



Please do not hesitate to contact us if you have any questions about this letter or the Order.  We also encourage you to speak to your attorney (or, where applicable, your company's attorney) if you have any questions.  Nothing in this letter is intended or meant to be an attempt to collect a debt.

Sincerely,


/s/ Paula Colbath

Paula K. Colbath
Michael Barnett
Loeb & Loeb LLP

Attachment

# EXHIBIT SIX

# APPLICATION FOR CERTIFICATE OF AUTHORITY
## FOREIGN CORPORATION
Office of the Secretary of the State
30 Trinity Street / P.O. Box 150470 / Hartford, CT 06115-0470 / Rev. 05/07/2004

|  |  |
|---|---|
| Space For Office Use Only | Filing Fee: $275.00 Stock<br>$20.00 Nonstock |

Please contact the Department of Revenue Services or your tax advisor as to any potential tax liability relating to your business.

1. NAME OF CORPORATION IN ITS STATE OR COUNTRY OF FORMATION:

NOVA GROUP, INC.

2. THE CORPORATION'S NAME IS <u>NOT AVAILABLE</u> FOR USE IN CONNECTICUT. THE CORPORATION SHALL, THEREFORE, TRANSACT BUSINESS IN CONNECTICUT UNDER THE FOLLOWING NAME:

*(Complete only if the name of the corporation is not available for use in Connecticut)*

3. CHECK EITHER A OR B

 _X_ A. The corporation is organized for profit.          ____B. The corporation is nonprofit.

| 4. STATE/COUNTRY OF INCORPORATION: | 5. DATE OF INCORPORATION: |
|---|---|
| DE | August 30, 2002 |

6. DURATION: (CHECK ONE)    _X_ PERPETUAL    ____OTHER   (SPECIFY)_____

7. DATE CORPORATION BEGAN TRANSACTING BUSINESS/CONDUCTING AFFAIRS IN CONNECTICUT:

01  /  30  /  07
MONTH   DAY   YEAR

| 8. PRINCIPAL OFFICE ADDRESS OF THE CORPORATION: | 9. MAILING ADDRESS OF THE CORPORATION: |
|---|---|
| 100 Grist Mill Road<br>Simsbury, CT 06070 | Same |

### 10. OFFICERS

| NAME | TITLE | RESIDENCE ADDRESS | BUSINESS ADDRESS |
|---|---|---|---|
| Wayne Bursey | President | 100 Grist Mill Rd.<br>Simsbury, CT 06070 | Same |
| Molly Carpenter | Treasurer | Same | Same |
| Amanda Rossi | Secretary | Same | Same |

Note: If additional space is needed, please reference an 8 1/2 X 11 attachment

## 11. DIRECTORS

| NAME | RESIDENCE ADDRESS | BUSINESS ADDRESS |
|------|-------------------|------------------|
| Wayne Bursey | 100 Grist Mill Rd. Simsbury, CT 06070 | Same |
| Molly Carpenter | Same | Same |
| Amanda Rossi | Same | Same |
| | | |

## 12. Appointment of Registered Agent for Service of Process
(Check A or complete B)

A. _____ The corporation appoints the Secretary of the State of Connecticut and his successors in office to be its agent upon whom any process, in any action or proceeding against it, may be served.

B. Print or type name of agent

Halloran & Sage LLP

Business address: (P.O. Box unacceptable)

One Goodwin Square, 225 Asylum St. Hartford, CT 06103

Residence address: (P.O. Box unacceptable)

Same

Acceptance of Appointment

Robert B. Cox, Esq. Signature of Agent
Partner

## 13. EXECUTION
Dated this _30_ day of ___Jan___, 20_07_____.

| Wayne Bursey | President | _Wayne Bursey_ |
|--------------|-----------|----------------|
| Print or type name of signatory | Capacity of signatory | Signature |

# EXHIBIT SEVEN



PAULA K. COLBATH
Partner

345 Park Avenue
New York, NY 10154

Direct 212.407.4905
Main 212.407.4000
Fax 212.937.3169
pcolbath@loeb.com

Via E-mail

August 19, 2010

Ms. Karen Fontaine
Manager of ADR Services
American Arbitration Association
950 Warren Avenue
East Providence, RI 02914

Re: 13 195 Y 1558 10, Universitas Education, LLC v. Nova Group, Inc., Wayne Bursey, Benistar Admin. Services, Inc., Donald Trudeau, Grist Mill Capital, LLC and Daniel E. Carpenter

Dear Ms. Fontaine:

As you know, we represent Universitas Education, LLC ("Universitas") in the above matter.

Pursuant to Rule R-6, Universitas is dropping all claims against and involving Grist Mill Capital LLC for, among other reasons, no arbitration agreement exists between Universitas and Grist Mill Capital.

We will be filing an amended statement reflecting this change shortly.

Sincerely,

Paula Colbath /Ju

Paula K. Colbath
Partner

cc: William McGrath, Esq.
Joseph Pastore III, Esq.
Paul Dehmel, Esq.
Richard S. Order, Esq.

NY859848.1
214560-10001

A limited liability partnership including professional corporations

# EXHIBIT EIGHT



PAULA K. COLBATH
Partner

345 Park Avenue
New York, NY 10154

Direct  212.407.4905
Main   212.407.4000
Fax    212.937.3189
pcolbath@loeb.com

Via E-mail

March 22, 2011

Peter Altieri, Esq.
Epstein Becker & Green, P.C.
250 Park Avenue, 14th Floor
New York, NY 10177

Re:   AAA No. 13 195 Y 1558 10 — Universitas Education, LLC v. Nova Group, Inc., et. al.

Dear Arbitrator Altieri:

We write on behalf of Universitas Education, LLC ("Universitas") to report that Nova Group, Inc. ("Nova Group") failed to deposit $26,525,535.98 into escrow (by March 19), as required by your January 24, 2011 Arbitration Award (the "Award"). We thus request that you begin Phase II of the Arbitration.

As you will recall, your Award required Nova Group to "deposit $26,525,535.98 in escrow with the law firm of Updike Kelly and Spellacy on or before the later of 30 days following the date of [the] Award or 30 days after determination of any motion for reconsideration under Rule 46[.]" 1/24/11 Award at 13.  Universitas submitted a motion for reconsideration, that your Honor denied on February 17, 2011 (Nova Group did not submit a motion for reconsideration).  Nova Group was thus required to comply with the Award's escrow deposit requirement by no later than March 19, 2011.

Yesterday I wrote to Richard Order, Nova Group's counsel, requesting that he provide me with documentary proof of Nova Group's compliance with the escrow deposit provision.  3/21/11 E-mail from Paula Colbath, attached as Ex. 1.  Mr. Order did not provide any proof that the monies were deposited, as required by the Award.

Pursuant to your Honor's Order of December 1, 2010 (attached as Ex. 2), Universitas plans to contact TD Bank and request the immediate production of the originally subpoenaed documents for Phase II of this Arbitration.

*Further, in view of Nova Group's failure to deposit the required monies into escrow, Universitas* requests that you:

> 1. Set a date for an Initial Scheduling Conference for Phase II of this Arbitration, in which Universitas will proceed against (a) Benistar Administrative Services, Inc. ("BASI"); (b) Nova Benefit Plans, LLC; and (c) Wayne Bursey ("Bursey").[1]

---

[1] Universitas withdraws its arbitration claims against Daniel Carpenter ("Carpenter") and Donald Trudeau ("Trudeau") without prejudice.



2. Allow Universitas to submit a Second Amended Statement of Claim against Nova Group, Inc., BASI, Bursey and Nova Benefit Plans -- including a claim of statutory theft under Connecticut law -- within two (2) weeks following the occurrence of the initial Scheduling Conference for Phase II of this Arbitration.

3. Determine whether BASI, Nova Benefit Plans and Bursey are bound to arbitrate (as you will recall, they claim they are not). This issue has already been fully briefed.[2] Universitas also requests that your Honor take judicial notice of the testimony at the December 2010 hearings pertaining to the activities of BASI, Nova Benefit Plans and Bursey in administering and operating the Charter Oak Trust. See pp. 469-479, 484-490, 674-675, 704-705, 760, 814-815, 830-831 and 1055-1056 of the Hearing Transcript. Should your Honor require additional briefing on this issue, Universitas would be happy to supplement its prior submissions.

4. Dismiss Carpenter's pending motion to strike, which is moot in view of Universitas' decision not to proceed against Carpenter in this Arbitration.

5. Authorize Universitas to immediately take the depositions of Nova Group, Inc. and the Phase II Parties on Phase II issues.

We are prepared to participate in a telephone conference at your earliest convenience so that Phase II can begin expeditiously.

Respectfully submitted,

Paula K. Colbath

Attachments

cc:   Richard S. Order, Esq. (via e-mail w/ attachments)
      Joseph M. Pastore III, Esq. (via e-mail w/ attachments)
      Daniel P. Scapellati, Esq. (via email w/ attachments)
      Karen Fontaine (AAA) (via e-mail w/ attachments)

---

[2] Universitas refers your Honor to Respondents' 10/6/10 Motion to Dismiss; Universitas' 10/15/10 Opposition to Respondents' Motion to Dismiss; Respondents' 10/22/10 Reply; and Universitas' 12/16/10 Post-Hearing Legal Brief at 35-36.

# EXHIBIT NINE

## LINCOLN # 7320809
## $20,000,000



CHARTER OAK TRUST

## ELECTION OF PARTICIPATION &
## BENEFICIARY DESIGNATION FORM

NAME OF EMPLOYER: HOLDINGS CAPITAL GROUP, INC.

NAME OF COVERED EMPLOYEE: SASH A. SPENCER        SSN: 065·30·4914

To: Administrator of the CHARTER OAK PLAN & TRUST

To participate in the Plan, place your initials in the space provided next to "A" below and insert the names of your beneficiaries. To make such beneficiary designation irrevocable, place your initials in the space next to "B" below and insert the names of your beneficiaries. Please do not forget to designate at least one beneficiary.

A. _____   I wish to participate in the Plan and name the following persons or entities as the Beneficiaries of any death benefit payable under the Plan:

Name of Beneficiaries: _____

Contact Person: _____     Phone: _____

Address: _____

I understand that I may change this designation at any time by submitting a new Beneficiary Designation Form to the Plan Administrator, and that such new designation will become effective when accepted by the Plan Administrator.

B. ✓   I wish to participate in the Plan and name the following persons or entities as the Irrevocable Beneficiaries of any death benefit payable under the Plan:

Name of Beneficiaries: UNIVERSITAS EDUCATION, LLC

Contact Person: SHARON SIEBERT        Phone: 212·826·0056

Address: 404 E. 55TH STREET, SUITE 13A, NY NY

I hereby elect that the foregoing designation of my beneficiary or beneficiaries of any death benefit that becomes payable pursuant to the Plan is irrevocable and non-amendable, and I shall have no right whatsoever to change such beneficiary designation for any reason. (If you have chosen option B, your signature must be notarized.)

NOTE: I hereby designate Grist Mill Capital, LLC as primary beneficiary of any sums which remain unpaid pursuant to any other agreements I might have with Nova Group, Inc. and acknowledge that any beneficiaries as designated above will receive all death benefit proceeds in excess of the sums payable to Grist Mill Capital, LLC.

X _____          X _____
Signature of Employer's Authorized Person       Signature of Covered Employee

SASH A. SPENCER, CEO                        SASH A. SPENCER
Name and Title of Authorized Person (Print or Type)    Name of Employee (Print or Type)

May 9th, 2008                              The foregoing instrument was acknowledged
Date of this Designation                    before me this 9th day of May 2008

                                          _____
                                          Notary Public

                                          Commission Expires: 10/31/2010

COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 02/27/07

4

BARBARA A. KNIFFEN
Notary Public, State of New York
No. 31-4826843
Qualified in New York County
Commission Expires 2010

10/31



CHARTER OAK TRUST

## ADOPTION AGREEMENT

The undersigned Employer ("Employer") adopts, joins, and agrees to participate in the Charter Oak Plan & Trust ("Plan") and contribute funds for the benefit of certain specified Employees listed below. The Employer agrees to all of the provisions of the Plan and accepts the Plan Sponsor as the Named Fiduciary and Administrative Trustee and will remit all contributions directly to the Plan Administrator.

Employer: HOLDING CAPITAL GROUP INC.
Contact Person: SASH A. SPENCER
Address: 7 RIDGEWOOD DR
BRIDGEWATER, CT 06752

Tax ID: 06-1378816
Type of Entity: PRIC. EQUITY INVESTMENTS
Fiscal Year End:
Phone #: 212-486-6670 XT 211
Fax #:
E-Mail: SSPENCER @HOLDING CAPITAL.COM

### DEATH BENEFIT
### COVERED EMPLOYEES / BENEFITS

| Name of Employee (attach additional sheets if necessary) | Social Security # | Date of Birth | Annual Funding Amount | Death Benefit Amount[1] |
|---|---|---|---|---|
| SASH A. SPENCER | 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 | 6-22-51 | | 30,000,000 |
| | | | | 20,000,000 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

1)  In all cases, the benefits provided by the Plan shall be limited to the amount of the benefit specified in the Certificate of Coverage and subject to all rules and limitations as described in the Plan Document. In the event of the death of the Participant before any insurance coverage is in force on the life of the Participant, the maximum benefit payable is limited to the total contributions received by the Plan for that Participant's benefit. No benefits are payable if the Employer has terminated its participation in the Plan prior to the Participant's death. This Plan is a welfare benefit plan and is not to be used for deferred compensation purposes. All unresolved disputes or claims under the Plan will be settled by binding arbitration in New York, New York, and such arbitration shall be governed by the laws of the State of New York.

Executed by the Employer at _____ on this 19 day of March 2007

Signature of Officer / Authorized Representative of Employer

SASH A. SPENCER, CEO
Printed Name and Title

COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 01/19/07

3



CHARTER OAK TRUST



_____ and its insurance companies (hereinafter collectively referred to as the "Carrier") have agreed to accept applications for individual insurance policies from the Plan Administrator and/or Sponsor of the CHARTER OAK PLAN & TRUST (hereinafter the "Plan") on Participants in the Plan. Subject to its underwriting requirements and restrictions, the Carrier has agreed to issue policies to the Plan on the lives of eligible employees of the undersigned Participating Employer (hereinafter the "Employer"). Any policy so issued will designate the Plan as the sole owner and beneficiary of the policy, and the exercise of any contract rights under that policy will require the written authorization of the Plan Sponsor.

