# EXHIBIT 13

## Settlement Agreement

This Settlement Agreement (the "Agreement") is effective as of September 30, 2010 (the "Effective Date") by and among GIST MILL CAPITAL, LLC, a Connecticut limited liability company ("Grist Mill"), AVON CAPITAL, LLC, a Connecticut limited liability company ("Avon") (and together with Grist Mill, hereinafter referred to, as the context may require, individually or collectively, and in any case, jointly and severally, as the "Borrower"), CHARTER OAK TRUST ("COT"), a Connecticut Trust, and AVON INSURANCE TRUST, a Connecticut Trust ("AIT". COT and AIT are collectively the "Trusts"), and RIDGEWOOD FINANCE II LLC, a Delaware limited liability company (successor in interest to RIDGEWOOD FINANCE INC., a Delaware corporation) (the "Lender").

## RECITALS

WHEREAS, Lender and Borrower have entered into that certain Line of Credit and Security Agreement dated November 22, 2006 as amended by Amended and Restated Line of Credit and Security Agreement dated February 12, 2007 (collectively, the "Credit Agreement" and together with the other documents and instruments executed and delivered in connection therewith, each a "Credit Document" and, collectively, the "Credit Documents"), pursuant to which Lender advanced monies to Borrower in one or more loan transactions (each an "Advance", collectively, the "Advances") for the purpose of providing financing to Borrower to loan sums, pursuant to loan and fee agreements (each an "Assigned Fee Agreement", collectively, "Assigned Fee Agreements") to the Trusts to pay premium payments and expenses related to the funding and maintenance of certain life insurance policies owned by the Trusts for the benefit of participants (each a "Policy", collectively, the "Policies"). Unless otherwise defined in this Agreement, capitalized terms shall have the meanings defined in the Credit Agreement and Credit Documents; and

WHEREAS, the Borrower and the Lender desire to amend the Credit Agreement pursuant to Section 12(o) thereof and set forth their continuing business relationship as provided herein.

NOW THEREFORE, in consideration of the premises and the mutual agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1) **Change Forms.** The Lender shall deliver to the Borrower duly completed change of ownership and change of beneficiary forms for each of the Policies listed in Exhibit "A" changing the owner and beneficiary of such Policies to the designee of the Lender (the "Change Forms"). Upon receipt of the Change Forms, the Borrower shall promptly, but in any event within ten (10) business days following receipt, review such Change Forms, the trustee of the relevant Trust that is the owner and beneficiary of the relevant Policy shall execute (except in the case of the Policies listed on Exhibit "B" (but not the Change Forms for the Remainder Policies which shall remain undated) date such Change Forms, and the Borrower shall return the fully executed Change Forms to the Lender. The Lender shall file the Change Forms for the Policies specified in Exhibit "B" promptly following receipt of the executed Change Forms from the Borrower and after satisfactory completion of the reconciliation contemplated in Section 3 including delivery of the Situsbury Documentation) (defined below), with the

issuing carrier (the "Bank A Change"). The Lender anticipates filing the Change Forms for the remainder of the Policies not listed on Exhibit "B" (the "Remainder Policies") at a future point in time or times as it determines it is in its sole discretion, but in no event later than twelve (12) months following the Effective Date, provided that the debt associated with the Remainder Policies shall be extinguished in accordance with Section 10. The Lender is hereby authorized to date any Change Form not dated and in particular to date the Change Forms for the Remainder Policies on or about the date upon which such Change Forms are sent to the issuing carrier.

2)  **Collateral Transfer Agreements.** The Lender shall deliver to the Borrower duly completed Collateral Transfer Agreements, substantially in the form of Exhibits "D-1" and "D-2" hereto for each of the Policies listed in Exhibit "A" where the participant has been terminated, transferring such Policies to the Lender (each a "Collateral Transfer Agreement"). Upon receipt of the Collateral Transfer Agreements, the Borrower and the Trustee shall execute such Collateral Transfer Agreements and shall deliver them to the Lender within ten (10) business days following receipt. Within ten (10) business days of each participant being terminated, including those terminated in accordance with Section 5, the Borrower shall deliver to Lender a Collateral Transfer Agreement relating to the Policy related to the terminated Participant. Each Collateral Transfer Agreement delivered to the Lender shall be held in escrow until such time as the Change Form for the related Policy has been filed with the issuing carrier at which time such Collateral Transfer Agreement shall be released to the Lender.

3)  **Reconciliation of Files.** Within ten (10) business days of the Effective Date, the Borrower shall provide to the Lender access to the files (electronic or hard) maintained by Borrower in its Stamford, Connecticut offices for each Policy, including correspondence with each Participant or former Participant, each insured, each issuing carrier and any other relevant and material communications or documentation, in order for the Lender to verify such files' contents to ensure the completeness of Lender's files and where Lender deems necessary, Borrower shall allow complete copies to complete Lender's files. Borrower shall provide to such Policy (the "File Review"). The Lender shall have the right to request and inspect originals of any documentation contained in the files. Following the File Review, Borrower shall request for each Policy be conducted and copies of material documentation, including annual statements, illustrations, updated life expectancy reports, carrier notices or correspondence and verifications of coverage relating thereto, communications with and from Participants or former Participants, the insured or a member of the insured's family, and their financial advisors and legal advisors, agreements, formal or informal, written or otherwise, between COT or its affiliates and any Participant or former Participant or their affiliates, any amendment to the Borrower on or before the tenth (10th) business day following the Lender's request. The File Review must be completed no later than sixty (60) days after the Effective Date.

4)  **Interaction with Former Participants.** The Lender shall consult with the Borrower with respect to the best manner in which to approach former Participants in order to obtain additional documentation for the better maintenance of the Policies and Assigned Fee Agreements. The Lender agrees that prior to initially contacting any former Participant, the

Lender will provide the Borrower with written notice of its intention to contact the former Participant and the general purpose of such contact. Nothing in this section shall impair, restrict or otherwise diminish the Lender's ability to interact with the former Participants. Lender agrees that once a Participant has been terminated, neither the Borrower nor the Trusts shall have any liability to the Lender arising from Lender's contact with such former Participants.

