# EXHIBIT 7

[Page 1]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

CASE NO. 11-1590-LTS-HBP


  UNIVERSITAS EDUCATION, LLC

            Plaintiff,


          vs.


NOVA GROUP, INC., as trustee,

sponsor and fiduciary of the

CHARTER OAK TRUST WELFARE

BENEFIT PLAN,

            Defendant.


          April 17, 2013

          10:00 a.m.

          DEPOSITION OF DANIEL E. CARPENTER


REPORTED BY:

MARY G. VAN DINA, Certified Court Reporter,

Certified LiveNote Reporter.

1              Daniel Carpenter 4/17/13

2    I correct that it's your position that the money

3    for the purchase of the Rhode Island property did

4    not originate with Grist Mill Capital?

5         A.   Yes, it did not originate with Grist

6    Mill Capital.

7              The money came from Phoenix Capital to

8    Grist Mill Holdings and then from Grist Mill

9    Holdings, it went to Hanover, and then from

10   Hanover over to Moonstone.

11        Q.   What is the business of Grist Mill

12   Capital, LLC?

13        A.   Grist Mill Capital is just in the

14   business of investing in life insurance policies.

15        Q.   What's the business of Grist Mill

16   Holdings, LLC?

17        A.   Grist Mill Holdings is my alter ego

18   for collecting commissions.

19        Q.   And what is the business, to the

20   extent you haven't already told me, of Hanover

21   Trust Company?

22        A.   Just to handle various assets.  That's

23   it.

24        Q.   Have you ever accessed the cash value

25   of any of the insurance policies held by Hanover

[Page 75]

1                     Daniel Carpenter 4/17/13

2           A.   No, it was a split-dollar arrangement.

3    Every one of the policies that was purchased

4    through the Charter Oak Trust had a split-dollar

5    arrangement, collateral assignment agreement, so

6    there was nothing with Nova Group, Inc.  It was

7    directly with Charter Oak Trust.  So every single

8    one of the policies would have had a split-dollar

9    arrangement with Grist Mill Capital.

10          Q.   Was there a loan agreement at any

11   point in time between Grist Mill Capital and the

12   Charter Oak Trust?

13          A.   No.

14          Q.   Now, Herrick, Feinstein is a law firm.

15   Correct?

16          A.   Yes.

17          Q.   They're identified on the first page

18   of Moonstone 4?

19          A.   Yes.

20          Q.   And I think you testified that they

21   represented Ridgewood Capital and the Ridgewood

22   entities?

23          A.   Correct.

24          Q.   Now, who represented Nova Group, Inc.

25   in the transaction set forth on Moonstone 4?

1                  Daniel Carpenter 4/17/13

2        A.   I don't remember.  I don't know if

3   anybody represented -- Nova Group, Inc. was the

4   shell corp. that acted as the sponsor of the

5   Charter Oak Trust.

6        Q.   And to the best you can recall, in

7   connection with the transaction set forth in

8   Moonstone 4, you're not aware of anyone

9   representing Nova Group, Inc.'s interest?

10       A.   I have no knowledge of who was

11   representing Nova Group, Inc., and I know that

12   Halloran & Sage was definitely representing Grist

13   Mill Capital, and I don't know if there would

14   have been a conflict, so I'm going to guess that

15   Halloran & Sage would not have represented Nova

16   Group, Inc., because there's an inherent conflict

17   between Grist Mill Capital being the creditor and

18   Nova Group representing the Charter Oak Trust as

19   the debtor.

20       Q.   Right.

21       A.   So I don't know who would have

22   represented Nova Group at all.

23       Q.   And if I asked the question a little

24   differently, would you answer me the same?

25                  Was anyone representing Charter Oak

[Page 122]

Daniel Carpenter 4/17/13

1

2      A.    If I didn't ask them to do it, I don't

3  think they would do it for me.  So I'd say, no,

4  I've never had anybody backdate a document for

5  me.  I've never asked anyone to do it, and I

6  don't believe anybody has ever backdated a

7  document for me.

8      Q.    At the time this document was signed

9  in October 2010 -- I think it's fair to say that

10  it was signed in October 2010.  Correct?

11      A.    Once again, I believe that -- I

12  believe that the reason we did this document at

13  the same time was that there was another

14  transaction involving one of our affiliates named

15  Richard Belding, and we basically said, hey,

16  we're doing this loan between Carpenter Financial

17  Group and Richard Belding, let's document the

18  loan between Hanover and Moonstone.

19          So I realized that the Moonstone

20  transaction was done in 2009, but the genesis of

21  this document was we were doing another mortgage

22  for Rich Belding and that's why I believe we

23  created this document, and Bob Cox created both

24  mortgages.

25      Q.    This gentleman, Mr. Belding, he has

1          Daniel Carpenter 4/17/13

2   nothing whatsoever to do with Moonstone Partners,

3   LLC.  Correct?

4          A.    Correct.

5          Q.    Why didn't Phoenix Capital Management

6   loan the money directly to Moonstone?