In issuing its policies, the Carrier represents and warrants only those promises contained within the insurance contract itself, and no other. The Carrier's agreement to issue insurance policies to the Plan does not constitute an endorsement of the Plan. In agreeing to issue a policy on the life of an eligible employee of the Employer, the Carrier reserves the right to underwrite and determine independently whether or not to issue any further coverage on said employee and whether or not to issue any policies on the lives of Employer's other eligible employees. Coverage provided under any insurance policy issued to the Plan is dependent on the continued payment of the requisite premiums.

By accepting applications from the Plan Administrator and/or Sponsor of the Plan or by agreeing to issue any policy to the Plan, the Carrier makes no representations to the Employer or to any if its employees or representatives concerning the federal and state tax consequences of participation in the Plan. No director, officer, employee, agent, General Agent or other person has authority on behalf of the Carrier to provide the Plan, the Employer or any of Employer's employees with any legal or tax advice concerning participation in the Plan, or the termination of participation in the Plan.

In particular, the Carrier, Plan Sponsor, Administrator, and the Trustees make no representations concerning the following issues:

1.  Whether or not the Employer will be allowed a current income tax deduction for amounts contributed to the Plan;

2.  Whether or not an income tax deduction allowed in any taxable year may again be allowed in any subsequent taxable year for any reason;

3.  Whether the Employer or the Covered Employee will recognize any income or gain from participation in the Plan or from the termination of participation in the Plan;

4.  Whether any transaction might constitute a reversion of Plan assets to the Employer;

5.  What amount is includible in an employee's gross income, or in his wages for Social Security and Medicare tax purposes, as a result of participation in the Plan; and

6.  What the gift, estate or generation-skipping transfer tax consequences are with respect to an Employee's participation in the Plan, designation of any beneficiary under the Plan, or assignment of any entitlement under the Plan or insurance policy.

COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 01/19/07

5



*to the extent Employer is at fault in causing same reasonable*

CHARTER OAK TRUST

## DISCLOSURE AND ACKNOWLEDGMENT STATEMENT (CONT.)

The undersigned Employer, on its own behalf, and on behalf of its Participating Employees, agrees to indemnify and hold harmless the Plan Sponsor and the Trustees of the Trust from any and all costs including legal fees resulting from the Employer or the Participating Employees' participating in the Plan, and hereby acknowledges the following:

1. In determining whether to adopt the Plan and to what extent they would participate, they have sought and relied on legal and tax advice from their own independent advisors;

2. The Employer and Participating Employees are responsible for the tax consequences resulting from adoption and/or participation in the Plan;

3. Neither the Carrier nor any of its directors, officers, employees, agents, General Agents or other representatives have offered or have the authority to offer any legal or tax advice concerning the adoption and/or participation in the Plan. The Plan Sponsor, Administrator, Trustee and Carrier cannot and have not guaranteed or promised any particular legal or tax consequences from the Employer's adoption or participation in the Plan;

4. The Carrier and the Trustee have no responsibility for the administration of the Plan or for the distribution of benefits under the Plan;

5. The Carrier will be responsible solely for the promises contained in its insurance contracts;

6. Any illustrations provided in connection with the sale of the Carrier's policy do not constitute a guarantee or warranty of the policy's value, nor are such illustrations either estimates or projections of the policy's future performance or dividend scale;

7. The Plan provides for certain welfare benefits for Participating Employees and cannot be used as a vehicle for deferred compensation or retirement income.

8. Due to the possibility of future changes in the tax laws, there can be no guarantee or representation of any sort as to the future tax deductibility of any contribution to the Plan. Specifically, neither the Sponsor nor the Administrator can make any representa... warranty of any tax deductibility of any contributions to the Plan.

9. Any unresolved disputes or claims inv... the Plan shall be settled by final, binding and non-appealable arbitration under the commercial arbitra... ...es of the American Arbitration Association, with such arbitration to be conducted in New York, New York... be governed by the laws of the State of New York.

The undersigned Employer, for itself, its su...rs, assigns and its Participating Employees, hereby asserts that it has read this statement in full, understands ...isions or has ...ing legal advice concerning its provisions, and agrees to be bound by the same.

Signature of Participating Employer      Date: 3-19-07

Name and Title: SASH A. SPENCER , CEO

COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. Rev. 01/19/07      6



CHARTER OAK TRUST



## ADMINISTRATION FEE AGREEMENT

This Agreement, effective as of the date below, is entered into by and between the undersigned Employer (hereinafter called the "Employer") and Nova Group, Inc. (hereinafter called the "Administrator"). In consideration of the mutual covenants and agreements contained herein, it is hereby agreed as follows:

SECTION 1. The Employer has signed an Adoption Agreement to participate in the Charter Oak Plan & Trust (hereinafter the "Plan"). The Administrator shall administer the Plan and shall also perform some duties assigned to the Plan Sponsor and Trustee in the Plan documents as their agent. Such services shall include, but not be limited to, the following:

a) Determine contributions, bill employers, and process all deposits;
b) Claims administration;
c) Approval and selection of appropriate insurance contracts to fund benefits;
d) Preparation of annual financial report and tax return; and
e) Provision of summary plan description.

SECTION 2. The Administrator shall process all benefit claims on behalf of Plan Participants in strict accordance with the claims procedures, rules and regulations for the administration of the Plan as formulated by the Plan Sponsor. The Administrator shall have sole responsibility to determine a Participant's status and eligibility for benefits under the Plan, based on information provided by the Employer.

SECTION 3. In performing its obligations under this Agreement, the Administrator neither assumes nor underwrites any liability of the Plan. The Sponsor is the fiduciary of the Plan and exercises discretionary authority and control over the assets of the Plan and the Administration of the Plan. The Employer also acknowledges that the Trustee will only follow the written instructions of the Administrator and/or Sponsor.

SECTION 4. The Employer agrees to indemnify the Administrator and hold it, its directors, officers, and employees, harmless from all amounts and expenses (including reasonable attorneys' fees and court costs) for which the Administrator may become liable as a result of any suits or omissions by the Employer with respect to the administration of the Plan, including, but not limited to, the determination of an employee's eligibility for benefits, the decision to pay benefits to a beneficiary under the Plan, and the determination of the amount of benefits payable to any beneficiary, except for any act or omission attributed to the Administrator's grossly negligent failure to perform its obligations under the Plan and this Agreement or the Administrator's willful misconduct. This indemnification covenant shall survive the termination of this Agreement.

SECTION 5. As compensation for its services under this Agreement, the Administrator shall receive $1,500 upon the signing of the Adoption Agreement. Thereafter, the Plan Administration fees are payable as of March 31 for every subsequent Plan Year in advance at $750 per year. Plan Administration fees will not be pro-rated in the event of an Employer's termination from the Plan, which must be done with 60 days advanced written notice with a termination fee payable of $500. Specific fees for additional services will be quoted on a case-by-case basis upon request.

SECTION 6. This Agreement shall be terminated upon the Employer's withdrawal from the Plan by giving the Administrator at least sixty (60) days written notice of termination and payment of the $500 termination fee. The Administrator may terminate this Agreement and the Employer's participation in the Plan immediately if the Administrator fails to receive the contributions required by the Plan or its administrative fees, with such termination to be accomplished by written notice from the Administrator or the Sponsor to the Employer.

SECTION 7. Any notice required to be given hereunder shall be given to the Administrator at its current address and to the Employer at its address as set forth in the Adoption Agreement or to such other address as either party may advise the other in writing from time to time. Notice shall be delivered by facsimile or by certified mail, return receipt requested.

SECTION 8. This Agreement may be assigned by the Administrator to any other party, including any successor to the business of the Administrator by merger, consolidation, purchase of assets or otherwise. The Administrator reserves the right to increase its annual administration fee by giving the Employer notice by January 15th of each year.

SECTION 9. This Agreement shall be governed by the laws of the State of New York.

SECTION 10. The Employer will be responsible for the following matters with respect to the Plan:

a) All legal and tax consequences of the Employer's and Employees' participation in the Plan;
b) Prompt remittance of contributions to the Plan upon receiving notice from the Administrator;
c) Timely payment of the Administrator's fee upon receipt of an invoice for the same;
d) Providing Covered Employees with information about the Plan supplied by the Administrator; and
e) Providing the Administrator with a list of Covered Employees and their Welfare Benefit amounts at the beginning of each year.

SECTION 11. Any dispute or controversy arising under or in connection with this Agreement or with respect to the Employer's participation in the Plan shall be settled exclusively by binding arbitration, conducted by a single arbitrator in New York, New York in accordance with the rules of the American Arbitration Association then in effect. The expense of the arbitrator shall be shared equally by the Employer and the Administrator. The decision of the arbitrator shall be final, binding, and non-appealable, and judgment may be entered on the arbitrator's award in any court having jurisdiction thereof. The Parties evidence their agreement to the provisions herein by their signatures below:

Employer: HOLDING CAPITAL GROUP, INC.          Administrator: Nova Group, Inc.

By: _____ Date: 7-19-07          By: _____
                                                         Signature
SASH A. SPENCER                                    Wayne H. Bursey
Printed Name and Title                             Printed Name and Title

COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 01/19/07

7



**CHARTER OAK TRUST**

## CERTIFICATE OF RESOLUTION

Adopted By:

**HOLDING CAPITAL GROUP, INC**
(Full Legal Name of Employer)

I, the undersigned, as an officer, director, member, partner, or other authorized person of the Employer (hereinafter the "Authorized Persons"), hereby certify by this document that the following resolutions have been adopted on behalf of the Employer:

RESOLVED: That the Employer hereby approves, adopts, and agrees to make contributions to and fund benefits for certain employees through the CHARTER OAK PLAN & TRUST, a Welfare Benefit Fund as described under Internal Revenue Code Section 419(e), *in amounts at its sole discretion.*

RESOLVED: That the Authorized Persons are hereby authorized and directed to execute all documents, take all steps necessary to effectuate said approval and adoption of the CHARTER OAK PLAN & TRUST on behalf of the Employer, and direct that this certification be filed with the records of the Employer.

Dated as of this ___19___ day of __March___, 20_07_

(X) _____
Authorized Signature

**SASH A. SPENCER**
Name and Title

COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 01/19/07

8

# LINCOLN # 7305475
# $10,000,000



CHARTER OAK TRUST

## ELECTION OF PARTICIPATION & BENEFICIARY DESIGNATION FORM

NAME OF EMPLOYER: HOLDINGS CAPITAL GROUP, INC.

NAME OF COVERED EMPLOYEE: SASH A. SPENCER    SSN: 065.30.4914

To: Administrator of the CHARTER OAK PLAN & TRUST

To participate in the Plan, place your initials in the space provided next to "A" below and insert the names of your beneficiaries. To make such beneficiary designation irrevocable, place your initials in the space next to "B" below and insert the names of your beneficiaries. Please do not forget to designate at least one beneficiary.

A. _____     I wish to participate in the Plan and name the following persons or entities as the Beneficiaries of any death benefit payable under the Plan:

Name of Beneficiaries: _____

Contact Person: _____  Phone: _____

Address: _____

I understand that I may change this designation at any time by submitting a new Beneficiary Designation Form to the Plan Administrator, and that such new designation will become effective when accepted by the Plan Administrator.

B. ✓     I wish to participate in the Plan and name the following persons or entities as the Irrevocable Beneficiaries of any death benefit payable under the Plan:

Name of Beneficiaries: UNIVERSITAS EDUCATION, LLC

Contact Person: SHARON SIEBERT    Phone: 212-826-0056

Address: 404 E. 55TH STREET, SUITE 13A, NY NY

I hereby elect that the foregoing designation of my beneficiary or beneficiaries of any death benefit that becomes payable pursuant to the Plan is irrevocable and non-amendable, and I shall have no right whatsoever to change such beneficiary designation for any reason. (If you have chosen option B, your signature must be notarized.)

NOTE: I hereby designate Grist Mill Capital, LLC as primary beneficiary of any sums which remain unpaid pursuant to any other agreement I might have with Nova Group, Inc. and acknowledge that my beneficiaries as designated above will receive all death benefit proceeds in excess of the sums payable to Grist Mill Capital, LLC.

x _____
Signature of Employer's Authorized Person

SASH A. SPENCER, CEO
Name and Title of Authorized Person (Print or Type)

_____
Date of this Designation

x _____
Signature of Covered Employee

SASH A. SPENCER
Name of Employee (Print or Type)

The foregoing instrument was acknowledged before me this ____ day of ____ 200_

_____
Notary Public

Commission Expires: 10/31/2010

COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 02/27/07

4

BARBARA A. KNIFFEN
Notary Public, State of New York
No. 31-4629643
Qualified in New York County
Commission Expires 10/31/2010

## II.   ADOPTION AGREEMENT

The Employer adopts, joins, and agrees to participate in the CHARTER OAK TRUST WELFARE BENEFIT PLAN (hereinafter, the "Plan") and contribute funds for the benefit of certain specified Employees listed below. The Employer agrees to all of the provisions of the Plan and accepts the Plan Sponsor, GRIST MILL CAPITAL, LLC, as the Fiduciary and Trustee and will remit all contributions made payable to the CHARTER OAK TRUST WELFARE BENEFIT PLAN directly to the Trustee at the following address:

Charter Oak Trust Welfare Benefit Plan
100 Grist Mill Road
Simsbury, CT 06070

### DEATH BENEFIT
#### Covered Employees

| Name of Employee | Soc. Sec. # | DOB | Death Benefit |
|---|---|---|---|
| Sash A Spencer | 065 30 4914 | 6.22.1931 | 10,000,000 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

In all cases, the benefits provided by the Plan shall be limited to the amount of the benefit specified in the Certificate of Coverage and subject to all rules and limitations as described in the Plan Documents. No benefits are payable if the Employer has terminated its participation in the Plan prior to the Employee's death. This Agreement shall be governed by the laws of the State of New York. Any and all disputes regarding this Agreement and/or the Policy shall be submitted to binding arbitration before a single arbitrator under the commercial arbitration rules of the American Arbitration Association, and such arbitration shall take place in New York, New York. The arbitrator shall not be empowered to award special or punitive damages. The losing party in the arbitration shall pay all fees and costs (including attorneys' fees and costs, as well as the costs of arbitration) of the prevailing party. The final decision of the arbitrator shall be final, binding, and non-appealable, and judgment on the award may be entered in any court having jurisdiction thereof.