5)  **Termination of Participants.** Unless otherwise agreed by the Lender, the Trustee and the Borrower shall promptly, but in any event within ten (10) business days from the Effective Date, send to each of the Participants identified in Exhibit "E", part I, with a copy to Lender, the Trust's standard letters (first letter and second letter) terminating such Participants from their respective plans. Unless otherwise agreed by the Lender, the Trustee and the Borrower shall promptly, but in any event within ten (10) business days of the Lender's written request following the maturity date of the Assigned Fee Agreement relating to the Policies relating to the Participants identified in Exhibit "E", part II, send to each of the Participants identified in Exhibit "E", part II, with a copy to Lender, the Trust's standard letters (first letter and second letter) terminating such Participants from their respective plans. The Borrower shall provide the Lender with copies of the delivery receipt for each letter referred to in the preceding two sentences within ten (10) business days of Borrower's receipt of same. The Participants insured under the Policies identified in Section 18 shall not be terminated from their respective plans until substantiated by the Lender in writing and the Lender and the Borrower shall cooperate in determining the best manner to address these cases which are currently the subject of litigation. Notwithstanding the foregoing, Lender, Borrower and the Trusts agree that nothing in this Agreement shall have the effect of accelerating the termination of any Participant in either Plan and any such termination shall be effectuated solely pursuant to the normal, ordinary, and customary business operations of the plans.

6)  **Cooperation.** For a period of twenty four (24) months following the Effective Date, the Borrower and the Trustee shall cooperate with the Lender and comply with all reasonable requests of the Lender in order to effectuate the change of ownership and beneficiary of the Policies with the issuing carrier, including the re-execution of the Change Forms if necessary and to take any steps necessary with Christiana Bank and Trust to effectuate the transactions contemplated by this Agreement. In connection with any further maintenance and/or dispositions of any of the Policies, each of the Borrower and the Trustee agrees to use their best reasonable efforts in connection with maintaining any such insurance and/or dispositions as the Lender shall reasonably request in writing, including, without limitation, providing information in the Borrower's possession relating to any Policy, the related insured and gathering additional information, including illustrations, annual statements, HIPAA forms, life expectancy reports, medical records, and obtaining cooperation and documents from the insured and beneficiaries. If the Borrower or the Trusts is contacted by telephone or other means of communication regarding the Policies, the Borrower or the Trusts, as the case may be, shall promptly, and in any event later than ten (10) business days, inform the Lender in writing of such communication and shall refrain from responding to such inquiries until such time as Borrower or Trusts has consulted with and received written instructions from the Lender. The Borrower and the Trusts agree not to correspond with any insurance carrier, insured, agent, Christiana Bank & Trust or other person with respect to any Policy for which

2

3

Lender has filed a Change Form with the Issuing Carrier, without Lender's prior written consent.

7) **Rejected Change Forms.** If any Change Form is rejected by the Issuing Carrier then:

a) The Borrower shall assist the Lender in dealing with the Issuing carrier to effect such Change Form; and

b) All right, title and interest in the relevant Policy shall be owned by the Lender and the relevant Trust shall hold such Policy in trust for the Lender and the Trustee shall take written instructions solely from the Lender with respect to such Policy; provided, however, that the debt extinguishment and debt satisfaction provisions contained in this Agreement shall not be affected by any rejection of an executed Change Form by an issuing carrier.

8) **Power of Attorney.** So long as any Policy for which a Change Form has been executed by Borrower remains in either Trust, the Trustee, in its capacity as the trustee of each of the Trusts, irrevocably designates and appoints the Lender (or its designees) as the trustee's attorney-in-fact, coupled with an interest, with full power of substitution to take any and all actions on the Trusts' behalf with respect to such Policy, including executing any documents on behalf of the Trust with respect to any such Policy. Such power of attorney shall be irrevocable until no Policies for which Change Forms have been executed by Borrower are titled in the name of either of the Trusts.

9) **Collateral Security.** The Collateral Security held by the Lender with Christiana Management Services (account # CHC12022.0) under Section 3(c) of the Credit Agreement in the amount of $847,466.85 (as of 7/31/2010) plus any additional accrued interest or amounts held as Collateral Security, shall be released to and retained by the Lender and used to reduce the debt owing by the Borrower to the Lender pro rata among the outstanding Advances related to the Policies set out in Exhibit "C" and each Advance specified in Exhibit "C" shall be satisfied by such amount. The Borrower shall not have any further right or interest in the Collateral Security following the extinguishment of the debt associated with the Advances specified in Exhibit "C". As of the Effective Date, the Total Debt (as that term is hereinafter defined) with respect to the Policies set out in Exhibit "C" is automatically extinguished and deemed fully satisfied as a result of this Section 9. This Section 9 shall serve as joint instructions of the Lender and the Borrower to Christiana Bank & Trust, if needed, authorizing Christiana Bank & Trust to distribute the Collateral Security as directed by the Lender.

10) **Extinguishment of Debt.** With respect to the Policies relating to the Batch A Changes (the "Batch A Policies"), the Total Debt (as defined below) relating to such Batch A Policies shall be extinguished and completely satisfied on the later of (a) the date the Change Forms are received by the Lender with respect to such Batch A Policies, and (b) the date upon which the Lender notifies the Borrower in writing that the reconciliation contemplated by Section 3 is fully and finally complete with respect to each particular Advance shall include, but not be limited to, principal, unpaid interest, interest receivable and any additional interest on overdue principal payment as permitted under the Credit Documents, as well as any and all other Obligations, fees and expenses related to such Advance (collectively for any particular Advance, the "Total Debt"). Promptly, but in no event later than ten (10) business days following the filing of any Change Form relating to the Remainder Policies with the Issuing

4

carrier, the Lender shall notify the Borrower in writing of such filing and shall acknowledge to the Borrower the complete satisfaction and extinguishment of the Total Debt related to such Policy. With respect to the Remainder Policies, the Total Debt shall be extinguished on the earlier of (a) the date upon which the Lender first files a Change Form with the issuing Carrier, and (b) the date that is twelve (12) months following the Effective Date, regardless of whether or not the related Change forms have been filed with the issuing carrier.

11) **Amendment to Credit Agreement.** Sections 14(f) and 16(g) of the Credit Agreement shall be deleted in their entirety, shall be deemed null and void, and nothing shall be substituted in their place and stead.

12) **Treatment of Interim Proceeds.** As of the date hereof, with respect to each Policy of a former Participant, the Lender shall have the sole rights to any death benefit that may be payable under each Policy and/or any other distribution, payment or proceeds of any kind that is due and/or made with respect to any and all of the Policies (collectively, the "Death Benefit") and neither the Borrower nor the Trust shall have any claim to any part of the Death Benefit with respect to the Policies. Upon the Lender's receipt of the Death Benefit with respect to any Policy, the Total Debt with respect to such Policy shall be automatically extinguished and deemed fully satisfied.

13) **Continuation of Credit Agreement.** In all respects not specifically addressed in this Agreement, the terms and conditions of the Credit Agreement and Credit Documents shall remain in full force and effect. Except as expressly identified herein, the Lender maintains the right to exercise any and all rights and remedies available to Lender under the Credit Agreement and/or any other rights and remedies available to Lender under applicable law or otherwise at any time and without further notice to Borrower.