7          A.    Phoenix Capital Management put the

8   money into Grist Mill Holdings, but certainly --

9   certainly, we could have lent money directly

10  to -- Phoenix Capital Management could have

11  directly lent money to Moonstone, but we didn't

12  do it that way, so...

13         Q.    Why not?

14         A.    I don't know.  You know, in other

15  words, I could have borrowed money out of my

16  insurance policies and financed the purchase of

17  Moonstone, but we didn't do it that way either.

18         Q.    That would require you to go to the

19  insurance carriers to tap into your cash value.

20  Correct?

21         A.    Correct, but I've done that before to

22  buy other businesses.  In other words, why we

23  decided to do one transaction rather than

24  another, but the reason for using Hanover Trust

25  is to make sure that someone wouldn't be coming

[Page 124]

1                    Daniel Carpenter 4/17/13

2      after the Moonstone property.

3                So Phoenix Capital Management had

4      cash.  Hanover didn't have any cash.  So when you

5      ask the question of why didn't you just have

6      Phoenix Capital lend money directly to Moonstone,

7      I would say it was my fear that someone would

8      say, you know, it's all Dan Carpenter, and the

9      reason for doing this transaction in the first

10     place was to make sure that the Boston exchangers

11     wouldn't go after the Moonstone property because

12     under the theory that Dan Carpenter owns and

13     controls everything.

14                So there's no question that Phoenix

15     Capital Management is owned and controlled by

16     Carpenter Financial Group, and if they're going

17     after independent entities that have absolutely

18     nothing to do with Daniel Carpenter, then clearly

19     they would go after a transaction where it's

20     Carpenter Financial Group that owns 99 percent of

21     Phoenix.

22                So the whole reason behind the

23     security agreement and the whole reason behind

24     Hanover Trust is to protect Moonstone from the

25     Boston exchangers.

1           Daniel Carpenter 4/17/13

2       Q.    You mentioned someone by the name of

3    --

4           MR. SIANO:   Ms. Colbath, you're over

5       your three hours.   May I have some sense as

6       to when you intend to finish?

7           MR. BARNETT:   I don't think we're over

8       our three hours.

9           MR. SIANO:   Well, that's nice of you,

10   Mr. Barnett.

11          MS. COLBATH:   What calculation do you

12      have?

13          MR. SIANO:   It's five minutes after

14      1:00 and we started at 10:00 exactly.

15          MR. BARNETT:   There have been several

16      breaks.

17          MS. COLBATH:   You took a break to

18      speak to your client.

19          MR. SIANO:   Right.   That took two

20      minutes.   I have it on my watch.

21          MS. COLBATH:   We have been keeping

22      time of our breaks.

23          MR. SIANO:   Well, that's good.

24   Mr. Barnett keeps time for you, and I keep

25      time for me, and we have a disagreement.

[Page 126]

                    Daniel Carpenter 4/17/13

1

2              MS. COLBATH:  We can ask the court

3       reporter.

4              We can calculate when we were off on

5       break.  I have about ten more minutes,

6       probably not even.

7              MR. SIANO:  Why don't you take five.

8              MS. COLBATH:  Let me ask one more

9       question before we take the break.

10             MR. BARNETT:  By my count, there's 24

11      minutes.

12             MR. SIANO:  There isn't 24 minutes,

13      and if you think I'm staying for 24 minutes,

14      you can take it up with the judge.  There

15      isn't 24 minutes.  Take five, and after

16      five --

17             MS. COLBATH:  Let me ask the question

18      first, the we can take five.

19             MR. SIANO:  No, no, we can take five

20      --

21   BY MS. COLBATH:

22      Q.    So the court reporter has a name of

23   someone.

24             You keep referring to Belding?

25      A.    Rich Belding, yes, B-E-L-D-I-N-G, and

```
 1                    Daniel Carpenter 4/17/13
 2     Richard Belding was an insurance broker that did
 3     a lot of work with us.
 4          Q.   Your recollection is that you were
 5     papering a transaction with him and that's why
 6     you did prepare what we marked as Moonstone 15.
 7     Correct?
 8          A.   Correct, so Rich Belding was buying a
 9     house in Canton.
10               I, through Carpenter Financial Group,
11     lent him over 150,000 to purchase that house, and
12     Bob Cox suggested that we do a mortgage
13     instrument for him to secure Carpenter Financial
14     Group, and that was the hey, you know, if we're
15     doing this on the Belding transaction, let's do
16     this on the Moonstone transaction as well.
17          Q.   And Carpenter Financial Group, as I
18     understand it, had the money for both of those
19     transactions.
20               Right?
21          A.   Carpenter Financial Group is a very
22     substantial company that has a lot of money.
23          Q.   Was Carpenter Financial Group the
24     lender in the Belding transaction?
25          A.   Yes.
```