© 2006 Charter Oak Trust

By joining this Plan, the Employer agrees to contribute to the Trust annually. In the event that payments are not made and the Policy becomes in danger of lapsing and/or administration fees are not remitted, the Employer's participation in the Plan will be terminated and all Employee benefits and contributions to date shall be forfeited to the Plan. The Employer may make advanced funding contributions of any additional amount at any time.

Executed by the Employer at _____ on this $17\frac{th}{}$ day of December , 200 6

Signature of authorized officer/representative

GASH  A SPENCER
Printed Name

CEO
Title

© 2006 Charter Oak Trust

## III. ELECTION OF PARTICIPATION & BENEFICIARY DESIGNATION FORM

NAME OF EMPLOYER: _Holding Capital Group, Inc._

NAME OF COVERED EMPLOYEE: _Sash A Spencer_

SSN: _065. 30. 4914_

To:       Administrator of the Charter Oak Trust Welfare Benefit Plan

To participate in the Plan, place your initials in the space provided next to "A" below and insert the name(s) of your beneficiary(ies). To make such beneficiary designation irrevocable, place your initials in the space next to "B" below and insert the names of your beneficiary(ies). Please do not forget to designate a beneficiary.

A. _____

I wish to participate in the Plan and name the following person(s) or entity(ies) as Beneficiaries of any death benefit payable under the Plan:

Name of Beneficiary(ies): _Universitas Education LLC_

Contact Person: _Sharon Siebert_

Phone: _212 826 0056_

Address: _404 E 55th St Ste 13A NM NY_

I understand that I may change this designation at any time by submitting a new Beneficiary Designation Form to the Plan Administrator, and that such new designation will become effective when accepted by the Plan Administrator.

B. _____

I wish to participate in the Plan and name the following person(s) or entity(ies) as the Irrevocable Beneficiary(ies) of any death benefit payable under the Plan:

Name of Beneficiary(ies): _____

_____

_____

Contact Person: _____

Phone: _____

Address: _____

I hereby elect that the foregoing designation of my beneficiary(ies) of any death benefit that becomes payable pursuant to the Plan is irrevocable and unamendable, and I shall have no right whatsoever to change such beneficiary designation for any reason. (If you have chosen option B, your signature must be notarized).

Signature of Employer's Authorized Person

_Sash A. Spencer_
Print Name and Title of Authorized Person

_CEO_
Date _12/17/06_

Signature of Covered Employee

_Sash A. Spencer_
Print Name of Employee

The foregoing instrument was acknowledged before me this ___ day ___, 20__.

Notary Public
Commission expires: _____

© 2006 Charter Oak Trust

## IV.  DISCLOSURE, ACKNOWLEDGMENT & CERTIFICATION AGREEMENT

Policy Owner:   Charter Oak Trust
Insured:        SASH SPENCER
Carrier:        LINCOLN
Policy No.:

    In connection with an arrangement ("Funding Arrangement") pursuant to which GRIST MILL CAPITAL, LLC (the "Funder"), will provide premium funding in relation to the acquisition of a life insurance policy or policies (each a "Policy" and collectively, the "Policies") insuring the above-referenced insured (the "Insured"), such Funding Arrangement having been disclosed and explained to the Insured and the Insured's duly licensed insurance broker and/or agent (the "Agent"), each of the Insured and the Agent hereby certifies, represents and warrants to the Funder, for good and valuable consideration (including the issuance of the Policy and the attendant benefits derived therefrom), the receipt and sufficiency of which are hereby acknowledged, as follows:

    1.    The Insured seeks to obtain the Policy on his own initiative, as part of the Insured's estate planning.

    2.    The Policy shall be solely owned by the Charter Oak Trust (the "Trust"), and the Trust shall be the sole beneficiary of the Policy. Neither the Insured nor the Insured's beneficiaries shall be the owner or beneficiaries of the Policy.

    3.    The Policy is not being purchased with the intent of selling it in a settlement sale, and there have been no offers to sell or buy the Policy. Neither Agent, Funder, nor the Trust have recommended such a sale.

    4.    The benefits of the Policy and the underlying death benefit are understood by the Insured. The Trust, as the Policy owner, may maintain the Policy after the termination of the Funding Arrangement.

    5.    If in the future the Trust, as Policy owner, no longer desires to maintain the Policy, the Trust may surrender, lapse or otherwise dispose of the Policy subject to the terms of the Policy, the Funding Arrangement, and the circumstances existing at that time.

    6.    No rebate to the Insured or remuneration to the Agent of any kind has been offered.

    7.    The Funder shall provide premium payments for so long as the Trust owns the Policy.

    8.    The Trust shall hold and maintain the Policy until the death of the Insured or the termination or disposition of the Policy. All death proceeds from the Policy shall be payable to the Trust so long as the Trust owns the Policy.

    9.    The Insured and Agent both understand and agree that the following remittances, fees and expenses shall be due and payable to the Funder upon the maturation, disposition, termination, or change in beneficiary of the Policy:

© 2006 Charter Oak Trust

(a)     repayment of all premiums and related costs regarding the Policy;

(b)     an Origination Fee of twenty percent (20%) of the total premiums funded and paid for the Policy in consideration of the Funding Arrangement having been implemented;

(c)     a Premium Funding Fee of three percent (3%) of the face amount of the Policy in consideration for the funding of such premiums;

(d)     a Termination Fee of one percent (1%) of the face amount of the Policy in consideration of the termination of the Funding Arrangement.

10.     The Insured has the option of acquiring the Policy from the Trust at any time on terms to be mutually determined by the Trust and the Insured.

11.     The Insured has had a full and unhindered opportunity to read, review, consider, and understand (with the Insured's legal counsel) the terms and provisions contained herein. The Insured has been advised to consult with an independent legal counsel of his own choosing, concerning the terms and provisions contained herein.

12.     The Insured has been advised to consult with independent financial advisors of his own choosing, concerning the issuance of the Policy and the terms and provisions contained herein.

13.     The Insured understands and appreciates the nature and magnitude of the risks assumed by him in entering into the transactions contemplated by the Funding Arrangement. The Insured voluntarily and knowingly makes the decision to take those risks, free of any coercion or duress.

14.     At no time has the Funder, the Trust, or any of their affiliated companies or its or their respective officers, employees, agents, representatives, affiliates, trustees, or designees made any express or implied representation or warranty in connection with the transactions contemplated by the Funding Arrangement.

15.     The Insured acknowledges that neither the Funder nor the Trust are encouraging, endorsing or recommending the acquisition of the Policy, the Policy itself, or any of its underlying investments. The Policy is being acquired at the Insured's own initiative and is being effectuated as part of the Insured's estate planning or charitable giving, with the assistance and the advice of the Agent and the Insured's financial and legal advisors.

16.     The Insured understands that the acquisition of the Policy and/or its subsequent disposition by the Trust may affect the Insured's ability to obtain insurance coverage in the future.

17.     The Insured understands that if at some point in the future he wishes for the Policy to be sold, a settlement sale of the Policy may not be appropriate or desirable for various reasons.

18.     Nothing contained herein or in any of the documents relating to the Funding Arrangement shall be deemed or construed as advice or guidance by the Funder or the Trust concerning the Insured's decision to enter into the Funding Arrangement or regarding the issuance of the Policy.

© 2006 Charter Oak Trust

19. This Disclosure, Acknowledgment & Certification Agreement shall be governed by the laws of the State of New York. Any and all disputes hereunder and/or regarding the Policy and/or the transactions contemplated by the Funding Arrangement between and among the Insured, the Agent, the Funder, and/or the Trust shall be submitted to binding arbitration under the commercial arbitration rules of the American Arbitration Association before a single arbitrator, such arbitration to be held in New York, New York. The arbitrator shall not be empowered to award special or punitive damages. The losing party in the arbitration shall pay all fees and costs (including attorneys' fees and costs, as well as the costs of arbitration) of the prevailing party. The final decision of the arbitrator shall be final, binding, and *non-appealable*, and judgment on the award may be entered in any court having jurisdiction thereof.

The parties hereto evidence their agreement to the provisions above with their signatures below:

INSURED:

_____  12/17/2006
Signature                        Date

SASH SPENCER
Printed Name          Title

AGENT:

_____  12-17-06
Signature                        Date

Bruce J Meeks  12-17-06
Printed Name          Title

ACCEPTED AND AGREED:
GRIST MILL CAPITAL, LLC

_____
Name:
Title:
Date:

© 2006 Charter Oak Trust

# EXHIBIT TEN

| | |
|---|---|
| Date: | March 19, 2007 |
| Insured: | Sash Spencer |
| Carrier: | Lincoln National |
| Policy No. | 7320809 |

## CHARTER OAK TRUST

### FUNDING OBLIGATION AGREEMENT AND POWER OF ATTORNEY

THIS POWER OF ATTORNEY AND FUNDING OBLIGATION AGREEMENT ("Agreement"), dated as of the date first above written, is by and between the Charter Oak Trust (the "Trust") and Grist Mill Capital, LLC (the "Funder").

Whereas, the Trust has been established to provide for the acquisition of and investment in various types of insurance policies to provide a welfare benefit fund or estate planning benefits for certain specified participants; and

Whereas, Funder conducts a life insurance premium funding business pursuant to which Funder applies for and obtains a life insurance policy or policies (collectively, the "Policy") issued on the life of the insured (the "Insured"), with such Policy at all times being owned by the Trust; and

Whereas, in consideration of Funder managing the Policy application process by which the Policy shall be issued to and/or acquired by the Trust, Funder shall receive certain fees from the Trust as outlined herein; and

Whereas, all parties hereto agree to operate the Trust and the financial investment in the Policy in such a way as to not violate any state or federal laws in the United States of America or to do anything to jeopardize the Trust or any specific entity's tax exempt status;

NOW, THEREFORE, the parties hereto hereby agree, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, to the following provisions:

1. For so long as the Trust owns the Policy, the Trust shall be the sole owner and beneficiary of the Policy.

2. The Trust hereby agrees to pay the Funder (i) repayment of all payments and contributions funded regarding the Policy, (ii) an Origination Fee of twenty percent (20%) of the total amount funded, and (iii) a placement fee of no more than ten percent (10%) of the face amount (or death benefit) of the Policy (collectively, the "Payments"), in consideration of the Funder managing the application for and issuance of the Policy and the funding arrangement.

3. In the case of a newly issued Policy, the Trust shall be the applicant for all Policy application purposes.

1

COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 02/27/07

4. The Trust hereby agrees that the Payments shall be due and payable within ninety (90) days of receipt by the Trust of the proceeds from the maturation, disposition, or termination of the Policy.

5. The Funder hereby agrees to obtain on an as-needed basis a current HIPAA compliant authorization executed by the Insured authorizing the Funder to obtain current medical records from the Insured's medical providers. The Trust shall render all reasonable necessary assistance to the Funder in obtaining such authorizations.

6. The Trust hereby grants to Funder and its designee an unconditional power of attorney coupled with an interest in favor of the Funder and its designee authorizing the Funder and its designee to take any and all actions on the Trust's behalf with respect to the Policy and its attendant benefits. Such power of attorney shall be irrevocable for so long as Funder owes any amounts to Ridgewood Finance, Inc. ("Ridgewood") with respect to the Policy. Funder hereby irrevocably and unconditionally makes Ridgewood its designee under such power of attorney for so long as Funder owes any amounts to Ridgewood with respect to the Policy.

7. As security interest for the due and punctual payment of any and all Payments or other obligations of the Trust hereunder, the Trust hereby assigns, mortgages, pledges, hypothecates, transfers, sets over, and grants to the Funder a first priority lien and a first priority security interest in and to all properties, assets, and rights of the Trust, wherever located, whether now owned or hereafter acquired or arising, including, without limitation, the Policy (including all proceeds thereof, such proceeds to encompass, among other things, any premium refunds, cash value, death proceeds or other payments by the insurer with respect to such Policy or any proceeds from the sale thereof), and all certificates and other writings representing or evidencing any of such life insurance policies, property or rights in and to the same, including, without limitation, each original manuscript policy, all personal and fixture property of every kind and nature, all goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), documents, accounts (including healthcare insurance receivables), chattel paper (whether tangible or electronic), deposit accounts, letter of credit rights (whether or not the letter of credit is evidenced by a writing), commercial tort claims, securities and all other investment property, supporting obligations, any other contract rights or rights to the payment of money, insurance claims or proceeds, tort claims, and all general intangibles including, without limitation, all payment intangibles, patents, patent applications, trademarks, trademark applications, trade names, copyrights, copyright applications, software, engineering drawings, service marks, customer lists, goodwill, and all licenses, permits, agreements of any kind or nature, pursuant to which the Trust possesses, uses or has authority to possess or use property (whether tangible or intangible) of the Trust, and all recorded data of any kind or nature, regardless of the medium of recording including, without limitation, all software, writings, plans, specifications and schematics, and any and all additions and accessions to the foregoing, all substitutions and replacements therefor, and all products and proceeds thereof. All terms defined in the Uniform Commercial Code of the State of New York and used herein shall have the same definitions herein as now specified therein and as such terms may hereafter be amended; provided, however, the term "instrument" shall be such term as defined in Article 9 of the Uniform Commercial Code of the State of New York rather than Article 3 thereof. The Funder shall have the right to file one or more financing statements pursuant to the Uniform Commercial Code or other notices appropriate under applicable law in form satisfactory to the Funder, in all public offices where filing or recording is deemed by the Funder to be necessary or desirable. The Trust hereby authorizes the Funder to take all action (including, without limitation, the filing of any Uniform Commercial Code Financing Statements or

2

COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 02/27/07

amendments thereto, without the signature of the Trust) that the Funder may deem necessary or desirable to perfect or otherwise protect the liens and security interests created hereunder and to obtain the benefits of this Agreement.