14) **ANICO Policy Transaction.** In connection with the transaction related to ANICO policy U0583990 (the "ANICO Policy"):

a) The Change Form changing the ownership and beneficiary of the Policy to Lender's designees shall be filed by the Lender together with the Batch A Changes and the associated Total Debt shall be extinguished and deemed fully satisfied upon filing of such Change Form;

b) The Borrower shall pay to the Lender 25% of the future premiums (the "Co-Pay") for the ANICO Policy in amounts as determined by the Lender and as requested by the Lender (each a "Due Date"). Attached as Exhibit "F" hereto is a schedule of premium payments and related Due Dates for the Co-Pay and no further notice of such Due Date or Co-Pay shall be provided by the Lender with respect to those premiums identified on Schedule "F";

c) Upon receipt of the cash disposition proceeds of the ANICO Policy, including any sale proceeds, receipt of any death benefit amount or any negotiated or settled amount paid by the issuing carrier, the Lender will pay to the Borrower 25% ("Participation Interest") of the net cash disposition proceeds of the ANICO Policy (the "Distribution Amount") within ten (10) business days of the receipt by the Lender of such

5

proceeds, with appropriate holdback for reasonable unpaid and expected third party costs of collection and administration of the ANICO Policy, if any, including reasonable legal fees associated with collecting any amounts;

d) For purposes of this Section 14, the Distribution Amount shall mean cash proceeds realized in connection with the ANICO Policy, net of the following: any interest paid to an unaffiliated party of the Borrower, repayment to Lender of all amounts paid by Lender in respect of the ANICO Policy, including all premium payments, through and including the Effective Date being $2,252,142.79 as of 8/31/2010, (the "Lender's Capital Deposit"), any costs associated with the disposition of or collection of proceeds for the ANICO Policy, and any other reasonable costs of the Lender associated with the maintenance of the ANICO Policy and resolving any disputes regarding the ANICO Policy (including litigation with the issuing carrier or the insured's beneficiary, if any). The calculation of the Distribution Amount shall be made by the Lender with support for such calculation provided by the Lender to the Borrower in writing.

e) The Lender shall make any and all decisions relating to the ANICO Policy, in its sole and absolute discretion, including any decision to (i) sell the ANICO Policy, (ii) take any action to preserve, maintain, or realize the value of the ANICO Policy or defend any suit brought with respect to such ANICO Policy, (iii) to negotiate any settlement with the issuing carrier or any other person with respect to such ANICO Policy, or (iv) to otherwise deal with the ANICO Policy as if the Borrower had no Participation interest, provided that so long as the Borrower has a Participation Interest, the Lender shall consult with the Borrower prior to finally selling or settling any action with respect to the ANICO Policy.

f) If any party fails to make any Co-Pay on or before the related Due Date, without any action or notice on the part of the other party, the non-paying party shall (i) forfeit any and all rights to the Distribution Amount and the related cash disposition proceeds and any other proceeds relating to the ANICO Policy, (ii) forfeit any amounts, including any Co-Pays or other premium advances, previously paid by the non-paying party in respect of the ANICO Policy, and (iii) take all actions requested by the paying party with respect to the ANICO Policy to secure that party's position as the sole and absolute owner of the ANICO Policy.

15) Policies in COT Against Which No Advances Have Been Made by Lender. Lender agrees that any Policies currently owned or held by COT against which no Advances have been made by Lender and that are not listed as Policies on Exhibit "A" and immediately upon receipt of the Change Forms for each of the Policies listed in Exhibit "A" and completion of the Reconciliation contemplated by Section 3, the Lender has no right, claim or interest in any such Policies.

16) Cancellation of Credit Documents With Respect to AIT. Lender agrees that once Change Forms have been executed by Borrower and delivered to Lender, and such Change Forms have been filed with the issuing carrier for the ANICO Policy and the Lincoln Second-to-Die Policy number JF5373516 (the "Lincoln Second-to-Die Policy"), and the

Participants relating to the Lincoln Second-to-Die Policy have been terminated from the Plan, then the Credit Documents and all other agreements between Avon and AIT on the one hand, and Lender on the other hand, shall be automatically canceled, terminated, and deemed of no further force or effect as between Avon and AIT on the one hand, and the Lender on the other hand, provided that any such termination shall not be effective as between the other parties to the Credit Agreements and such Credit Agreements shall remain in full force and effect as between such other parties except as otherwise specifically provided herein. Each of the Borrowers and the Trustee hereby represent and warrant that to their Knowledge (as that term is hereinafter defined), other than the ANICO Policy and the Lincoln Second-to-Die Policy, no other life insurance policy, cash or other assets that would be Collateral under the Credit Documents is directly or indirectly owned by AIT.

17) Representations and Warranties. For purposes of this Agreement, "Knowledge" shall mean with respect to a party, the actual knowledge of any of the senior officers of the party, and specifically with respect to the Trusts, the actual knowledge of the Trustee or any of the senior officers of the Borrowers after reasonable inquiry.

a) The Borrower and the Trusts each represent and warrant to the Lender as follows:

i) (a) the Borrowers are each a limited liability company duly organized and validly existing under the laws of the State of Connecticut and are in good standing under such laws, (b) the Trusts are each validly created trusts established under the laws of the State of Connecticut, (c) the Borrowers and the Trusts have all requisite legal, trust and company power and authority, as the case may be, and authority and all other necessary and all other documents or instruments contemplated by this Agreement (the "Ancillary Documents"), and to carry out and perform their obligations under this Agreement and the Ancillary Documents; (d) this Agreement and the Ancillary Documents have been duly executed and delivered by the Borrowers and the Trustee on behalf of the Trusts, and constitute the legally valid and binding obligations of the Borrowers and the Trusts, enforceable against them in accordance with their respective terms; and (e) the execution and delivery of this Agreement and the Ancillary Documents by the Borrowers and the Trusts do not, and the consummation by the Borrowers and the Trusts of the transactions contemplated hereby and thereby will not, to their Knowledge (i) violate any law, rule, regulation, ordinance or order in any material respect, (ii) conflict with, or result in a breach of or a default under, or give rise to a right of termination or loss of any benefit under the Borrowers' or Trusts' formation documents, (iii) result in the imposition of any encumbrances upon the Policies or (iv) require, from any court or administrative agency, order or authorization of, or the registration, declaration or filing with (collectively, the "Consents"), (A) any court, governmental or administrative agency, commission, authority, board, bureau or instrumentality, whether federal, state, local or foreign (each a "Governmental Entity"), or (B) any individual, corporation, partnership, joint venture, trust, business association or other entity, including any Governmental Entity (each, a "Person").