8. This Agreement may be amended or modified only by a written instrument signed by both parties. The terms of this Agreement cannot be orally waived, but only by a writing signed by the waiving party. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

9. This Agreement shall be governed by the laws of the State of New York. Any and all disputes regarding this Agreement and/or the Policy shall be submitted to binding arbitration before a single arbitrator under the commercial arbitration rules of the American Arbitration Association, and such arbitration shall take place in New York, New York. The arbitrator shall not be empowered to award special or punitive damages. The losing party in the arbitration shall pay all fees and costs (including attorneys' fees and costs, as well as the costs of arbitration) of the prevailing party. The final decision of the arbitrator shall be final, binding, and non-appealable, and judgment on the award may be entered in any court having jurisdiction thereof.

The parties hereto hereby evidence their agreement to the provisions above with their signatures below.

**CHARTER OAK TRUST**

**GRIST MILL CAPITAL, LLC**

Wayne H. Bursey
President
Nova Group, Inc.
Trustee of the Charter Oak Trust

Daniel E. Carpenter
Chairman of Managing Member

STATE OF CONNECTICUT )
COUNTY OF ~~FAIRFIELD~~ )  ss:
Hartford

Personally appeared Wayne H. Bursey, signer and sealer of the foregoing document on behalf of the Charter Oak Trust, and acknowledged the same to be his free act and deed before me on this 19 day of March, 2007.

NOTARY PUBLIC
My commission expires: Nov 30, 2010

COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 02/27/07

STATE OF CONNECTICUT )
COUNTY OF ~~FAIRFIELD~~ ) ss:
Hartford

Personally appeared Daniel E. Carpenter, signer and sealer of the foregoing document on behalf of the Grist Mill Capital, LLC, and acknowledged the same to be his free act and deed before me on this 14 day of March, 2007.

Deborah Thomas

NOTARY PUBLIC
My commission expires: Nov 30, 2010

COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 02/27/07

# COLLATERAL ASSIGNMENT AGREEMENT

FOR VALUE RECEIVED, this COLLATERAL ASSIGNMENT AGREEMENT, dated as of March 19, 2007 (as amended, supplemented or otherwise modified from time to time, this "Assignment") is entered into by CHRISTIANA BANK & TRUST COMPANY, acting solely in its capacity as the Insurance Trustee (the "Trustee") of the CHARTER OAK TRUST, a trust created and existing under the laws of the State of Connecticut (the "Assignor") pursuant to that certain trust instrument dated as of October 1, 2006 (the "Trust Agreement"), in favor of GRIST MILL CAPITAL, LLC, a limited liability company organized under the laws of the State of Connecticut (individually or collectively, the "Assignee"), its successors and assigns. Capitalized terms not defined herein have the same meaning as described in that certain Amended and Restated Line of Credit and Security Agreement dated as of February 12, 2007, by and among Assignee, Avon Capital, LLC and the Lender therein (as it may be amended, modified, supplemented or restated from time to time, the "Loan Agreement").

1.    Assignment. Assignor hereby assigns, transfers, pledges and grants all of Assignor's claims, options, privileges, rights, titles and interests in, to and under (except as provided in Section 2 hereof) the life insurance policies described on Exhibit A attached hereto and made a part hereof to Assignee and any and all additions, renewals and supplementary contracts issued in connection therewith and any and all proceeds thereof (said policies and contracts and proceeds are hereinafter collectively referred to as the "Insurance Policy"), subject to all the terms and conditions of this Assignment. This Assignment includes, without limitation (except as provided in Section 2 hereof), Assignor's assignment of the following rights to Assignee:

(a)    The sole right to collect from the insurer(s) issuing the Insurance Policy (the "Insurer") the net proceeds of the Insurance Policy due to the death of the insured or maturity (subject to the covenants herein);

(b)    The sole right to cancel or surrender the Insurance Policy and receive the surrender value thereof at any time provided by the terms of the Insurance Policy and at such other times as the Insurer may allow;

(c)    The sole right to obtain one or more loans or advances on Assignee's interest in the Insurance Policy at any time, either from the Insurer or from other persons, and to pledge or assign Assignee's interest of the Insurance Policy as security for such loans or advances;

(d)    The sole right to collect and receive all distributions or shares of surplus, dividend deposits or additions to the Insurance Policy now or hereafter made or apportioned thereto, and to exercise any and all options contained in the Insurance Policy with respect thereto; provided, that unless and until Assignee shall notify the Insurer in

1
COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 02/27/07

writing to the contrary, the distributions or shares of surplus, dividend deposits and additions shall continue on the plan in force at the time of this Assignment;

(e)     The right to exercise all non-forfeiture rights permitted by the terms of the Insurance Policy or allowed by the Insurer and to receive all benefits and advantages derived therefrom;

(f)     The right to exercise any and all voting rights or privileges to the extent created or endowed by the Insurance Policy; and

(g)     The right, upon the exercise of the Default Sale Right as set forth herein, to sell, transfer and assign the interest of the Insurance Policy conveyed to Assignee pursuant to Section 8.

2.     Rights Reserved. The parties agree that, so long as the Insurance Policy has not been surrendered, Assignor shall have the right to collect from the Insurer any disability benefit payable in cash that does not reduce the amount of insurance. The reservation of this right shall in no way impair the right of the Assignee to surrender the Insurance Policy completely with all of its incidents or impair any other rights of the Assignee hereunder, and any designation or change of beneficiary or election of a mode of settlement shall be made subject to this Assignment and to the rights of the Assignee hereunder.

3.     Obligations Secured. This Assignment is made, and the Insurance Policy is to be held, as collateral security for any and all obligations and liabilities of Assignor, either now existing or that may hereafter arise, under the Assigned Fee Agreements, all of which obligations and liabilities in respect of the Assigned Fee Agreements, secured or to become secured, are herein called the "Liabilities". Subject to the terms of this Assignment, Assignee shall apply money received under the Insurance Policy to pay the Liabilities as and when they become due in the order in which they become due.

4.     Representations and Warranties of Assignor. Assignor hereby represents and warrants to Assignee and the Insurer: (a) the execution, delivery and performance of this Assignment by Assignor is within Assignor's power and do not conflict with, violate, create a lien or default under or require a consent under any document or agreement to which Assignor is a party or by which it is bound; (b) the insured under the Insurance Policy has the financial ability, but not the obligation, to make subsequent contributions to the Assignor to allow the Assignor to pay the insurance premiums required to be paid for the Insurance Policy following the no less than twenty-five (25) nor more than thirty (30) months anniversary of the Client Transaction; (c) the Assignor has an insurable interest in the life of the insured under the Insurance Policy; (d) the Insurance Policy is in full force and effect; (e) the Assignor is the sole owner of the Insurance Policy and has full authority to assign the Insurance Policy to Assignee; (f) the Assignor has neither assigned, nor granted or suffered any lien or security interest against, the Insurance Policy to any other entity, except as provided in this Assignment; (g) this Assignment constitutes a legal, valid and binding obligation of the Assignor enforceable by Assignee against the Assignor in accordance with its terms (subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally); and (h) none of the proceeds of the Assigned Fee

COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 02/27/07

Agreements will be used for personal, family or household purposes or any purpose other than the payment of life insurance premiums and related fees and expenses for the Insurance Policy. Assignor further represents and warrants to Assignee that no proceedings in bankruptcy or any other insolvency law are pending or, to its knowledge, threatened against Assignor and that no grounds exist for any such proceedings.

5.     Covenants. Assignor and Assignee covenant and agree as follows:

(a)     Unless Assignee shall have elected to exercise the Default Sale Right (as defined below), any balance of sums received hereunder, including loans and cash withdrawals, from the Insurer remaining after payment of the then existing Liabilities, matured or unmatured, shall be paid in full by Assignee to the persons entitled thereto under the terms of the Insurance Policy;

(b)     Assignor shall not surrender, cancel, or otherwise terminate the Insurance Policy or allow the Insurance Policy to lapse or terminate. Assignor shall do or cause to be done all things necessary to preserve and keep in full force the Insurance Policy until the Liabilities have been satisfied in full under the terms and conditions of the Assigned Fee Agreements.

(c)     Assignee shall not consent to the exercise of either the right to surrender or lapse of the Insurance Policy or the right to obtain policy loans from the Insurer, unless and until there has been a Default Sale Event;

(d)     After a Default Sale Event, upon Assignor's request, Assignee shall forward to the Insurer, without unreasonable delay, the Insurance Policy for endorsement of any designation or change of beneficiary or any election of an optional mode of settlement;

(e)     The Insurer is hereby authorized and instructed by Assignor to recognize Assignee's claims to rights hereunder (including the exercise of the Default Sale Right) without investigating the reason for any action taken by Assignee, or the validity or the amount of the Liabilities or the existence of any Default Sale Event, or the giving of any notice hereunder, under applicable law or otherwise, or the application to be made by Assignee of any amounts to be paid to Assignee. The signatures of Assignee shall be sufficient for the exercise of any rights under the Insurance Policy assigned hereby and the receipt by Assignee of any sums shall be a full discharge and release therefore to the Insurer. Checks for all or any part of the sums payable under the Insurance Policy and assigned herein shall be paid to the exclusive order of Assignee if, when, and in such amounts as may be requested by Assignee;

(f)     Assignor shall at no time change the mode of premium payment or otherwise modify the timing of any such premium payments from the signed Insurance Policy illustration provided by Assignor to Assignee. Assignee shall be under no obligation to pay any premium, or the principal of or interest on any loans or advances on the Insurance Policy, whether or not obtained by Assignee, or any other charges on the Insurance Policy, but such amounts so paid by Assignee from its own funds, shall

3
COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 02/27/07

become a part of the Liabilities hereby secured and shall be subject to the terms of the Assigned Fee Agreements and shall be secured by this Assignment;

(g) The exercise of any right, option, privilege or power given by Assignor to Assignee under this Assignment shall be at the option of Assignee, and Assignee may exercise any such right, option, privilege or power without notice to, or assent by, or affecting the liability of, or releasing any interest hereby assigned by Assignor;

(h) Assignee shall promptly notify Assignor in writing if Assignee shall assign any of its rights under the Assigned Fee Agreements or this Assignment, and Assignee shall provide Assignor with the name and address of Assignee, and such other information as Assignor may request; and

(i) Assignee shall promptly provide Assignor with copies of all documents, instruments, correspondence and other written materials received by Assignee from the Insurer, and promptly (but in no event later than fifteen (15) days following receipt) remit to Assignor Assignee's share of any proceeds received by Assignee from the Insurer that are payable by Assignee to Assignor.

6.     Termination. This Assignment shall automatically terminate on the date on which the Liabilities have been paid and performed in full.

7.     Further Assurances. Assignee and Assignor each hereby covenant and agree to execute any and all documents, instruments, certificates and agreements that may be necessary to give effect to the matters contemplated herein.

8.     Default Sale Right; Default Sale Event. Each of the following shall constitute a "Default Sale Event" as that term is used in this Assignment: the occurrence and continuation of an event of default under the Assigned Fee Agreements which has not been remedied within the time period, if any, set forth in the Assigned Fee Agreements, (b) the occurrence and continuation of any breach by Assignor of any material covenant or obligation of Assignor contained in the Assigned Fee Agreements, and (c) the occurrence and continuation of any breach by Assignor of any material covenant or obligation of Assignor contained in this Collateral Assignment; provided that no event of default or breach of covenant or obligation shall be deemed to be a Default Sale Event unless, on or after the occurrence thereof, Assignee shall have given Assignor written notice of such event of default or breach of covenant or obligation, which notice shall state that Assignee has determined to exercise its Default Sale Right (the "Default Sale Notice") and thus foreclose on the Insurance Policy. Upon receipt of a Default Sale Notice, Assignor shall immediately transfer and assign Assignor's ownership, claims, options, privileges, rights, titles and interests, without limitation, in, to and under the Insurance Policy to Assignee (or its designee) and thereby forever relinquish any and all rights Assignor may have under this Assignment or the Note (the "Default Sale Right"). Assignor shall execute any and all documents necessary to effect the Default Sale Right. Upon the exercise of this Default Sale Right, Assignee shall notify the Insurer in writing and the Insurer shall thereafter recognize Assignee as the sole lawful owner of the Insurance Policy, and Assignee, acting in its sole and absolute discretion, shall have full power and authority (a) to sell or

4
COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 02/27/07

otherwise dispose of the Insurance Policy and to receive all consideration obtained in connection with such sale or other disposition, (b) to receive all payments due from the Insurer with respect to the Insurance Policy, and (c) otherwise to enjoy all rights and benefits of the Insurance Policy. Monies or other proceeds received by Assignee upon exercise of the Default Sale Right or otherwise in exercise of its rights and remedies by the giving of a Default Sale Notice following a Default Sale Event shall be applied as follows: first to payment of all costs and expenses, including fees and expenses of Assignee's counsel, incurred by the Assignee in connection with the Default Sale Event and exercise of its rights and remedies; second, to the payment of all amounts due and owing with respect to the Assigned Fee Agreements; and third, to the extent of any excess, the balance also to the Assignee, it being understood that such balance of any payments of death benefits or other amounts on the Insurance Policy, following application of the proceeds thereof to the items in paragraphs first through fourth, shall be remitted to the Assignor during the period prior to the Assignor's receipt of the Default Sale Notice declaring the Assignee's exercise of the Default Sale Right upon the occurrence of a Default Sale Event, but such balance shall be irrevocably retained by the Assignee (or its assigns) and not remitted to the Assignor if received during the period from and after the date the Assignor receives the Default Sale Notice declaring Assignee's exercise of the Default Sale Right upon the occurrence of a Default Sale Event.