ii) (e) To the Knowledge of the Borrowers and the Trusts, the Borrowers and Trusts have complied and are in compliance in all material respects with all laws, ordinances,



regulations, rules, requirements and orders of all Governmental Entities applicable to them or to the conduct or operation of its business; (b) the Borrowers and Trusts have not received any notice of any asserted violation of, nor has any other basis to believe that the Borrowers or the Trusts are not in compliance, in any material respect, with, any such laws, ordinances, regulations, rules, requirements or orders. (c) To the Knowledge of the Borrowers and the Trusts, no investigation or review by any Governmental Entity applicable to or that may have an adverse effect on the Collateral or Policies or any policy titled in the name of a Trust is pending or has been threatened, nor has any Governmental Entity indicated an intention to conduct the same; (d) except for the Policies set forth in Section 18, to the Knowledge of the Borrowers and the Trusts, none of the Borrowers, the Trusts or any of the Collateral, Policies or any policy titled or previously titled, in the name of a Trust is subject to any pending or threatened suits, actions, investigations, grievances or proceedings by any Person, including by any issuing carrier, Participant, former Participant or insured, affecting such Collateral or Policies, the Borrowers or the Trusts; (e) to the Knowledge of the Borrowers and the Trusts, no judgment, decree, injunction, rule or order of any Governmental Entity or arbitrator exists or is in force or effect that (i) adversely affects or could adversely affect the Collateral or Policies or (ii) seeks to enjoin or prohibit any of the transactions contemplated by this Agreement or any of the Ancillary Documents.

iii) To the Knowledge of the Borrowers and the Trusts: (a) except for interests of current Participants, the liens of the Lender and the Borrowers, the Trusts have good and clear title to the Collateral and Policies, free and clear of all Liens (as defined in the Credit Agreement), claims, security interests and encumbrances of any type, other than those of the Lender and the Borrower, and on the date upon which the Change Forms are filed with the issuing carrier, the Lender shall acquire good and clear title to the Policies, free and clear of all Liens, claims, security interests and encumbrances of any type. Trusts are the sole legal and beneficial owner of each of the Policies, free and clear of all Liens, claims, security interests and encumbrances of any type, except for those of the Lender and the Borrowers.

iv) To the Knowledge of the Borrowers and the Trusts: (a) none of the Policies is subject to any prior assignment, conveyance, transfer or participation or agreement to assign, convey, transfer or participate, in whole or in part or any agreement under which any person other than a current Participant, the Lender or Borrowers has any interest in, claim, right, or title in the Policies, and proceeds of the Policies payable upon the death of the insured or thru the sale of the underlying Policy or otherwise.

v) None of the Borrowers or the Trusts is a debtor in any federal or state bankruptcy or insolvency proceeding or similar proceeding in any jurisdiction.

vi) To the Knowledge of the Borrowers and the Trusts, the Assigned Fee Agreements, Policies and Other Security Documents and the provisions thereof have not been amended, modified or altered in any manner whatsoever.

vii) To the Knowledge of the Borrowers and the Trusts, none of the insureds under any of the Policies listed in Exhibit "A" and none of the insureds under any of the policies

referred to in Section 15 that is titled or previously titled in the name of a Trust, has died.

b) The Lender represents and warrants to the Borrowers, Trusts and the Guarantors as follows:

i) the Lender is duly formed and validly existing under the laws of the State of Delaware and has full corporate power and authority to carry on its business as currently conducted and to carry on its business on and following the Effective Date. The Lender has all requisite legal and corporate power and authority and all other necessary corporate authorizations, to execute and deliver this Agreement and the Ancillary Documents contemplated by this Agreement, and to carry out and perform its obligations under the terms of such instruments. To the extent to which the Lender is a party, this Agreement and the Ancillary Documents have been duly executed and delivered by the Lender, and constitute the legal, valid and binding obligations of the Lender enforceable against the Lender in accordance with their respective terms. The execution and delivery of this Agreement and the Ancillary Documents by the Lender, do not, and the consummation by the Lender of the transactions contemplated hereby and thereby will not, to their Knowledge, in any material respect: (i) violate any law, rule, regulation, ordinance or order, (ii) conflict with, or result in a breach of or a default under, or give rise to a right of termination or loss of any benefit under the Lender's certificate of formation or operating agreement; or (iii) require the consent, approval or authorization of, or the registration, declaration or filing with any Governmental Entity or any Person.

18) Litigation Matters. For each Policy identified in Section 18, or any Policy where there is litigation or threatened litigation, notwithstanding anything else contained herein, the Lender shall notify the Borrower of the Change Form with the issuing carrier under Section 1 of this Agreement and may, in its sole discretion as to legal, continue to act and the Lender and the Borrower shall discuss how best to proceed with respect to those cases. The Common Interest and Cooperation Agreement between the Lender and the Trust dated June 3, 2010 shall remain in full force and effect and the parties hereby agree to extend the legal rights, duties, and obligations thereunder to any and all litigation involving Penn Mutual and Policies owned by the Trusts. The Lender agrees that the Borrower and Trust will continue to act as lead defendant in the Phoenix policy # 97527951 ($5 million) and policy # 97529560 ($6 million) actions and in the Penn Mutual policy # 21475105 ($8 million) action (the "Penn Mutual Case") provided that the Borrower's counsel, Halloran & Sage and Fox Rothschild, shall continue to cooperate and consult with the Lender's counsel and drafts of all filings and materials are provided to Lender's counsel in advance of filing with sufficient time for Lender's counsel to provide input and comments. Borrower shall be solely responsible for all fees of Halloran & Sage and Fox Rothschild in respect of these litigation matters without contribution by the Lender and Lender shall be responsible for its counsel's fees without contribution from the Borrower. With respect to the Penn Mutual Case the Borrower and the Lender shall discuss how best to defend such action. The Lender's counsel and agreed in this paragraph is being provided without waiving its rights at any time to notify the Borrower that the Lender will take over the lead defense of any of the litigation matters at which point the Borrower and its counsel shall no longer defend such matters and shall cooperate in

19) **Christiana Bank and Blocked Accounts.**

(a) As of the date that the Lender files the last Change Form for a Remainder Policy with the issuing carrier (the "Final Change Date"), this Section 19 shall automatically operate as an amendment of the Blocked Account Control Agreement dated February 12, 2006, by and among Griet Mill, Lender, and Christiana Corporate Services, Inc., as Depository and the Blocked Account Control Agreement dated February 12, 2006, by and among Avon, Lender, and Christiana Corporate Services, Inc., as Depository (collectively, the "Blocked Account Control Agreement") to give full control of the bank accounts that are subject to the Blocked Account Control Agreements solely to Lender. As of the Final Change Date, Borrower and the Trusts shall have no further obligation or liability under the Blocked Account Control Agreement. At such time as Lender decides, in its sole and absolute discretion, to terminate the Blocked Account Control Agreement, any and all remaining monies in the accounts that are subject to the Blocked Account Control Agreement shall be distributed to the Lender. Until such time as the earlier of (i) the Final Change Date, and (ii) the date upon which the Lender decides, in its sole and absolute discretion, to terminate the Blocked Account Control Agreement, all provisions of the Blocked Account Control Agreement shall remain in full force and effect; provided that with respect to any Policy titled in the name of COT but that is not listed on Exhibit "A", the Borrower may establish separate bank accounts and funds relating to such Policies need not flow through the accounts subject to the Blocked Account Control Agreement.