9.      Assignee's Appointment as Attorney-in-Fact.

(a)      Assignor hereby irrevocably constitutes and appoints Assignee and any officer or agent thereof, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of Assignor and in the name of Assignor or in its own name, from time to time in Assignee's discretion, for the limited purpose of carrying out all terms of this Assignment, to take any and all appropriate action and to execute and deliver any and all documents and instruments which Assignee may deem necessary or desirable to accomplish the purposes of this Assignment and, without limiting the generality of the foregoing, hereby gives Assignee the power and right, on behalf of Assignor, without notice to or assent by Assignor to do the following:

(i)      to take possession of and endorse and collect any checks, drafts, notes, acceptances or other instruments for the payment of monies due under the Insurance Policy and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by Assignee for the purpose of collecting any and all such monies due under the Insurance Policy whenever payable and to file any claim or to take any other action or proceeding in any court of law or equity or otherwise deemed appropriate by Assignee for the purpose of collecting any and all such monies due under the Insurance Policy whenever payable; and

(ii)      (A) to direct any party liable for any payment under the Insurance Policy to make payment of any and all monies due, and to become due there under, directly to Assignee or as the Assignee shall direct; (B) to receive payment of and receipt for any and all monies, claims and other amounts due, and to become due at any time, in respect of or arising out of the Insurance Policy; (C)

COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 02/27/07

to commence and prosecute any suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect amounts due under the Insurance Policy or any part thereof and to enforce any other right in respect of the Insurance Policy; (D) to defend any suit, action or proceeding brought against Assignor with respect to the Insurance Policy; (E) to settle, compromise or adjust any suit, action or proceeding described above and, in connection therewith, to give such discharges or releases as Assignee may deem appropriate; and (F) generally to sell, transfer, pledge, make any agreement with respect to or otherwise deal with the Insurance Policy as fully and completely as though Assignee were the absolute owner thereof for all purposes, and to do, at Assignee's option, at any time, or from time to time, all acts and things that Assignee reasonably deems necessary to protect, preserve or realize upon the Insurance Policy and Assignee's lien therein, in order to effect the intent of this Assignment, all as fully and effectively as Assignor might do.

(b)     Assignor hereby ratifies, to the extent permitted by law, all that any said attorney shall lawfully do or cause to be done by virtue hereof. The power of attorney granted pursuant to this Assignment, being coupled with an interest, shall be irrevocable until the Liabilities are indefeasibly paid in full (in the case of payment obligations) and otherwise satisfied and discharged.

(c)     The powers conferred on Assignee hereunder are solely to protect Assignee's interests in the Insurance Policy and shall not impose any duty upon it to exercise any such powers. Assignee shall be accountable only for amounts that it actually receives as a result of the exercise of such powers and neither it nor any of its officers, directors, employees or agents shall be responsible to Assignor for any act or failure to act, except for its own gross negligence or willful misconduct.

(d)     Assignor also authorizes Assignee, at any time and from time to time upon the occurrence and during the continuance of a Default Sale Event, to execute, in connection with the sale provided for herein, any endorsements, assignments or other instruments of conveyance or transfer with respect to the Insurance Policy.

10.     No Waiver. Any forbearance or failure or delay by Assignee in exercising any right, power or remedy hereunder shall not be deemed to be a waiver of such right, power or remedy, and any single or partial exercise of any right, power or remedy shall not preclude the further exercise thereof. Assignee may take or release other security, may release any party primarily or secondarily liable for any of the Liabilities, may grant extensions, renewals or indulgences with respect to the Liabilities, or may apply to the Liabilities in such order as Assignee shall determine, the proceeds of the Insurance Policy hereby assigned or any amount received on account of the Insurance Policy by the exercise of any right permitted under this Assignment, without resorting or regard to other security or any guaranty. No waiver of any provision hereof shall be effective unless it shall be in writing and signed by Assignee.

11.     Successors and Assigns. All of the terms and provisions of this Assignment shall be binding upon, and inure to the benefit of, and be enforceable by, the respective successors, executors, administrators and assigns of the parties hereto.

COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 02/27/07

12.     Entire Agreement. This Assignment and Assigned Fee Agreements are the entire agreement and understanding of the parties with respect to the subject matter hereof and supersede all prior agreements or understandings between or among such parties with respect to such subject matter. This Assignment may not be altered or amended except by subsequent written agreement duly executed by all of the parties. The unenforceability of any provision of this Assignment shall not affect the enforceability or validity of any other provision hereof. No delay or omission on the part of Assignee in exercising any rights hereunder or under the Assigned Fee Agreements shall operate as a waiver of such right or of any other right under this Assignment, or the Assigned Fee Agreements.

13.     Notices. All notices and other communications required or permitted hereunder shall be given in writing and shall be deemed effectively given (a) upon delivery, when delivered personally against receipt therefor, (b) upon delivery when sent by certified mail, postage prepaid and return receipt requested, (c) upon transmission, when transmitted by telecopier, facsimile, telex or other electronic transmission method, provided that receipt is confirmed and notice is sent by certified or registered mail, postage prepaid and return receipt requested, or (d) upon delivery, when sent by Federal Express or other nationally recognized overnight delivery service:

If to Assignee:          Grist Mill Capital, LLC
                         100 Grist Mill Road
                         Simsbury, Connecticut 06070
                         Telephone:(860)408-7000
                         Facsimile: (860)408-7005


If to Assignor:          Charter Oak Trust
                         100 Grist Mill Road
                         Simsbury, Connecticut 06070
                         Telephone: (860) 408-7000
                         Facsimile: (860) 408-7005

With a copy to:          Christiana Bank & Trust Company
                         300 Delaware Avenue, Suite 714
                         Wilmington, DE 19801
                         Telephone: (302) 888-7438
                         Facsimile: (302) 421-3628
                         Attention: Deborah L. Lutes, Trust Officer

14.     Governing Law. This Assignment shall be governed by and construed in accordance with the internal laws of the State of New York, without giving effect to conflicts of law provision or rule (whether of the State of New York or any other jurisdiction) that would result in the application of the laws of any jurisdiction other than the State of New York.

7
COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 02/27/07

15. Consent to Jurisdiction and Waiver of Jury. EACH PARTY HERETO AGREES TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT OR THE CONNECTICUT SUPERIOR COURT, STAMFORD/NORWALK DIVISION, WITH RESPECT TO ANY CLAIM OR CAUSE OF ACTION, WHETHER IN LAW OR EQUITY, INCLUDING SPECIFIC PERFORMANCE, ARISING UNDER OR RELATING TO THIS AGREEMENT, AND WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT, AND CONSENTS THAT ALL SERVICES OF PROCESS MAY BE MADE BY CERTIFIED OR REGISTERED MAIL, POSTAGE PRE-PAID AND RETURN RECEIPT REQUESTED, TO THE ADDRESS OF THE PARTIES SET FORTH HEREIN. EACH PARTY HERETO WAIVES ANY OBJECTION BASED ON FORUM NON-CONVENIENS AND WAIVES ANY OBJECTION TO VENUE OF ANY ACTION INSTITUTED HEREUNDER. EACH PARTY HERETO WAIVES TRIAL BY JURY IN ANY ACTION BROUGHT HEREUNDER. EACH PARTY HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN ANY OTHER JURISDICTION BY SUIT ON A JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS SECTION SHALL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW. TO THE EXTENT THAT ANY PARTY HERETO HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS WITH RESPECT TO ITSELF OR ITS PROPERTY, SUCH PARTY HEREBY WAIVES (TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW) SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS HEREUNDER.

16. Heading. The headings of the sections of this Assignment are inserted for convenience only and shall not be deemed to constitute a part hereof.

17. Severability. In the event any one or more of the provisions contained in this Assignment shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision hereof, and this Assignment shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

18. Counterparts. This Assignment may be executed in any number of separate counterparts by one or more of the parties hereto and all of said counterparts taken together shall constitute one and the same instrument.

19. Limited Liability. It is expressly acknowledged and agreed that the liabilities and obligations under this Assignment are the sole obligations of the Assignor and are not the individual liabilities or obligations of the Trustee or of any settlor or beneficiary of the Assignor.

[Signatures appear on following pages.]

8
COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 02/27/07

IN WITNESS WHEREOF, the undersigned Assignor has executed this Assignment in favor of Assignee as of the date first written above.

ASSIGNOR:

CHARTER OAK TRUST

By: Christiana Bank & Trust Company,
    Insurance Trustee

By: _____
    Name:
    Title:

Date: _____

---

State of Delaware
County of New Castle

UNDER MY HAND AND NOTARIAL SEAL, _____day of _____200__.

_____
Notary Public
My Commission Expires: _____

---

IN WITNESS WHEREOF, the undersigned assignee has accepted and acknowledged this Assignment as of the date first written above:

**ASSIGNEE:**

GRIST MILL CAPITAL, LLC, a Connecticut limited liability company

By: _Daniel E. Carpenter_

Daniel E. Carpenter, Chairman of Managing Member

Date: _March 19 2007_

---

State of Connecticut
County of ~~Fairfield~~ *Hartford*

UNDER MY HAND AND NOTARIAL SEAL, 19 day of March 2007

_Deborah Thomas_
Notary Public
My Commission Expires: Nov 30, 2010

9
COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 02/27/07

# EXHIBIT ELEVEN

July 23, 2008

FOR SETTLEMENT PURPOSES ONLY
VIA FEDERAL EXPRESS

Mary M. Spencer                                Holding Capital Group, Inc.
251 Crandon Boulevard, Unit 164                7 Ridgewood Drive
Key Biscayne, FL 33149                         Bridgewater, CT 06752

Donna J. Vasser                                Arthur M. Michaelson, Esq.
Sharon Siebert                                 Hofheimer Gartlir & Gross, LLP
Universitas Education, LLC                      530 Fifth Avenue
404 East 55th Street, Suite 13A                New York, NY 10036
New York, NY 10022

      Re:     Charter Oak Trust and Sash A. Spencer

Ladies & Gentlemen:

      I write this letter on behalf of the Charter Oak Trust (the "Trust"), Nova Group, Inc. ("Nova," the Plan Sponsor of the Trust), and Grist Mill Capital, LLC ("GMC"). The purpose of this letter is to correct what appear to be serious misunderstandings among the parties regarding policy numbers 7305475 and 7320809 (the "Policies") issued by The Lincoln National Life Insurance Company ("Lincoln") on the life of Sash A. Spencer (the "Insured"), having a total face amount (death benefit) of $30 million.

      As you are all undoubtedly aware, the Trust is the sole owner and beneficiary of the Policies. Nova, as GMC's designee, received from the Insured a durable and irrevocable power of attorney coupled with an interest authorizing Nova "to take any and all actions on the [Insured's] behalf with respect to the Polic[ies]." After the Insured's untimely death in June 2008, Nova—pursuant to its power of attorney from the Insured and the fact that the Trust is the sole owner and beneficiary of the Policies—filed a death claim with Lincoln with respect to the Policies. Nova expects Lincoln to pay the full net death benefit to the Trust (approximately $30 million, plus cash value accumulations and minus policy charges) within the next 90 days.

      Pursuant to irrevocable beneficiary designation forms executed by the Insured dated May 9, 2008 (approximately one month before his death) and delivered to the Trust, the Insured designated Universitas Education, LLC ("Universitas") as the sole and exclusive irrevocable beneficiary of all benefits payable pursuant to the Trust (the "Net Trust Benefits").

      I understand, based on drafts of settlement documentation that have been forwarded to me, that Universitas and Mary M. Spencer, the executrix of the Insured's estate ("Mary"), have reached an agreement whereby Mary and Universitas have agreed to share the Net Trust Benefits in some manner. The Trust has no objection to such an arrangement, **provided**, **however**, that Universitas agrees to such an arrangement in writing and releases the Trust, Nova, GMC, Lincoln, and their affiliates from any and all claims regarding the Trust's payment of the Net Trust Benefits (to which Universitas is currently the sole beneficiary) to any person or entity *other* than Universitas.

Before outlining the necessary steps to effectuate such an arrangement, I want to describe exactly how the Net Trust Benefits are calculated:

| | | | |
|---|---|---|---|
| Death benefit payable by Lincoln: | | | $ 30,000,000 |
| Less: | 1) | 20% of death benefit retained by the Trust (pursuant to Trust § 6.01) | 6,000,000 |
| | 2) | Reimbursement of all premiums paid by GMC (pursuant to Disclosure Agreement § 10(a)) | 4,055,537 |
| | 3) | Origination fee of 20% of total premiums paid (pursuant to Disclosure Agreement § 10(b)) | 811,107 |
| | 4) | Placement fee of 2% of the total death benefit (pursuant to Disclosure Agreement § 10(c)) | 600,000 |
| Net Trust Benefits [1] | | | $ 18,533,356 |

Because the Trust is required by law to pay the **entire** amount of the Net Trust Benefits directly to Universitas, the Trust will not pay the Net Trust Benefits to any other person or entity unless directed to do so in writing by Universitas, with appropriate releases and indemnifications for the benefit of the Trust, Nova, GMC, Lincoln, and their affiliates.

All parties are undoubtedly aware that all of the premiums for the Policies were paid solely by GMC, so no other party has any legal or equitable claims in that regard. Furthermore, I hasten to remind all parties of the following Trust provisions:

Section 13.06 <u>Applicable Law</u>. This Declaration of Trust shall be construed, regulated and administered by and under the laws of the State of Connecticut, where the Trust is created.

Section 13.07 <u>Disputes</u>. Any and all disputes regarding the Trust or the Plan shall be settled by Arbitration. Any Arbitration between the Plan and any Participant or Employer shall be limited to the Participant's or the Employer's individual claims, and no claims arising out of this Agreement shall be asserted or arbitrated on a classwide basis. *Any court litigation brought against the Plan, or threatened against the Plan either on an individual or a classwide basis, will result in the immediate termination from the Plan of the individual Participant(s) or Employer(s) bringing such action or litigation or threatening such action or litigation*. (Emphasis added).[2]

---

[1]  Less additional attorneys' fees and costs incurred by the Trust to consummate receipt of the death benefit from Lincoln.

[2]  The Disclosure Agreement executed by the Insured, and to which Mary as the executrix of the Insured's estate is legally bound, calls for binding arbitration before a single arbitrator in New York, New York. The final decision of the arbitrator shall be final, binding, and *non-appealable*.

Thus, any litigation, or threat of litigation, brought against the Trust, Nova, GMC, or Lincoln, will cause all of the Net Trust Benefits otherwise payable to Universitas **to automatically and entirely forfeit to the Trust**. Consequently, all parties would be well-advised to govern themselves accordingly.

In light of the foregoing, neither the Trust, nor Nova, nor GMC, shall execute the proposed "settlement agreement" or "escrow agreement" that have been recently circulated, notwithstanding any oral or written statements of intention that may have been previously communicated to the contrary. The **only** arrangement to which the Trust will agree, other than payment of the entire Net Trust Benefits directly to Universitas, is the following:

1) Execution by Universitas of an irrevocable instruction letter and release drafted by the Trust directing the Trust to pay the Net Trust Benefits to a designated escrow account;

2) Neither the Trust, nor Nova, nor GMC, will be parties to any "settlement agreement" or "escrow agreement" governing such escrow account; and

3) The escrow agent must either be a nationally reputable bank or financial institution (such as JP Morgan Chase or PNC Bank), or a law firm of the Trust's choosing (such as Halloran & Sage LLP in Hartford, Connecticut, but not Hofheimer Gartlir & Gross LLP, due to its lack of presence in Connecticut).