(b) The parties hereby jointly instruct Christiana Corporate Services, Inc. to release and distribute any and all Transaction Documents in its possession to the Escrow Agent pursuant to the terms and provisions of an escrow agreement dated _____ among Ridgewood Finance Inc., Avon Capital, LLC, Griet Mill Capital, LLC and Christiana Corporate Services, Inc. (the "Escrow Agreement") to the Lender. Nothing in this section 19(b) amends or alters the Lender's right under the Escrow Agreement to unilaterally instruct the escrow agent to release the Transaction Documents in accordance with the Escrow Agreement.

(c) On the earlier of (i) the Final Change Date, and (ii) the date upon which the Lender decides, in its sole and absolute discretion, to terminate the appointment of Christiana Bank & Trust ("CB&T") as Insurance trustee ("Insurance Trustee") under the Appointment Agreement dated December 12, 2006 by and between Christiana Bank & Trust, Ridgewood Finance Inc. and consented to by Griet Mill Capital, LLC (the "Appointment Agreement"), the parties agree to terminate CB&T as Insurance Trustee and to take all steps necessary to effect such

termination. Nothing in this section 19(c) amends or alters the Lender's right to unilaterally terminate CB&T as Insurance Trustee in accordance with the Appointment Agreement.

20) **Confidentiality.**

a) Each of the parties hereto hereby acknowledges that they will use their reasonable best efforts not to use, divulge, publish or otherwise reveal, either directly or through another, the contents and provisions of this Agreement or any confidential information or proprietary information obtained with respect to the business of the other parties hereto; provided that this Section 20 shall not apply to any information to the extent that (i) the disclosure by any party is necessary for such party to operate its business in the ordinary course and in particular for the Lender to manage, maintain or otherwise operate the portfolio of Policies in such manner as it sees fit in its sole and absolute discretion, including communications with former participants and insureds with respect to the transfer of the Collateral to the Lender, (ii) the disclosure of such information to a third party is reasonably required in connection with the fulfillment of any party's obligations hereunder and such third party shall enter into an agreement to keep such information confidential, (iii) such information shall become generally known to the public through no violation of this Section 20, (iv) the disclosure of such information is required by applicable law or by a court of competent jurisdiction; or (v) any disclosure to a party's accountants, attorneys, advisors, affiliates, stockholders, members, partners and direct and indirect owners that have a need to know such information; provided that each Party shall advise such persons of the confidential nature of such confidential information and the party shall be responsible for any unauthorized use or disclosure by such persons of any such confidential information. If asked about this Agreement or the terms of settlement, each party shall respond to such inquiry by stating that "the matter has been amicably resolved."

21) **Non-Disparagement.** Each of the parties hereto, on behalf of such party and such party's officers, directors, members, partners, trustees, employees, shareholders, representatives, advisors, agents, affiliates, successors and assigns, agrees not to make any disparaging or deprecating remarks about or concerning any other party or its parent corporations, its subsidiaries, its predecessors, its directors, partners, trustees, agents, consultants, employees, representatives, advisors, customers, suppliers, affiliates and the business, affairs, practices and performance of any of the foregoing or any or do anything which could disparage, undermine or be reasonably interpreted to denigrate the capabilities, performance, integrity or reputation of any such party, whether publicly or privately. Except as otherwise described in Section 20, under no circumstances shall any party discuss the financial affairs of any other party to this Agreement or that financial or other relationship with any other party to this Agreement with any other person or entity.

22) **Remedies.** Each of the parties hereto agrees that the restrictions set forth in this Agreement are reasonable and necessary to protect the other parties hereto. Should any court of competent jurisdiction or other adjudicator of a dispute hereunder find that the restrictions set forth in this Agreement are unenforceable because of their duration, geographic scope or for any other reason, the parties hereto agree that said court or adjudicator shall have the authority to revise and enforce such restriction in accordance with the maximum extent allowed by law.

Each of the parties hereto further agrees that, should such party breach any of the provisions of this Agreement, the non-breaching parties will be irreparably harmed in excess of mere monetary losses and hereby consents to the non-breaching parties obtaining injunctive relief to enforce this Agreement without the necessity to post a bond or other security therefor. Nothing shall be construed as prohibiting any non-breaching party from pursuing or being entitled to any other available redress for such harm or threatened breach including the recovery of damages. In any action or proceeding to enforce the provisions of this Agreement, in addition to any other payments, compensation or awards, the prevailing party shall be entitled to reimbursement of all costs and expenses, including reasonable legal fees, costs and other expenses, incurred in enforcing this Agreement.

23) **Governing Law; Jurisdiction.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed within such state without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the laws of any other jurisdiction other than the State of New York. Any and all disputes between Lender and Borrower arising under or related to this Agreement or the Credit Documents, notwithstanding anything to the contrary contained in the Credit Documents, shall be submitted exclusively to the Superior Court of the State of Connecticut for the Stamford-Norwalk Judicial District in Stamford, Connecticut.

24) **Benefit.** This Agreement shall inure to, and be binding upon, each of the parties hereto, their respective heirs, executors, administrators, and permitted assigns. This Agreement and the terms, conditions, representations, warranties and obligations contained therein, shall not inure to the benefit of any third party for any purpose other than as explicitly set forth in this Agreement.

25) **Amendment.** This Agreement may be amended, modified, waived or superseded only by written instrument executed by all the parties hereto.

26) **Headings.** Headings in this Agreement are for convenience only and shall not be used to interpret or construe its provisions.

27) **Severability.** In the event that any one or more of the provisions of this Agreement shall be for any reason invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability will not affect any other provision of the Agreement and such invalid, illegal or unenforceable provision will be treated as if it had never been contained herein.