Therefore, unless and until Universitas informs me in writing that it agrees to this arrangement, then neither the Trust, nor Nova, nor GMC, shall take any actions or execute any documents to alter their existing legal obligations to pay the entirety of the Net Trust Benefits directly to Universitas.

Sincerely,

Jack E. Robinson
Vice President

cc: Bruce J. Mactas
Mactas Alper & Szrolovits
292 Madison Avenue, 7th Floor
New York, NY 10017

3

# EXHIBIT TWELVE

SETTLEMENT AGREEMENT AND RELEASES

This SETTLEMENT AGREEMENT AND RELEASES is made as of the 11th day of · November, 2008 by and between Holding Capital Group, Inc., a Connecticut corporation having an office at 7 Ridgewood Drive, Bridgewater, Connecticut 06752 ("Holding Capital"), and Universitas Education, LLC, having an office at 404 East 55th Street, Suite 13A, New York, New York 10022 ("UE LLC").

A.  Background – which all parties hereto acknowledge:

1.  Through the offices of Bruce Mactas, on or about December 22, 2006, two life insurance policies in the aggregate principal amount of $30,000,000, issued by The Lincoln National Life Insurance Company ("Lincoln National") were purchased by Charter Oak Trust (the "Trust") on the life of Holding Capital's principal, the late Sash A. Spencer, who passed away on June 10, 2008.

2.  The Trust is the owner and beneficiary of those policies (hereinafter the "Policies"). ·

3.  UE LLC is the sole named beneficiary of the Trust. However, differences have arisen among the parties as to their respective rights and claims causing a review of the Trust documentation.  Certain contingencies were not addressed and clarification is needed to accurately reflect the intended beneficiary designations.

4.  Holding Capital, UE LLC and their principals have now settled all differences and claims and agree as follows.

{ 60017/010/01178485:1-CRS}

EXHIBIT 106

AAA Case No. 13195 Y 1558 10

UNIV-000180

B.    Agreement:

1.    (a)    UE LLC and Holding Capital shall be equal beneficiaries of the Trust. Accordingly, the net proceeds of the Policies shall belong to, and be disbursed directly by the Trust in equal shares, as follows: (a) one-half to UE LLC, and (b) one-half to Holding Capital or its designee as indicated in writing to the trustee of the Trust and to UE LLC. The parties shall execute and deliver such documentation as shall be necessary for that purpose, with any necessary copies thereof provided to the Trust.

(b)    The net proceeds of the Policies shall consist of all amounts distributed by the Trust and/or its affiliates in respect of the Policies, it being understood that the net proceeds shall be (i) after offset for a claim of the Trust and its affiliates, which claim is being jointly disputed by the parties hereto, and (ii) after deduction of compensation of $200,000 payable to Bruce Mactas, whether payable directly by the Trust or jointly by the parties, but only to the extent that the net proceeds after such reductions shall, as intended, exceed $23,000,000. Bruce Mactas hereby agrees that he has no further claim against the parties as a result of this transaction.

(c)    It is understood and agreed that the receipt of proceeds from Lincoln National is not a certainty in any amount whatsoever. Each party hereto shall take all reasonable actions to fulfill the intent and purpose of this agreement and the transactions contemplated hereby, including prompt compliance with all reasonable requests made by or on behalf of Lincoln National in connection with the parties' claims under the Policies. No party hereto makes any warranty or representation, direct or implied, as to receipt of proceeds. Each party specifically disclaims any obligation or liability of any other party with respect thereto, provided, however, that in the unexpected event that net proceeds received from Lincoln National are

- 2 -

{ 60017/010/01178485 1-CRS}

UNIV-000181

reduced, even if by refund, Holding Capital and UE LLC shall each be responsible for one-half of the reduction. If outside counsel or other professionals are retained by the parties in case of dispute with Lincoln National or the Trust, the selection shall be made jointly by Holding Capital and UE LLC (in case of dispute with Lincoln National such selection shall be recommended to the trustee of the Trust), and the costs shall be borne equally. Any decision to commence, continue or settle litigation shall be made jointly by the parties.

(d) It is the intention of the parties that insofar as possible, neither UE LLC nor Holding Capital nor any other person be at risk for any sums greater than the net sums received by them after reduction for all expenses, taxes of any nature resulting therefrom payable on the proceeds, or any other costs relating to this matter.

2. (a) Subject to the terms of this agreement, the parties hereto, for themselves and on behalf of their owners, members, partners, employees, shareholders, officers, agents, trustees, beneficiaries, sponsors, administrators, attorneys, assigns, any heirs or successors thereof and any others claiming by, from or through them, hereby release, remise and discharge the other parties hereto (together with Mary Spencer, wife of the late Sash A. Spencer, the Estate of Sash A. Spencer, Holding Capital Group, Inc. (a Florida corporation), Donna J. Vassar, Sharon E. Siebert, Arnold Broser, Bruce Mactas and Mactas, Alper Szrolovits, Inc.) and their owners, employees, agents, consultants, assigns and attorneys, and any heirs, successors and affiliates, from all claims, demands, causes of action, damages, judgments and executions and liabilities which any of them have or may have, known and unknown, foreseen or unforeseen, including but not limited to the potential claims underlying this agreement and in connection with any business or other dealings among such parties, including the introduction of a real estate project on Grand Bahama Island, but excepting any documented investment (e.g., by Mr. Spencer in

- 3 -

UNIV-000182

Sage Sound, LLC). The releases hereunder shall be applicable (i) from Holding Capital only as to UE LLC and those of the above persons associated with it, and (ii) from UE LLC only to Holding Capital and those of the above persons associated with it. The foregoing releases shall be effective only after receipt by the parties of any net proceeds of the Policies.

(b)     Contemporaneously herewith Mary Spencer and the Estate of Sash A. Spencer, Donna J. Vassar and Sharon E. Siebert have delivered releases running to the parties hereto and to persons named in subparagraph "(a)" above.

3.     Each of the parties to this agreement has had access to the advice of counsel in entering into this agreement, and each of the parties acknowledges that it has received the benefit of access to such advice or has declined same and requires no further access to counsel incident to agreeing to being bound by this agreement.

4.     Upon the reasonable request of either party hereto, following the date hereof, the other party hereto will execute and deliver to the requesting party such other documents, assignments and other instruments as may be required to give effect to this agreement and consummate the transactions contemplated hereby.

5.     Each of the parties recognizes and acknowledges that the subject matter and the terms of this Agreement are private and confidential. Each party therefore agrees that it will not disclose this agreement or any of the terms hereof to any third party for any reason or purpose whatsoever except (i) on a confidential basis insofar as possible, as may be necessary to conduct its business or perform its obligations, or (ii) as may be required by law.

6.     This agreement shall be enforced only in, governed by, and construed in accordance with, the laws of the State of New York. The undersigned hereby consent to the

- 4 -

{ 60017/010/01178485:1-CRS}

UNIV-000183

jurisdiction of the courts of the State of New York and agree that any action or proceeding in connection with this agreement shall be brought in New York County.

7. This agreement may be executed in counterparts by the parties.

8. This agreement may be modified only in writing signed by the parties to be bound by such modification.

Dated: NOVEMBER 11, 2008

HOLDING CAPITAL GROUP, INC.,
a Connecticut Corporation

By: _____
James Donaghy

Dated: NOVEMBER 11, 2008

UNIVERSITAS EDUCATION, LLC

By: _____
Sharon E. Siebert

CONSENTED TO:

_____
Donna J. Vassar

_____
Sharon E. Siebert, in her individual capacity

ESTATE OF SASH A. SPENCER

By: _____
Mary M. Spencer, Personal Representative

_____
Bruce Mactas

- 5 -

{ 60017/010/01178485·1-CRS}

UNIV-000184

STATE OF NEW YORK )
        )ss.:
COUNTY OF NEW YORK )

  On the 11TH day of NOVEMBER in the year 2008 before me, the undersigned, personally appeared JAMES DONAGHY, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                 _____
                      Notary Public

STATE OF NEW YORK )
        )ss.:
COUNTY OF NEW YORK )

               ARTHUR M. MICHAELSON
            Notary Public, State of New York
               No. 02MI-2688875
              Qualified in Nassau County
          Certificate Filed in New York County
        Commission Expires September 30, 20__

  On the 11th day of NOVEMBER in the year 2008 before me, the undersigned, personally appeared SHARON E. SIEBERT, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                 _____

         ARTHUR M. MICHAELSON  Notary Public
         Notary Public, State of New York
           No. 02MI-2688875
           Qualified in Nassau County
         Certificate Filed in New York County
        Commission Expires September 30, 20 09

- 6 -

{ 60017/010/01178485-1-CRS}

## RELEASE

WHEREAS, contemporaneously herewith the following persons have entered into a "Settlement Agreement and Releases" dated as of the date hereof (the "Settlement Agreement"):

A.    HOLDING CAPITAL GROUP, INC:, a Connecticut Corporation having an office at 7 Ridgewood Drive, Bridgewater, Connecticut 06752, and

B.    UNIVERSITAS EDUCATION, LLC, having an office at 404 East 55th Street, Suite 13A, New York, New York 10022, and

WHEREAS, pursuant to the Settlement Agreement and in consideration thereof, it has been agreed that the undersigned and others are to deliver releases as therein provided,

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

DONNA J. VASSAR, residing at 404 East 55th Street, New York, New York 10022, for herself and on behalf of her heirs and successors, and any others claiming by, from or through her, subject to the terms of the Settlement Agreement and effective only after receipt by the parties thereto of any net proceeds thereunder, hereby releases, remises and discharges Holding Capital Group, Inc. (a Connecticut corporation), Holding Capital Group, Inc. (a Florida corporation), Mary M. Spencer, the Estate of Sash A. Spencer, Arnold Broser, Bruce Mactas, and Mactas, Alper Szrolovits, Inc., their heirs, successors, affiliates, employees, agents, consultants, assigns and attorneys from all claims, demands, causes of action, damages, judgments and executions and liabilities which any of them have or may have, known and unknown, foreseen or unforeseen.

IN WITNESS WHEREOF, the undersigned has executed and delivered this Release as of this ___11ᵀᴴ___ day of _NOVEMBER_, 2008

_Donna J. Vassar_
Donna J. Vassar

UNIV-000186

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NEW YORK)

On the __11th__ day of _November_ in the year 2008 before me, the undersigned, personally appeared DONNA J. VASSAR, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_Cathr M. Michaelson_
Notary Public

ARTHUR M. MICHAELSON
Notary Public, State of New York
No. 02MI-2688873
Qualified in Nassau County
Certificate Filed in New York County
Commission Expires September 30, 20 0 9

- 2 -

( 60017/010/01178500.1-CRS)

# RELEASE

WHEREAS, contemporaneously herewith the following persons have entered into a "Settlement Agreement and Releases" dated as of the date hereof (the "Settlement Agreement"):

A.     HOLDING CAPITAL GROUP, INC:, a Connecticut Corporation having an office at 7 Ridgewood Drive, Bridgewater, Connecticut 06752, and

B.     UNIVERSITAS EDUCATION, LLC, having an office at 404 East 55th Street, Suite 13A, New York, New York 10022, and

WHEREAS, pursuant to the Settlement Agreement and in consideration thereof, it has been agreed that the undersigned and others are to deliver releases as therein provided,

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

SHARON E. SIEBERT, having an office at 404 East 55th Street, New York, New York 10022, for herself and on behalf of her heirs and successors, and any others claiming by, from or through her, subject to the terms of the Settlement Agreement and effective only after receipt by the parties thereto of any net proceeds thereunder, hereby releases, remises and discharges Holding Capital Group, Inc. (a Connecticut corporation), Holding Capital Group, Inc. (a Florida corporation), Mary M. Spencer, the Estate of Sash A. Spencer, Arnold Broser, Bruce Mactas, and Mactas, Alper Szrolovits, Inc., their heirs, successors, affiliates, employees, agents, consultants, assigns and attorneys from all claims, demands, causes of action, damages, judgments and executions and liabilities which any of them have or may have, known and unknown, foreseen or unforeseen.

IN WITNESS WHEREOF, the undersigned has executed and delivered this Release as of this ___11th___ day of _NOVEMBER_ , 2008

Sharon E. Siebert

UNIV-000188

STATE OF NEW YORK )
                   )ss.:
COUNTY OF NEW YORK)

On the 11th day of NOVEMBER in the year 2008 before me, the undersigned, personally appeared SHARON E. SIEBERT, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

ARTHUR M. MICHAELSON
Notary Public, State of New York
No. 02MI-2668873
Qualified in Nassau County
Certificate Filed in New York County
Commission Expires September 30, 2069

- 2 -

{ 60017/010/01178495·1-CRS}

## CONSENT TO SETTLEMENT AGREEEMENT AND RELEASES

The undersigned, being all the members of UNIVERSITAS EDUCATION, LLC (the "Company") having an office at 404 East 55th Street, Suite 13A, New York, New York 10022 do hereby consent to the execution and carrying out by and on behalf of the Company of a Settlement Agreement and Releases and all further actions thereunder relating to the division of certain life insurance proceeds directly or indirectly receivable from The Lincoln National Life Insurance Company on the life of the late Sash A. Spencer.

The names and addresses of the members of the Company are as follows:

| Name | Address |
|------|---------|
| Donna J. Vassar | 404 East 55th Street, NY, NY 10022 |
| Sharon E. Siebert | 404 East 55th Street, NY, NY 10022 |

Dated: November 11, 2008

Donna J. Vassar

Dated: November 11, 2008

Sharon E. Siebert

{ 60017/010/01178860:1-CRS}

jurisdiction of the courts of the State of New York and agree that any action or proceeding in

connection with this agreement shall be brought in New York County.

    7.     This agreement may be executed in counterparts by the parties.

    8.     This agreement may be modified only in writing signed by the parties to be bound

by such modification.