28) **Construing Agreement.** The language of all parts of this Agreement shall in all cases be construed as a whole, according to its fair meaning and not strictly for or against any of the parties. The parties acknowledge that each party participated in the drafting of this Agreement, and no presumptions against the drafter of this Agreement exist.

29) **Entire Agreement.** This Agreement represents the final agreement among the Trusts, Borrower and Lender with respect to its subject matter, and may not be contradicted by evidence of prior or contemporaneous oral agreements among the parties. There are no oral

agreements between the parties with respect to the subject matter of this Agreement. The recitals to this Agreement shall be deemed a part hereof.

30) **Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

31) **Authority.** The Parties represent that the individuals signing this Agreement have full authority to enter into this Agreement on behalf of the entities or persons for whom they are signing.

32) **E-mail Notices.** The Parties agree that written notice as required herein shall include electronic mail to: a) in the case of the Lender to case.mgr@bridgewoodfinance.com with a copy to veronica.crammy@caldwell-is.com; and b) in the case of the Borrower and the Trusts to dstlocksmithtin@boulate.com and jrobinson@boulate.com, or such other e-mail addresses as advised by other party from time to time.

[Signature on Next Page]

IN WITNESS WHEREOF, this Agreement has been executed as of the date first written above.

Lender:
RIDGEWOOD FINANCE II LLC

By: _____
Name: Adam Belinsky
Title: Authorized Individual

Borrower:
GRIST MILL CAPITAL, LLC

By: _____
Name: Daniel E. Carpenter
Title: Chairman of Managing Member

AVON CAPITAL, LLC

By: _____
Name: Daniel E. Carpenter
Title: Chairman of Managing Member

CHARTER OAK TRUST

By: _____
Name: Wayne Bursey
Title: Trustee

AVON INSURANCE TRUST

By: _____
Name: Wayne Bursey
Title: Trustee

14

Exhibit A – List of All Policies

| Carrier | Policy Number | Policy Face |
|---|---|---|
| American National (ANICO) | U0581351 | $ 4,000,000 |
| American National (ANICO) | U0583999 | $ 10,000,000 |
| AXA | 157200849 | $ 8,333,333 |
| AXA | 157207141 | $ 10,000,000 |
| AXA | 7307974 | $ 7,500,000 |
| Lincoln National Life | JF-5578759 | $ 7,000,000 |
| Lincoln National Life | JF5573516 | $ 10,000,000 |
| Lincoln National Life | JJ-7006908 | $ 10,000,000 |
| Lincoln National Life | JJ-7006237 | $ 5,000,000 |
| Lincoln National Life | JJ-7008016 | $ 10,000,000 |
| Lincoln National Life | 51-7014955 | $ 5,000,000 |
| Lincoln National Life | JJ-7011826 | $ 7,000,000 |
| Lincoln National Life | JJ-7017837 | $ 2,500,000 |
| Lincoln National Life | JJ-7011616 | $ 4,000,000 |
| Lincoln National Life | JJ-7028562 | $ 9,500,000 |
| Lincoln National Life | JJ7027445 | $ 1,900,000 |
| Lincoln National Life | JJ-7054765 | $ 8,000,000 |
| Lincoln National Life | JJ-7030498 | $ 5,225,000 |
| Lincoln National Life | JJ-7038754 | $ 7,250,000 |
| Lincoln National Life | JJ-7020114 | $ 5,000,000 |
| Lincoln National Life | JJ-7030478 | $ 5,475,000 |
| Lincoln National Life | JJ-7021395 | $ 1,250,000 |
| Lincoln National Life | JJ-7046105 | $ 9,600,000 |
| Lincoln National Life | JJ-7046609 | $ 5,000,000 |
| Lincoln National Life | JJ-7046613 | $ 4,000,000 |
| Lincoln National Life | JJ-7040089 | $ 10,000,000 |
| Lincoln National Life | JJ-7052429 | $ 4,000,000 |
| Lincoln National Life | JJ-7038226 | $ 4,175,000 |
| Lincoln National Life | JJ-7046283 | $ 3,500,000 |
| Lincoln National Life | JJ-7030881 | $ 5,000,000 |
| Med.Life | 207212405USU | $ 800,000 |
| Med.Life | 207240400USU | $ 5,000,000 |
| Med.Life | 207240496USU | $ 6,000,000 |
| Penn Mutual | 8207541 | $ 5,000,000 |
| Penn Mutual | 8209124 | $ 5,000,000 |
| Penn Mutual | 8209251 | $ 5,000,000 |

15

## Exhibit B – Batch A Changes

| Carrier | Policy Number | Policy Face |
|---|---|---|
| American National (ANICO) | U0581151 | $ 4,000,000 |
| American National (ANICO) | U0583990 | $ 10,000,000 |
| AXA | 157200849 | $ 8,333,333 |
| AXA | 157207141 | $ 10,000,000 |
| MetLife | 207212405USU | $ 800,000 |
| MetLife | 207240400USU | $ 5,000,000 |
| MetLife | 207240394USU | $ 6,000,000 |
| Penn Mutual | 8207341 | $ 5,000,000 |
| Penn Mutual | 8209124 | $ 5,000,000 |
| Penn Mutual | 8209251 | $ 5,000,000 |
| Penn Mutual | 8 209 305 | $ 4,000,000 |
| Penn Mutual | 8 214 703 | $ 5,000,000 |
| Phoenix | 97520679 | $ 6,000,000 |
| Phoenix | 97520753 | $ 5,000,000 |
| Phoenix | 97531952 | $ 5,000,000 |
| Phoenix | 97531280 | $ 5,000,000 |
| Phoenix | 97531289 | $ 4,000,000 |
| Phoenix | 97521947 | $ 2,500,000 |
| Phoenix | 97521965 | $ 3,000,000 |
| Phoenix | 97532159 | $ 5,000,000 |
| Phoenix | 97523897 | $ 3,000,000 |
| Phoenix | 97527951 | $ 3,000,000 |
| Phoenix | 97529560 | $ 6,000,000 |
| Phoenix | 97530084 | $ 10,000,000 |
| Sun Life | 20150259 | $ 7,500,000 |
| Transamerica | 65068470 | $ 5,000,000 |

| Carrier | Policy Number | Policy Face |
|---|---|---|
| Penn Mutual | 8 209 305 | $ 4,000,000 |
| Penn Mutual | 8 214 703 | $ 5,000,000 |
| Phoenix | 97520679 | $ 6,000,000 |
| Phoenix | 97530733 | $ 5,000,000 |
| Phoenix | 97531952 | $ 5,000,000 |
| Phoenix | 97531280 | $ 5,000,000 |
| Phoenix | 97531289 | $ 4,000,000 |
| Phoenix | 97521947 | $ 2,500,000 |
| Phoenix | 97521965 | $ 3,000,000 |
| Phoenix | 97532159 | $ 5,000,000 |
| Phoenix | 97525897 | $ 3,000,000 |
| Phoenix | 97527951 | $ 5,000,000 |
| Phoenix | 97529560 | $ 6,000,000 |
| Phoenix | 97530084 | $ 10,000,000 |
| Sun Life | 20150259 | $ 7,500,000 |
| Transamerica | 65068470 | $ 5,000,000 |