Dated: _NOVEMBER 11_, 2008           HOLDING CAPITAL GROUP, INC.,
                                     a Connecticut Corporation

                                     By: _____
                                        James Donaghy

Dated: _NOVEMBER 11_, 2008           UNIVERSITAS EDUCATION, LLC

                                     By: _____
                                        Sharon E. Siebert

CONSENTED TO:

_____
Donna J. Vassar

_____
Sharon E. Siebert, in her individual capacity

ESTATE OF SASH A. SPENCER

By: _____
     Mary M. Spencer, Personal Representative

_____
Bruce Macias

                           -5-

{ 60017/010/01178485:1-CRS}

jurisdiction of the courts of the State of New York and agree that any action or proceeding in connection with this agreement shall be brought in New York County.

    7.    This agreement may be executed in counterparts by the parties.

    8.    This agreement may be modified only in writing signed by the parties to be bound by such modification.

Dated: _____, 2008

HOLDING CAPITAL GROUP, INC.,
a Connecticut Corporation

By: _____
          James Donaghy

Dated: _____, 2008

UNIVERSITAS EDUCATION, LLC

By: _____
          Sharon E. Siebert

CONSENTED TO:

_____
Donna J. Vassar

_____
Sharon E. Siebert, in her individual capacity

ESTATE OF SASH A. SPENCER

By: _____
    Mary M. Spencer, Personal Representative

_____
Bruce Maggee

- 5 -

( 60017/010/01178483.1-CRS)

UNIV-000192

## RELEASE

WHEREAS, contemporaneously herewith the following persons have entered into a "Settlement Agreement and Releases" dated as of the date hereof (the "Settlement Agreement"):

A.    HOLDING CAPITAL GROUP, INC:, a Connecticut Corporation having an office at 7 Ridgewood Drive, Bridgewater, Connecticut 06752, and

B    UNIVERSITAS EDUCATION, LLC, having an office at 404 East 55th Street, Suite 13A, New York, New York 10022 ("UE LLC"), and

WHEREAS, pursuant to the Settlement Agreement and in consideration thereof, it has been agreed that the undersigned and others are to deliver releases as therein provided,

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

MARY M. SPENCER, residing at 251 Crandon Boulevard, Key Biscayne, Florida 33149, for herself and on behalf of her heirs and successors, and any others claiming by, from or through her, subject to the terms of the Settlement Agreement and effective only after receipt by the parties thereto of any net proceeds thereunder, hereby releases, remises and discharges UE LLC, Donna J. Vassar, Sharon E. Siebert and Arnold Broser, their heirs, successors, employees, agents, assigns and attorneys from all claims, demands, causes of action, damages, judgments and executions and liabilities which any of them have or may have against them, known and unknown, foreseen or unforeseen.

IN WITNESS WHEREOF, the undersigned has executed and delivered this Release as of this _12th_ day of _November_, 2008

Mary M. Spencer

{ 60017/010/01176596:1-CRS}

UNIV-000193

STATE OF **FLORIDA** )          as
COUNTY OF **MIAMI-DADE** )

On the **12th** day of **November** in the year 2008 before me, the undersigned, personally appeared MARY M. SPENCER, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Louis Nostro

Notary Public


Notary Public State of Florida
Louis Nostro
My Commission DO613428
Expires 01/19/2011

- 2 -

[ 60017/010/01172503.1-CRS]

## RELEASE

WHEREAS, contemporaneously herewith the following persons have entered into a "Settlement Agreement and Releases" dated as of the date hereof (the "Settlement Agreement"):

    A.     HOLDING CAPITAL GROUP, INC:, and a Connecticut Corporation having an office at 7 Ridgewood Drive, Bridgewater, Connecticut 06752, and

    B.     UNIVERSITAS EDUCATION, LLC, having an office at 404 East 55th Street, Suite 13A, New York, New York 10022 ("UE LLC"), and

WHEREAS, pursuant to the Settlement Agreement and in consideration thereof, it has been agreed that the undersigned and others are to deliver releases as therein provided,.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

MARY M. SPENCER, residing at 251 Crandon Boulevard, Key Biscayne, Florida 33149, as Personal Representative of the ESTATE OF SASH A. SPENCER (the "Estate") on behalf of the Estate, its beneficiaries, and any others claiming by, from or through the Estate, subject to the terms of the Settlement Agreement and effective only after receipt by the parties thereto of any net proceeds thereunder, hereby releases, remises and discharges UE LLC, Donna J. Vassar, Sharon E. Siebert and Arnold Broser, their heirs, successors, employees, agents, assigns and attorneys from all claims, demands, causes of action, damages, judgments and executions and liabilities which any of them have or may have against them, known and unknown, foreseen or unforeseen but excepting any documented investment (e.g., by Mr. Spencer in Sage Sound, LLC).

IN WITNESS WHEREOF, the undersigned has executed and delivered this Release as of this 12th day of November, 2008.

*Mary M. Spencer*

Mary M. Spencer, as Personal
Representative of the Estate of Sash A. Spencer

{ 60017/010/01178503 1-CRS}

UNIV-000195

STATE OF __FLORIDA____ )     as
COUNTY OF __MIAMI-DADE__ )

On the 12th day of November in the year 2008 before me, the undersigned, personally appeared MARY M. SPENCER, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.



Notary Public

> Notary Public State of Florida
> Louis Nostro
> My Commission DD613428
> Expires 01/19/2011

- 2 -

{ 60017/010/01178503 1-CRS}

UNIV-000196

# EXHIBIT THIRTEEN



CHARTER OAK TRUST

| | |
|---|---|
| Participant/Insured: | SASH SPENCER |
| Carrier: | LINCOLN NATIONAL |
| Policy No.: | 7320809 |

## DISCLOSURE, ACKNOWLEDGMENT & CERTIFICATION AGREEMENT

In connection with an arrangement ("Funding Arrangement") pursuant to which GRIST MILL CAPITAL, LLC (the "Funder") will provide plan funding in relation to the acquisition of benefits through the Charter Oak Trust (the "Plan" or "Trust"), it is understood and agreed that the Plan shall acquire an insurance policy or policies (each a "Policy" and collectively, the "Policies") insuring the life of the undersigned Plan participant (the "Participant/Insured") and thereby securing the promise of Plan benefits. Such Funding Arrangement having been disclosed and explained to the Participant/Insured and his/her duly licensed insurance broker and/or agent (the "Agent"), each of the Participant/Insured and the Agent hereby discloses, acknowledges, certifies, represents and warrants to the Funder, for good and valuable consideration (including the funding of the Plan, the acquisition of the Policy, and the attendant benefits derived therefrom), the receipt and sufficiency of which are hereby acknowledged, as follows:

1.     The Participant/Insured seeks to obtain the benefits under the Trust (and any Policy obtained to support such benefits) on his/her own initiative, and as part of his/her benefit, business, charitable, or estate planning.

2.     The Policy shall be solely owned by the Trust, and the Trust shall be the sole beneficiary of the Policy. Neither the Participant/Insured nor his/her beneficiaries shall be the owner or beneficiaries of the Policy. The Participant/Insured shall be a beneficiary of the Trust.

3.     In the case of a newly issued Policy, the Trust shall be the applicant for all Policy application purposes.

4.     The Policy is not being purchased with the intent of selling it in a settlement or viatical sale, and there have been no offers to sell or buy the Policy. Neither Agent, nor Funder, nor the Trust have recommended such a sale.

5.     The benefits of the Policy and the underlying death benefit are understood by the Participant/Insured. The Trust, as the Policy owner, may maintain the Policy after the termination of the Funding Arrangement.

6.     If in the future the Trust, as Policy owner, no longer desires to maintain the Policy, the Trust may surrender, lapse or otherwise dispose of the Policy subject to the terms of the Policy, the Funding Arrangement, and the circumstances then existing.

7.     No rebate to the Participant/Insured or remuneration to the Agent of any kind has been offered.

8.     The Funder shall provide premium payments for so long as the Trust owns the Policy.

9.     The Trust shall hold and maintain the Policy until the death of the Participant/Insured or the termination or disposition of the Policy or the Funding Arrangement. All death proceeds from the Policy shall be payable to the Trust so long as the Trust owns the Policy.

COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 01/19/07

1



CHARTER OAK TRUST



INITIAL
HERE

10.    The Participant/Insured and Agent both understand and agree that the following remittances, fees, and expenses shall be due and payable to the Funder within ninety (90) days of receipt by the Trust of the proceeds derived from the maturation, disposition, or termination of the Policy:

      (a)    repayment of all payments or contributions and related costs funded by Funder on behalf Participant/Insured regarding the funding of life insurance benefits and any Policy used to se such benefits;

      (b)    an Origination Fee of twenty percent (20%) of the total amount funded in consideration of the Funding Arrangement having been implemented; and    2 %.    **Initial**    DEC

      (c)    a Placement Fee of three percent (3%) of the total death benefit (or face amount of any Policy or Policies) in consideration for managing the underwriting and acquisition of benefits, the issuance of the Policy, and managing the Funding Arrangement.

                                                                  reasonable

11.    The Participant/Insured has the option of acquiring the Policy from the Trust at any time on terms that release the Plan from ongoing benefit obligations and such other terms to be mutually determined by the Trust and the Participant/Insured.

12.    The Participant/Insured has had a full and unhindered opportunity to read, review, consider, and understand (with his/her legal counsel) the terms and provisions contained herein. The Participant/Insured has been advised to consult with an independent legal counsel of his/her own choosing, concerning the terms and provisions contained herein.

13.    The Participant/Insured has been advised to consult with independent financial advisors of his/her own choosing, concerning the issuance of the Policy and the terms and provisions contained herein.

14.    The Participant/Insured understands and appreciates the nature and magnitude of the risks assumed by him/her in entering into the transactions contemplated by the Funding Arrangement. The Participant/Insured voluntarily and knowingly makes the decision to take those risks, free of any coercion or duress.

15.    At no time has the Funder, the Trust, or any of their affiliated companies or its or their respective officers, directors, employees, agents, representatives, affiliates, trustees, sponsors, administrators, or designees made any express or implied representation or warranty in connection with the transactions contemplated by the Funding Arrangement.

16.    The Participant/Insured acknowledges that neither the Funder nor the Trust are encouraging, endorsing or recommending the acquisition of the Policy, the Policy itself, or any of its underlying investments. The Policy and the benefits it is securing are being acquired at the Participant/Insured's own initiative and are being effectuated as part of his/her benefit, business, charitable, and/or estate planning, with the assistance and the advice of the Agent and the Participant/Insured's financial and legal advisors.

17.    The Participant/Insured understands that the acquisition of the Policy and/or its subsequent disposition by the Trust may affect his/her ability to obtain insurance coverage in the future.

18.    The Participant/Insured understands that if at some point in the future he/she wishes for the Policy to be sold, a settlement sale of the Policy may not be appropriate or desirable for various reasons.

COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 01/19/07

2



CHARTER OAK TRUST

19.    Nothing contained herein or in any of the documents relating to the Funding Arrangement shall be deemed or construed as advice or guidance by the Funder or the Trust concerning the Participant/Insured's decision to enter into the Funding Arrangement or regarding the issuance of any Policy.

20.    The Participant/Insured hereby agrees, no later than the twelfth (12ᵗʰ) month after the issuance of the Policy and on an as-needed basis thereafter, to execute as and when requested in writing by the Funder, a current HIPAA compliant authorization from the Participant/Insured authorizing the Funder to obtain current medical records from the Participant/Insured's medical providers.

21.    The Participant/Insured, for so long as the Funding Arrangement exists, hereby grants to the Funder an irrevocable power of attorney coupled with an interest in favor of the Funder and its designee authorizing the Funder and its designee to take any and all actions on the Participant/Insured's behalf with respect to the Policy *except to create any monetary exposure or liability to insured*    DEC

22.    This Agreement may be amended or modified only by a written instrument signed by all parties. The terms of this Agreement cannot be orally waived, but only by a writing signed by the waiving party. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. This Agreement shall be governed by the laws of the State of New York. Any and all disputes regarding this Agreement, the Policy, the Plan, or any benefits related thereto or derived therefrom, shall be submitted to binding arbitration before a single arbitrator under the commercial arbitration rules of the American Arbitration Association, and such arbitration shall take place in New York, New York. The arbitrator shall not be empowered to award special or punitive damages. The losing party in the arbitration shall pay all fees and costs (including attorneys' fees and costs, as well as the costs of arbitration) of the prevailing party. The final decision of the arbitrator shall be final, binding, and *non-appealable*, and judgment on the award may be entered in any court having jurisdiction thereof.

[*signature page follows*]

COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 01/19/07

3



CHARTER OAK TRUST

IN WITNESS WHEREOF, the parties heret... ...by evidence their agreement to the provisions above with their
signatures below as of the dates written below next t... ...signatures:

with addendum to #5 10(c), 11, and 21.

PARTICIPANT/INSURED:

X _____
Signature                        Date

SASH A. SPENCER
Printed Name

AGENT: _____
_____      3.19.07
Signature                        Date

Bruce T Meefar
Printed Name                     Title

**ACCEPTED AND AGREED:**

**GRIST MILL CAPITAL, LLC**

Daniel E. Carpenter
Name: Daniel E. Carpenter
Title: Chairman Managing member
Date: 3-19-07

COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 01/19/07

4



CHARTER OAK TRUST

## ADOPTION AGREEMENT

The undersigned Employer ("Employer") adopts, joins, and agrees to participate in the Charter Oak Plan & Trust ("Plan") and contribute funds for the benefit of certain specified Employees listed below. The Employer agrees to all of the provisions of the Plan and accepts the Plan Sponsor as the Named Fiduciary and Administrative Trustee and will remit all contributions directly to the Plan Administrator.