Exhibit "B" — Form of Collateral Transfer Agreement

## COLLATERAL TRANSFER AGREEMENT

This COLLATERAL TRANSFER AGREEMENT (the "Agreement") is effective as of [Date], 2010 and is by and among the Trustee (the "Trustee") of the Avon Insurance Trust (the "Trust"), Avon Capital, LLC ("Avon") (hereinafter referred to as the "Borrower"), and Ridgewood Finance II LLC, a Delaware limited liability company (successor in interest to Ridgewood Finance Inc., a Delaware corporation) (the "Lender").

WHEREAS, Lender and Borrower have entered into that certain Line of Credit and Security Agreement on November 22, 2006 as amended by Amended and Restated Line of Credit and Security Agreement dated February 12, 2007 (collectively, the "Credit Agreement" and together with the other documents and instruments executed and delivered in connection therewith, each a "Credit Document" and, collectively, the "Credit Documents"), pursuant to which Lender advanced monies to Borrower in one or more loan transactions (each an "Advance", collectively, the "Advances") for the purpose of providing financing to Borrower to loan sums, pursuant to loan and fee agreements (each an "Assigned Fee Agreement, collectively, "Assigned Fee Agreements") to the Trust;

WHEREAS, the Lender, the Borrower and the Trust entered into a Settlement Agreement dated as of September 30, 2010 (the "Settlement Agreement");

WHEREAS, pursuant to one such Advance, identified as _____ the Borrower loaned money to the Trust secured by that certain life insurance policy issued by _____ (the "Insurance Carrier") as policy insuring the life of _____ in the face amount of $_____ (the "Collateral") which secured repayment of the money borrowed, fees, interest and other liabilities of the Borrower and Trust pursuant to the respective Assigned Fee Agreement and Advance;

WHEREAS, the Trust and the Borrower wish to transfer, convey, and assign to the Lender all of the Trust's and/or Borrower's right, title and interest in and to the Collateral, free and clear of all liens, claims, interests and encumbrances, in full satisfaction of the Assigned Fee Agreement and Advance relative to the Collateral,

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1) **Transfer of Collateral in Satisfaction of Assigned Fee Agreement and Advance relative to the Collateral.** The Trustee hereby voluntarily transfers, conveys, and assigns to the Lender all of the Trust's legal, equitable, beneficial and other right, title and interest in and to the Collateral, and the Trustee and Borrower hereby consent, without any current or future objection of any kind or nature whatsoever, to the Trustee's transfer of and Lender's acceptance of the Collateral. The Trustee and Borrower hereby agree that Borrower shall use its reasonable best efforts to: (i) execute and deliver to the Lender such further instruments and documents, and take such further action, as shall be necessary or desirable to the Lender to accomplish the

18

19

Exhibit "C" — Debt Estimated by Collateral Borrower

| Facility ID | Total Due as of 7/15/10 | Maturity Date | Date of Loan |
|---|---|---|---|
| RWF002244 | $ 357,393.45 | 6/9/2009 | 2/26/2007 |
| RWF002243 | $ 355,597.09 | 9/28/2009 | 6/28/2007 |
| RWF002253 | $ 1,659,454.51 | 10/12/2009 | 6/27/2007 |
| RWF002323 | $ 495,461.89 | 11/2/2009 | 8/22/2007 |
| RWF001856 | $ 288,496.66 | 3/27/2010 | 12/28/2007 |
| | $ 3,054,403.70 | | |

transfer, conveyance and assignment of the Collateral contemplated hereby and all other purposes, transactions and actions contemplated hereby, and (ii) cooperate with the Lender in its efforts, if any, to sell or otherwise dispose of the Collateral (any and all proceeds of which, for the avoidance of doubt, will be the property solely of the Lender and of no other party, notwithstanding any provision of the Credit Documents). The Trust and Borrower hereby waive any and all rights under any collateral disposition agreement between the Trust and/or Borrower and the Lender and/or waive any obligation that the Lender may have to dispose of the Collateral in accordance therewith.

2) **Acceptance of Collateral in Satisfaction of the Assigned Fee Agreement and Advance relative to the Collateral.** The Lender hereby accepts the full execution of this Agreement and the transfer, conveyance and assignment of the Collateral pursuant to Section 1 above in full satisfaction of the Assigned Fee Agreement and Advance relative to the Collateral.

3) **Effect of Transfer and Acceptance of Collateral.** It is hereby acknowledged and agreed that, as of the date hereof, the Trust and/or Borrower shall no longer have any right, title or interest in or to any of the Collateral or the proceeds thereof whatsoever, including, without limitation, any benefits payable thereunder.

4) **Consent.** The Trustee and Borrower hereby covenant that the Trust and Borrower will not include any of the Collateral in any schedules of assets to be filed in connection with any subsequent petition filed by or against it under Title 11 of the United States Code or any similar proceeding under applicable state or federal law.

5) **Amendment and Waiver.** This Agreement may be amended, modified or waived only in a writing signed by the parties hereto.

6) **Settlement Agreement Incorporated Herein.** The Settlement Agreement is expressly incorporated herein and the terms and provisions thereof are expressly made a part hereof. In the event of any contradiction between any term or provision of the Settlement Agreement and this Agreement, such term or provision of the Settlement Agreement shall control in all respects.

[Signatures on Next Page]

20

---

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first written above.

Ridgewood Finance II LLC

By:
Title:

Avon Insurance Trust

By: Wayne Burney, as Trustee of the
Avon Insurance Trust

Avon Capital, LLC

By: Daniel E Carpenter
Name: Daniel E Carpenter
Title: Chairman of Manager's member

21

Exhibit "D-2" – Form of Collateral Transfer Agreement

COLLATERAL TRANSFER AGREEMENT

This COLLATERAL TRANSFER AGREEMENT (the "Agreement") is effective as of [Date] and is by and among the Trustee (the "Trustee") of The Charter Oak Trust (the "Trust"), Grist Mill Capital, LLC ("Grist Mill") (hereinafter referred to as the "Borrower"), and Ridgewood Finance II LLC, a Delaware limited liability company (successor in interest to Ridgewood Finance Inc., a Delaware corporation) (the "Lender").