Employer: **HOLDING CAPITAL GROUPING**
Contact Person: **SASH A SPENCER**
Address: **7 RIDGEWOOD DR**
**BRIDGEWATER, CT 06752**

Tax ID: **06-1378816**
Type of Entity: **PRIV. EQUITY INVESTMENTS**
Fiscal Year End:
Phone #: **212-486-6670 XT 211**
Fax #:
E-Mail: **SSPENCER @ HOLDING CAPITAL.COM**

**DEATH BENEFIT**
**COVERED EMPLOYEES / BENEFITS**

| Name of Employee (attach additional sheets if necessary) | Social Security # | Date of Birth | Annual Funding Amount | Death Benefit Amount[1] | |
|---|---|---|---|---|---|
| SASH A. SPENCER | 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 | 6-22-51 | | ~~25,000,000~~ | |
| | | | | 20,000,000 | |
| | | | | | |
| | | | | | |
| | | | | | |

1) In all cases, the benefits provided by the Plan shall be limited ~~all rules and limitations as described in the Plan Document~~ force on the life of the Participant, the maximum benefit benefit. No benefits are payable if the Employer has term welfare benefit plan and is not to be used for deferred comp by binding arbitration in New York, New York, and such ar amount of the benefit specified in the Certificate of Coverage and subject to the event of the death of the Participant before any insurance coverage is in limited to the total contributions received by the Plan for that Participant's its participation in the Plan prior to the Participant's death. This Plan is a n purposes. All unresolved disputes or claims under the Plan will be settled shall be governed by the laws of the State of New York.

Executed by the Employer at _____ on this _19_ day of _March_ 200_7_

Signature of Officer / Authorized Representative of Employer

**SASH A. SPENCER , CEO**
Printed Name and Title

COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED, REV. 01/19/07

3



CHARTER OAK TRUST

## ELECTION OF PARTICIPATION & BENEFICIARY DESIGNATION FORM

NAME OF EMPLOYER: **HOLDING CAPITAL GROUP, INC.**

NAME OF COVERED EMPLOYEE: **SASH A. SPENCER**  SSN: **065·30·4914**

To: Administrator of the CHARTER OAK PLAN & TRUST

To participate in the Plan, place your initials in the space provided next to "A" below and insert the names of your beneficiaries. To make such beneficiary designation irrevocable, place your initials in the space next to "B" below and insert the names of your beneficiaries. Please do not forget to designate at least one beneficiary.

A.  _____  I wish to participate in the Plan and name the following persons or entities as the Beneficiaries of any death benefit payable under the Plan:

Name of Beneficiaries: **UNIVERSITAS EDUCATION LLC**

Contact Person: **SHARON SIEBERT**  Phone: **212-826-0056**
Address: **404 E. 55TH.ST SUITE 13A  NY NY**
I understand that I may change this designation at any time by submitting a new Beneficiary Designation Form to the Plan Administrator, and that such new designation will become effective when accepted by the Plan Administrator.

B.  _____  I wish to participate in the Plan and name the following persons or entities as the Irrevocable Beneficiaries of any death benefit payable under the Plan:

Name of Beneficiaries: _____

Contact Person: _____  Phone: _____

Address: _____
I hereby elect that the foregoing designation of my _____ iary or beneficiaries of any death benefit that becomes payable pursuant to the Plan is irrevocable and non-amen_____ and I shall have no right whatsoever to change such beneficiary designation for any reason. (If you have chosen op_____ our signature must be notarized.)

NOTE: I hereby designate Grist Mill Capital, LLC as primary beneficiary of any sums w_____ ith unpaid pursuant to any other agreements I might have with Nova Group, Inc. and acknowledge that my beneficiaries as designated above will rece_____ eath ben_____ pace of the sums payable to Grist Mill Capital, LLC

X _____
Signature of Employer's Authorized Person

**SASH A. SPENCER, CEO**
Name and Title of Authorized Person (Print or Type)

X _____
Signature of Covered Employee

**SASH A. SPENCER**
Name of Employee (Print or Type)

The foregoing instrument was acknowledged before me this _____ day of _____ 200_____.

_____
Date of this Designation

_____
Notary Public
Commission Expires: _____

COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED, REV. 01/19/07

4



CHARTER OAK TRUST

_____ and its insurance companies (hereinafter collectively referred to as the "Carrier") have agreed to accept applications for individual insurance policies from the Plan Administrator and/or Sponsor of the CHARTER OAK PLAN & TRUST (hereinafter the "Plan") on Participants in the Plan. Subject to its underwriting requirements and restrictions, the Carrier has agreed to issue policies to the Plan on the lives of eligible employees of the undersigned Participating Employer (hereinafter the "Employer"). Any policy so issued will designate the Plan as the sole owner and beneficiary of the policy, and the exercise of any contract rights under that policy will require the written authorization of the Plan Sponsor.

In issuing its policies, the Carrier represents and warrants only those promises contained within the insurance contract itself, and no other. The Carrier's agreement to issue insurance policies to the Plan does not constitute an endorsement of the Plan. In agreeing to issue a policy on the life of an eligible employee of the Employer, the Carrier reserves the right to underwrite and determine independently whether or not to issue any further coverage on said employee and whether or not to issue any policies on the lives of Employer's other eligible employees. Coverage provided under any insurance policy issued to the Plan is dependent on the continued payment of the requisite premiums.

By accepting applications from the Plan Administrator and/or Sponsor of the Plan or by agreeing to issue any policy to the Plan, the Carrier makes no representations to the Employer or to any if its employees or representatives concerning the federal and state tax consequences of participation in the Plan. No director, officer, employee, agent, General Agent or other person has authority on behalf of the Carrier to provide the Plan, the Employer or any of Employer's employees with any legal or tax advice concerning participation in the Plan, or the termination of participation in the Plan.

In particular, the Carrier, Plan Sponsor, Administrator, and the Trustees make no representations concerning the following issues:

1. Whether or not the Employer will be allowed a current income tax deduction for amounts contributed to the Plan;

2. Whether or not an income tax deduction allowed in any taxable year may again be allowed in any subsequent taxable year for any reason;

3. Whether the Employer or the Covered Employee will recognize any income or gain from participation in the Plan or from the termination of participation in the Plan;

4. Whether any transaction might constitute a reversion of Plan assets to the Employer;

5. What amount is includible in an employee's gross income, or in his wages for Social Security and Medicare tax purposes, as a result of participation in the Plan; and

6. What the gift, estate or generation-skipping transfer tax consequences are with respect to an Employee's participation in the Plan, designation of any beneficiary under the Plan, or assignment of any entitlement under the Plan or insurance policy.

COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 01/19/07

*to the extent of at causing same if
employer's in fault in reasonable*



CHARTER OAK TRUST

### DISCLOSURE AND ACKNOWLEDGMENT STATEMENT (CONT.)

The undersigned Employer, on its own behalf, and on behalf of its Participating Employees, agrees to indemnify and hold harmless the Plan Sponsor and the Trustees of the Trust from any and all costs including legal fees resulting from the Employer or the Participating Employees' participating in the Plan and hereby acknowledges the following:

1. In determining whether to adopt the Plan and to what extent they would participate, they have sought and relied on legal and tax advice from their own independent advisors;

2. The Employer and Participating Employees are responsible for the tax consequences resulting from adoption and/or participation in the Plan;

3. Neither the Carrier nor any of its directors, officers, employees, agents, General Agents or other representatives have offered or have the authority to offer any legal or tax advice concerning the adoption and/or participation in the Plan. The Plan Sponsor, Administrator, Trustee and Carrier cannot and have not guaranteed or promised any particular legal or tax consequences from the Employer's adoption or participation in the Plan;

4. The Carrier and the Trustee have no responsibility for the administration of the Plan or for the distribution of benefits under the Plan;

5. The Carrier will be responsible solely for the promises contained in its insurance contracts;

6. Any illustrations provided in connection with the sale of the Carrier's policy do not constitute a guarantee or warranty of the policy's value, nor are such illustrations either estimates or projections of the policy's future performance or dividend scale;

7. The Plan provides for certain welfare benefits for Participating Employees and cannot be used as a vehicle for deferred compensation or retirement income.

8. Due to the possibility of future changes in the tax laws, there can be no guarantee or representation of any sort as to the future tax deductibility of any contribution to the Plan. Specifically, neither the Sponsor nor the Administrator can make any representat[ion or] warranty of any tax deductibility of any contributions to the Plan.

9. Any unresolved disputes or claims inv[olving] the Plan shall be settled by final, binding and non-appealable arbitration under the commercial arbitrat[ion rul]es of the American Arbitration Association, with such arbitration to be conducted in New York, New York, [and shall] be governed by the laws of the State of New York.

The undersigned Employer, for itself, its su[ccesso]rs, assigns and its Participating Employees, hereby asserts that it has read this statement in full, understands i[ts pro]visions or has sought legal advice concerning its provisions, and agrees to be bound by the same.

Signature of Participating Employer

Date: 3-19-07

Name and Title: SASH A. SPENCER , CEO

COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED, REV. 01/19/07

6



CHARTER OAK TRUST

# ADMINISTRATION FEE AGREEMENT

This Agreement, effective as of the date below, is entered into by and between the undersigned Employer (hereinafter called the "Employer") and Nova Group, Inc. (hereinafter called the "Administrator"). In consideration of the mutual covenants and agreements contained herein, it is hereby agreed as follows:

SECTION 1. The Employer has signed an Adoption Agreement to participate in the Charter Oak Plan & Trust (hereinafter the "Plan"). The Administrator shall administer the Plan and shall also perform some duties assigned to the Plan Sponsor and Trustee in the Plan documents as their agent. Such services shall include, but not be limited to, the following:

a) Determine contributions, bill employers, and process all deposits;
b) Claims administration;
c) Approval and selection of appropriate insurance contracts to fund benefits;
d) Preparation of annual financial report and tax return; and
e) Provision of summary plan description.

SECTION 2. The Administrator shall process all benefit claims on behalf of Plan Participants in strict accordance with the claims procedures, rules and regulations for the administration of the Plan as formulated by the Plan Sponsor. The Administrator shall have sole responsibility to determine a Participant's status and eligibility for benefits under the Plan, based on information provided by the Employer.

SECTION 3. In performing its obligations under this Agreement, the Administrator neither assumes nor underwrites any liability of the Plan. The Sponsor is the fiduciary of the Plan and exercises discretionary authority and control over the assets of the Plan and the Administrator of the Plan. The Employer also acknowledges that the Trustee will only follow the written instructions of the Administrator and/or Sponsor.

SECTION 4. The Employer agrees to indemnify the Administrator and hold it, its directors, officers, and employees, harmless from all amounts and expenses (including reasonable attorneys' fees and court costs) for which the Administrator may become liable as a result of any acts or omissions by the Employer with respect to the administration of the Plan, including, but not limited to, the determination of an employee's eligibility for benefits, the decision to pay benefits to a beneficiary under the Plan, and the determination of the amount of benefits payable to any beneficiary, except for any act or omission attributed to the Administrator's grossly negligent failure to perform its obligations under the Plan and this Agreement or the Administrator's willful misconduct. This indemnification covenant shall survive the termination of this Agreement.

SECTION 5. As compensation for its services under this Agreement, the Administrator shall receive $1,500 upon the signing of the Adoption Agreement. Thereafter, the Plan Administration fees are payable as of March 31 for every subsequent Plan Year in advance at $750 per year. Plan Administration fees will not be pro-rated in the event of un-Employer's termination from the Plan, which must be done with 60 days advanced written notice with a termination fee payable of $500. Specific fees for additional services will be quoted on a case-by-case basis upon request.

SECTION 6. This Agreement shall be terminated upon the Employer's withdrawal from the Plan by giving the Administrator at least sixty (60) days written notice of termination and payment of the $500 termination fee. The Administrator may terminate this Agreement and the Employer's participation in the Plan immediately if the Administrator fails to receive the contributions required by the Plan or its administrative fees, with such termination to be accomplished by written notice from the Administrator or the Sponsor to the Employer.

SECTION 7. Any notice required to be given hereunder shall be given to the Administrator at its current address and to the Employer at its address as set forth in the Adoption Agreement or to such other address as either party may advise the other in writing from time to time. Notice shall be delivered by facsimile or by certified mail, return receipt requested.

SECTION 8. This Agreement may be assigned by the Administrator to any other party, including any successor to the business of the Administrator by merger, consolidation, purchase of assets or otherwise. The Administrator reserves the right to increase its annual administration fee by giving the Employer notice by January 15th of each year.

SECTION 9. This Agreement shall be governed by the laws of the State of New York.

SECTION 10. The Employer shall be responsible for the following matters with respect to the Plan:
a) All legal and tax consequences of the Employer's and Employees' participation in the Plan;
b) ~~Prompt remittance of contributions to the Plan upon receiving notice from the Administrator;~~
c) Timely payment of the Administrator's fee upon receipt of an invoice for the same;
d) Providing Covered Employees with information about the Plan supplied by the Administrator; and
e) Providing the Administrator with a list of Covered Employees and their Welfare Benefit amounts at the beginning of each year.

SECTION 11. Any dispute or controversy arising under or in connection with this Agreement or with respect to the Employer's participation in the Plan shall be settled by binding arbitration, conducted by a single arbitrator in New York, New York in accordance with the rules of the American Arbitration Association. The expense of the arbitrator shall be shared equally by the Employer and the Administrator. The decision of the arbitrator shall be final, binding, and enforceable, and judgment may be entered on the arbitrator's award in any court having jurisdiction thereof. The Parties evidence their agreement to the provisions by their signatures below:

Employer: HOLDING CAPITAL GROUP, INC.        Administrator: Nova Group, Inc.

By: _____  Date: 7-19-07    By: _____

SASH M. SPENCER                                Wayne H. Bursey
Printed Name and Title                          Printed Name and Title

COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 01/19/07

7



CHARTER OAK TRUST

## CERTIFICATE OF RESOLUTION

**Adopted By:**

**HOLDING CAPITAL GROUP, INC**

(Full Legal Name of Employer)

I, the undersigned, as an officer, director, member, partner, or other authorized person of the Employer (hereinafter the "Authorized Persons"), hereby certify by this document that the following resolutions have been adopted on behalf of the Employer:

RESOLVED: That the Employer hereby approves, adopts, and agrees to make contributions to and fund benefits for certain employees through the CHARTER OAK PLAN & TRUST, a Welfare Benefit Fund as described under Internal Revenue Code Section 419(e), *in amounts at its sole discretion.*

RESOLVED: That the Authorized Persons are hereby authorized and directed to execute all documents, take all steps necessary ████ ffectuate said approval and adoption of the CHARTER OAK PLAN & TRUST on behalf o████ Employer, and direct that this certification be filed with the records of the Employer.

Dated as of this _____1 9_____ day of __March__ , 20 0 7

(X) _____
Authorized Signature

__SASH A. SPENCER__
Name and Title

COPYRIGHT © 2007 NOVA GROUP, INC.
ALL RIGHTS RESERVED. REV. 01/19/07

8