WHEREAS, Lender and Borrower have entered into that certain Line of Credit and Security Agreement on November 22, 2006 as amended by Amended and Restated Line of Credit and Security Agreement dated February 12, 2007 (collectively, the "Credit Agreement", and together with the other documents and instruments executed and delivered in connection therewith, each a "Credit Document" and, collectively, the "Credit Documents"), pursuant to which Lender advanced monies to Borrower in one or more loan transactions (each an "Advance", collectively, the "Advances") for the purpose of providing financing to Borrower to loan sums, pursuant to loan and fee agreements (each an "Assigned Fee Agreement, collectively, "Assigned Fee Agreements") to the Trust;

WHEREAS, the Lender, the Borrower and the Trust entered into a Settlement Agreement dated as of September 30, 2010 (the "Settlement Agreement");

WHEREAS, pursuant to one such Advance, identified as _____ the Borrower loaned money to the Trust secured by that certain life insurance policy issued by _____ (the "Insurance Carrier") as policy insuring the life of _____ in the face amount of $_____ (the "Collateral") which secured repayment of the money borrowed, fees, interest and other liabilities of the Borrowers and the Trust pursuant to the respective Assigned Fee Agreement and Advance;

WHEREAS, each of the Trust and the Borrower wishes to transfer, convey, and assign to the Lender all of the Trust's and/or Borrower's right, title and interest in and to the Collateral, free and clear of all liens, claims, interests and encumbrances, in full satisfaction of the Assigned Fee Agreement and Advance relative to the Collateral;

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1)  Transfer of Collateral in Satisfaction of Assigned Fee Agreement and Advance relative to the Collateral. The Trustee hereby voluntarily transfers, conveys, and assigns to the Lender all of the Trust's legal, equitable, beneficial and other right, title and interest in and to the Collateral, and the Trustee and Borrower hereby covenant, without any current or future objection of any kind or nature whatsoever, to the Trustee's transfer of and Lender's acceptance of the Collateral. The Trustee and Borrower hereby agree that Borrower shall use its reasonable best efforts to: (i) execute and deliver to the Lender such further instruments and documents, and take such further action, as shall be necessary or desirable to the Lender to accomplish the transfer, conveyance and

22

assignment of the Collateral contemplated hereby and all other purposes, transactions and actions contemplated hereby, and (ii) cooperate with the Lender in its efforts, if any, to sell or otherwise dispose of the Collateral (any and all proceeds of which, for the avoidance of doubt, will be the property solely of the Lender and of no other party, notwithstanding any provision of the Credit Documents). The Trust and Borrower hereby waive any and all rights under any collateral disposition agreement between the Trust and/or Borrower and the Lender and waive any obligation that the Lender may have to dispose of the Collateral in accordance therewith.

2)  Acceptance of Collateral in Satisfaction of the Assigned Fee Agreement and Advance relative to the Collateral. The Lender hereby accepts the full execution of this Agreement and the transfer, conveyance and assignment of the Collateral pursuant to Section 1 above in full satisfaction of the Assigned Fee Agreement and Advance relative to the Collateral.

3)  Effect of Transfer and Acceptance of Collateral. It is hereby acknowledged and agreed that, as of the date hereof, the Trust and/or Borrower shall no longer have any right, title or interest in or to any of the Collateral or the proceeds thereof whatsoever, including, without limitation, any benefits payable thereunder.

4)  Covenant. The Trustee and Borrower hereby covenant that the Trust and Borrower will not include any of the Collateral in any schedules of assets to be filed in connection with any subsequent petition filed by or against it under Title 11 of the United States Code or any similar proceeding under applicable state or federal law.

5)  Amendment and Waiver. This Agreement may be amended, modified or waived only in a writing signed by the parties hereto.

6)  Settlement Agreement Incorporated Herein. The Settlement Agreement is expressly incorporated herein and the terms and provisions thereof are expressly made a part hereof. In the event of any contradiction between any term or provision of the Settlement Agreement and this Agreement, such term or provision of the Settlement Agreement shall control in all respects.

[Signatures on Next Page]

23

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the day and year first written above.

Ridgewood Finance II LLC

By: _____
Title:

Charter Oak Trust

_____
By: Wayne Bursey, as Trustee of the
Charter Oak Trust

Grist Mill Capital, LLC

By: _____
Name: Daniel E. Carpenter
Title: Chairman of managing member

24

---

## Exhibit "B" – Participants to be Terminated or Notified

### Part I - Terminate Now
#### (Past Maturity Date of Loan)

| Carrier | Policy Number | Policy Face |
|---|---|---|
| American National (ANICO) | U0581351 | $ 4,000,000 |
| AXA | 157207141 | $10,000,000 |
| Lincoln National Life | J1-7027596 | $ 1,750,000 |
| Penn Mutual | 8209124 | $ 5,000,000 |
| Phoenix | 97521280 | $ 5,000,000 |
| Phoenix | 97522159 | $ 5,000,000 |
| Phoenix | 97521959 | $ 3,000,000 |
| Phoenix | 97530084 | $10,000,000 |

### Part II - Loan current

| Carrier | Policy Number | Policy Face |
|---|---|---|
| Lincoln National Life | J1-7053429 | $ 4,000,000 |
| Lincoln National Life | J1-7058276 | $ 4,175,000 |
| Lincoln National Life | J1-7048283 | $ 3,500,000 |
| Lincoln National Life | J1-7058081 | $ 5,000,000 |

25

Exhibit "J"
Co-Pay Schedule for ANICO POLICY # U0583590 and Related Due Dates

| AVON Capital, LLC Due Date | AVON Capital, LLC Co-Pay Amount |
|---|---|
| 10/1/010 | $ 46,475.00 |
| 01/1/011 | $ 46,475.00 |
| 04/1/011 | $ 46,475.00 |
| 07/1/011 | $ 46,475.00 |
| 10/1/011 | $ 46,475.00 |
| 01/1/012 | $ 46,475.00 |
| 04/1/012 | $ 46,475.00 |
| 07/1/012 | $ 46,475.00 |
| 10/1/012 | $ 46,475.00 |
| 01/1/013 | $ 46,475.00 |
| 04/1/013 | $ 46,475.00 |
| 07/1/013 | $ 46,475.00 |
| 10/1/013 | $ 46,475.00 |
| 01/1/014 | $ 46,475.00 |
| 04/1/014 | $ 46,475.00 |
| 07/1/014 | $ 46,475.00 |
| 10/1/014 | $ 46,475.00 |

28